IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

_____

HECTOR RIVAS,

                    Petitioner,

                                        Civ. Action No.
                                        9:01-CV-1891 (GLS/DEP)

        vs.

BRIAN FISCHER, Superintendent, Sing
Sing Correctional Facility,

                    Respondent.

_____

APPEARANCES:                    OF COUNSEL:

FOR PETITIONER:

ZIMMER LAW OFFICE PLLC          KIMBERLY M. ZIMMER, ESQ.
333 East Onondaga St.
Monroe Bldg., Suite 301
Syracuse, NY  13202


FOR RESPONDENT:

HON. ANDREW M. CUOMO            PRISCILLA I. STEWARD, ESQ.
Attorney General of the        LEA L. La FERLITA, ESQ.
State of New York              Assistant Attorneys General
Office of the Attorney General
120 Broadway
New York, NY  10271

DAVID E. PEEBLES
U.S. MAGISTRATE JUDGE

## REPORT AND RECOMMENDATION

Petitioner Hector Rivas, a New York State prison inmate as a result of a 1993 murder conviction, has commenced this proceeding seeking federal habeas relief pursuant to 28 U.S.C. § 2254. In his petition, as amended, Rivas argues that newly discovered evidence casts doubt upon the trial testimony of a key prosecution witness, and additionally that the District Attorney failed to provide his counsel with certain exculpatory materials prior to or during the course of the trial.

In a decision issued earlier in the matter, the court found Rivas' petition to be time-barred and, accordingly, ordered it dismissed on that procedural basis without reaching the merits of petitioner's habeas claims. That determination regarding timeliness was reversed on appeal, however, and the matter was remanded with instructions that the court conduct an evidentiary hearing in order to assess whether, through the exercise of due diligence, petitioner could have discovered the evidence forming the underpinnings of his claims more than one year prior to filing of the petition, excluding applicable tolling periods, and if not whether petitioner has nonetheless established a credible claim of actual innocence.

2

Having now conducted the prescribed evidentiary hearing, at the direction of the assigned district judge, and based upon the findings that follow, I conclude that petitioner has established neither that he did not and could not have discovered the evidence serving as the factual predicate for his claims, through the exercise of due diligence, more than one year before his petition was filed, excluding any intervening tolling periods, nor a colorable claim of actual innocence, and therefore recommend that his petition be dismissed on that basis without reaching the merits of his habeas claims.

I.      BACKGROUND

A.      Facts Underlying Petitioner's Conviction

Petitioner's conviction stems from the 1987 murder of Valerie Hill, a woman who at the time lived alone on the bottom floor of a two-story rented home in Eastwood, New York.   *See* Transcript of the Trial of Hector Rivas (3/17/93) ("Trial Tr.") at 89-91.  Petitioner was an acquaintance of the victim, having dated her beginning in the summer of 1986.  *Id.* at 92-93.

In January of 1987 the victim informed her father, Randall Hill, that she no longer desired to continue her relationship with Rivas.  Trial Tr. at

3

94. According to the testimony at trial, the relationship between the two ended on or about January 26, 1987.[1]  *Id.* at 766.

At approximately 7:00 p.m. on Friday, March 27, 1987, Valerie Hill arrived at a local restaurant late for a planned dinner with her father, appearing to be upset.  Trial Tr. at 97-98.  During the course of that encounter Ms. Hill informed her father that over the coming weekend she would be out of town visiting a friend, and that she did not intend to return to her Eastwood home until Sunday evening.  *Id.* at 98-99.  Randall Hill attempted on several occasions to telephone his daughter after the time of her scheduled return on Sunday, but without receiving an answer.  *Id.* at 99.

The following day, after learning that his daughter had not reported for work at a nearby hospital, Randall Hill became concerned for his daughter's safety.  *Id.* at 100-01.  Mr. Hill drove to her apartment in Eastwood at approximately 11:45 a.m. on Monday, March 30, 1997 and, after seeing her car parked in the driveway, entered her home and eventually discovered the lifeless body of his daughter lying face down in

---

[1]     This is consistent with testimony given by the petitioner during the recent evidentiary hearing, in which he stated that the relationship ended around the time of the 1987 Super Bowl.  *See* Transcript of Evidentiary Hearing (Dkt. Nos. 60, 61) ("Hearing Tr.") at 291.

her living room, naked below the waist and with the robe she was wearing raised up around her shoulders.[2]  *Id.* at 101-03.  Upon closer inspection of the body, Hill realized that the belt of the robe she was wearing had been tied tightly around her neck.  Trial Tr. at 157.

The evidence adduced at trial revealed that although their relationship ended in January of 1987, Rivas attempted to contact the victim on almost a daily basis from that time through March of 1987.  Trial Tr. at 767.  The proof also established that Rivas entered Hill's home at times when she was not present, and attempted to join her when she was out with her friends, to the visible dismay of the victim.  *Id.* at 739-44, 769-70.

Among those assigned to investigate the Hill murder in March of 1987 was John D. Brennan, a Syracuse City Police Officer.  Trial Tr. at 227, 235.  Officer Brennan went to the home of the petitioner, whom authorities learned had been a recent boyfriend of the victim.  *Id.* at 235.  Rivas thereafter agreed to accompany Officer Brennan to the police station to provide law enforcement agents with background information

---

[2]      At the time he entered the victim's home, Randall Hill noticed that the door to her apartment was unlocked.  Trial Tr. at 102.  It was later developed during the course of the trial that Rivas apparently possessed a key to Hill's home.  *Id.* at 769-70.

concerning the victim.[3]  *Id.* at  235-39.  During the course of that meeting

Rivas acknowledged that at approximately 2:00 p.m. on Friday, March 27,

1987 he drove to Hill's home in his red van, but left shortly thereafter when

she did not answer the door.  *Id.* at 240-41.  Rivas stated that he next

returned to the victim's home at approximately 6:00 p.m. on that same

day, but again departed when she did not answer the door.  *Id.* at 241.

Rivas stated that he then joined some of his friends at a local tavern,

where he remained until 11:00 p.m.  *Id.* at 242.

On the evening of Saturday, March 28, 1987 Elizabeth Lewis, a

close friend of the victim, went to a party being held at a restaurant

located in Cazenovia, New York.  Trial Tr. at 777.  After entering the

establishment Lewis and her husband were approached by the petitioner,

who stated that "[i]t's too bad Valerie's not feeling well, that she can't be

here tonight."  *Id.* at 780.  At the time the comment struck Lewis as odd,

since she was aware of Hill's plans to be out of town for the weekend.  *Id.*

Lewis and Rivas subsequently engaged in a conversation during which

Lewis asked the petitioner to "leave Hill alone", noting her awareness that

Hill had made it clear to Rivas the two should no longer date.  *Id.* at 782.

---

[3]        Since Rivas was not yet a suspect in the homicide, he was not advised of
his constitutional rights at the time of this initial questioning.  Trial Tr. at 239.

Lewis also observed that later that night, when petitioner was alone with her, "a lot of what [Rivas] said [about Hill] was in the past tense" despite the fact that he did not appear to have accepted the fact that their relationship had ended.  *Id.* at 797-99.

The evidence at trial also revealed that one or two weeks after the murder Joseph Fields, an acquaintance of Rivas, encountered him at a bar in Cazenovia.  Trial Tr. at 814-16.  At one point during that evening Rivas, who had been drinking for a period of time, began crying about what had happened to Hill and exclaimed "Valerie, Valerie, I didn't mean to do it."[4]  *Id.* at 816-17.

On March 30, 1987 law enforcement agents obtained a warrant authorizing a search of Rivas' apartment.[5]  Trial Tr. at 270.  During the course of executing that warrant, they discovered a freshly laundered jacket draped over a clothesline in petitioner's basement.  *Id.* at 274-75. Officers also observed two religious-type candles burning inside a closet

---

[4]     On cross examination Fields testified that he was "absolutely positive" Rivas uttered those exact words on that evening.  Trial Tr. at 822.

[5]     The application for that warrant included reference to preliminary estimates by Dr. Erik Mitchell, who at the time served as the Onondaga County Medical Examiner, as to the victim's time of death, *see* Hearing Exh. P-127, and forms the principal basis for petitioner's argument that the medical examiner later altered his opinion regarding that issue.

near a large statue of the Virgin Mary, against which a photograph of Valerie Hill had been placed.  *Id.* at 272-73.

B.    State Court Proceedings

After a significant hiatus following the murder, petitioner was indicted in 1992 by an Onondaga County grand jury and charged with two counts of second degree murder.[6]  *See* Indictment No. 92-114-1.  A jury trial in connection with those charges was conducted commencing on March 17, 1993, with former (and now-deceased) Onondaga County Court Judge J. Kevin Mulroy presiding.  At the conclusion of that trial, at which he chose not to testify, Rivas was found guilty of the intentional murder of Hill.  Trial Tr. at 1198-1201.  As a result of that verdict Rivas was sentenced on May 13, 1993 to an indeterminate term of imprisonment of between twenty-five years and life.  *See* Sentencing Transcript (5/12/93) at 26.

Rivas appealed his conviction to the New York State Supreme Court Appellate Division, Fourth Judicial Department.  In support of that appeal petitioner raised several issues, arguing that 1) papers seized during the search of his apartment should have been suppressed by the trial court;

---

[6]    The indictment accusing petitioner of murder is undated.

8

2) evidence of his statements and comments concerning his silence during questioning by law enforcement agents should have been excluded; 3) he was deprived of a fair trial as a result of untimely disclosure of *Brady*[7] materials; 4) evidence of petitioner's prior bad acts was improperly admitted to rebut proof offered by him at trial of his good character; and 5) the verdict was against the weight of the evidence.

On April 28, 1995, the Fourth Department issued a decision unanimously affirming petitioner's judgment of conviction.  *People v. Rivas*, 214 A.D.2d 996, 626 N.Y.S.2d 640 (4th Dep't 1995).  In its decision, the Appellate Division initially agreed with petitioner that papers were unlawfully retrieved from his apartment, in violation of his Fourth Amendment rights.  The court concluded, however, that admission of that evidence at trial was harmless, noting that "[p]roof of guilt, though mainly circumstantial, was overwhelming and there is no reasonable possibility that admission of the [evidence] contributed to defendant's conviction."  *Rivas*, 214 A.D.2d at 996, 626 N.Y.S.2d 640 (citations omitted).  Rivas' appellate claims regarding suppression of his statements, the production of *Brady* material, proof of prior bad acts and weight of the evidence were

---

[7]    *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194 (1963).

9

all rejected by the Appellate Division on the merits.  *Rivas*, 214 A.D.2d at 996-97, 626 N.Y.S.2d 640.  Petitioner's application for leave to appeal the judgment of conviction further to the New York Court of Appeals was denied on August 15, 1995.  *People v. Rivas*, 86 N.Y.2d 801, 632 N.Y.S.2d 514 (1995) (table).

In addition to his direct appeal, petitioner commenced other state court proceedings collaterally challenging his conviction.  An application filed by petitioner with the Fourth Department seeking a writ of error *coram nobis* was denied on September 27, 1996.  *People v. Rivas,* 231 A.D.2d 971, 646 N.Y.S.2d 648 (4th Dep't 1996).  On July 12, 1999, assisted by counsel, Rivas filed a motion to vacate his judgment of conviction pursuant to N.Y. Criminal Procedure Law ("CPL") § 440.10 ("440.10 Motion").  In that application Rivas argued that he was entitled to a new trial because 1) the trial judge had engaged in misconduct during the trial and wrongfully failed to recuse himself from presiding over that proceeding based upon what petitioner characterized as a close personal relationship between the judge and the prosecuting attorney; 2) the Onondaga County medical examiner relied upon flawed scientific methods to expand his original estimate of the possible time of the victim's death,

offering false and misleading testimony at trial concerning that issue; 3) the practices followed by the employees of the medical examiner's office rendered findings from that agency suspect; 4) the prosecution failed to provide petitioner's counsel with *Brady* materials; and 5) Rivas received ineffective assistance of counsel at trial.  *See* 440.10 Motion.

On April 7, 2000, Acting Onondaga County Supreme Court Justice John J. Brunetti conducted an evidentiary hearing in connection with petitioner's 440.10 motion.  *See* Transcript of Evidentiary Hearing (4/7/00) ("440.10 Tr.") (admitted as Hearing Exh. P-110).  After hearing the evidence presented, Judge Brunetti addressed the issues presented in two stages.  Petitioner's arguments regarding the failure of prosecuting authorities to provide *Brady* materials, and the portion of his ineffective assistance of counsel argument predicated upon the claim that he was not properly advised by counsel concerning his right to testify during the course of his criminal trial, were both denied by oral decision rendered on April 7, 2000, based upon petitioner's failure to meet his burden of persuasion with regard to those two issues.  440.10 Tr. at 135-41.  The remaining claims were taken under advisement at the close of the hearing.

Judge Brunetti disposed of those open issues in a written decision issued by him on September 8, 2000 ("440.10 Decision") (admitted as Hearing Exh. P-114).  In his written decision, after lamenting that the matter could easily have been clarified through cross-examination by petitioner's attorney, if familiar with the medical examiner's file, Judge Brunetti held the fact that no slides of the victim's brain exist did not qualify as newly discovered evidence since it could have been discovered at trial.  440.10 Decision at 7.  Judge Brunetti went on to note that the lack of brain slides did not establish that the medical examiner's trial testimony was false, noting it was plausible that in giving testimony regarding having reviewed brain slides, the medical examiner was referring to photographic slides of the victim's brain, which did in fact exist.  *Id.* at 7-9.

Judge Brunetti next addressed the existence of a report from Dr. George Collins, showing that he had examined the victim's brain after "fixation", concluding first that Rivas failed to prove the report was not among the materials supplied to his counsel prior to trial.  440.10 Decision at 9-10.  Judge Brunetti went on to find that in any event it did not negate the medical examiner's claim to have independently examined the brain during the course of his autopsy, and further that the "evidence" was not

12

of such character as to have caused the verdict to be more favorable to Rivas, if presented at trial.  *Id.* at 9-12.

Turning to the investigation of the medical examiner's office, Judge Brunetti concluded that the existence of that ongoing investigation was widely publicized prior to the time of petitioner's trial, and thus could have been discovered by petitioner's counsel with due diligence, adding that in any event nothing resulting from that investigation in any way  undermined the reliability of the medical examiner's autopsy and trial testimony. 440.10 Decision at 12-14.

Addressing petitioner's claim that he was denied a fair trial, Judge Brunetti concluded that Rivas failed to satisfy his burden of proving that there was an off-the-record conversation that deprived him of a fair trial, additionally noting that the Fourth Department had rejected his denial of a fair trial claim on direct appeal.  440.10 Decision at 15-19.  Judge Brunetti further observed that the alleged friendship between the trial judge and the prosecuting attorney, in the absence of any evidence of preferential treatment toward the prosecution, did not provide any basis for recusal, nor did it inexorably lead to the conclusion that Rivas was denied a fair trial.  *Id.* at 19-21.

Judge Brunetti next addressed petitioner's claim that he received ineffective assistance from his counsel at trial.  After noting that the Fourth Department had rejected the claim on direct appeal, Judge Brunetti concluded that the trial strategy developed by counsel was "objectively reasonable" and "executed in a reasonably competent manner."  440.10 Decision at 34.  Based upon Judge Brunetti's oral and written findings, petitioner's section 440.10 motion to vacate his conviction was denied.  *Id.* 36.  Petitioner's request for review of that determination was denied by the Fourth Department on February 15, 2001.  *See* Dkt. No. 17, Exh. 14.

C.    Evidentiary Hearing Before This Court[8]

An evidentiary hearing was conducted in this matter on September 21 and 22, 2009.  *See* Transcript of Evidentiary Hearing (9/21-22/09) (Dkt. Nos. 60, 61) (collectively, "Hearing Tr.").  The focus of that hearing was upon the timeliness of Rivas' petition to this court, and specifically whether the "new evidence" upon which certain of his claims are grounded was or could have been discovered, through the exercise of due diligence, prior to May 8, 1999, in which case his one year statute of limitations for seeking federal habeas intervention would have expired by the time his

---

[8]    The following constitutes my recommended findings based upon the evidence adduced at the evidentiary hearing.

14

petition was filed.  The court was also tasked with making a determination

as to whether, in the event of a finding that the petition was untimely,

petitioner has established a credible claim of actual innocence.

During the course of the hearing petitioner testified on his own

behalf, additionally eliciting testimony from Dr. Cyril Wecht, a lawyer,

physician and pathologist; Anna Nieves, the petitioner's sister; and H.

Mitchell Schuman, Esq. and Sally Wasserman, Esq., two attorneys

representing Rivas in the course of his section 440.10 motion and

proceedings before this court.  Respondent did not present any witnesses

at the hearing.

Among the "new evidence" cited by petitioner's counsel in support of

his contention that the untimeliness of his petition should be excused are

affidavits given on June 7, 1999 by Dr. Wecht and Rivas' trial counsel,

Richard Calle.[9]  At the heart of Dr. Wecht's affidavit is his opinion that the

---

[9]      In his petition, as amended, Rivas describes the newly discovered
evidence upon which is habeas petition is grounded as including 1) allegedly false
testimony at the time of trial from medical examiner Dr. Erik K. Mitchell regarding time
of death; 2) the fact that Dr. Mitchell was under investigation at the time his testimony
was given; and 3) *Brady* material not supplied to the petitioner or his attorneys until
obtained through efforts following his conviction.

In a letter to Dr. Wecht, Attorney Schuman described the "newly
discovered evidence" in the case to include "the discovery that Dr. Mitchell was
involved in a high degree of irregular, unethical, and perhaps illegal conduct while he
was the chief medical examiner."  Hearing Exh. P-61.  Attorney Schuman went on to

available scientific evidence does not support the medical examiner's estimate regarding the time of the victim's death.  Attorney Calle's affidavit speaks principally to the contention that exculpatory materials which were acquired by Rivas after the trial were withheld from him by the prosecutor.

Much of the hearing testimony focused upon efforts by the petitioner and various other individuals working on his behalf to acquire documents and information concerning his prosecution and the investigation leading up to his indictment for Valerie Hill's murder, in order to provide support for the Wecht and Calle affidavits.  Those efforts centered upon three issues, including 1) the examination of the victim's body, both at the crime scene and during a later autopsy, including whether brain slides were prepared and preserved in the case, and whether the medical examiner actually examined the victim's brain, as bearing upon Dr. Mitchell's estimation as to the time of her death; 2) an ongoing investigation into practices of the medical examiner's office; and 3) potential *Brady* materials, including records of the Syracuse Police Department and other

_____

note that "[p]erhaps more importantly, it has been newly discovered that Dr. Mitchell could not have, in fact, examined brain slides to form or change his opinion regarding the time of death because according to the records of the medical examiner's office, brain slides do not exist and were never prepared in this case", adding the assertion that the brain examination was conducted by Dr. Collins, rather than Dr. Mitchell.  *Id.*

agencies regarding the investigation into the murder and the identity of possible suspects other than Rivas.

### 1. Records Of Medical Examiner Office Investigation

Endeavors to secure records concerning the ongoing investigation into the practices of the medical examiner's office included a request on December 22, 1997 under the New York Freedom of Information Law ("FOIL"), N.Y. Public Officers Law Art. 6, by Attorney Sally Wasserman to the Onondaga County Public Information Officer for information regarding the medical examiner's office.  Hearing Exh. P-191.  That request initially precipitated the production of a press release issued on March 23, 1998 by Onondaga County District Attorney William Fitzpatrick, Esq. concerning his investigation of that agency.  Hearing Exh. P-36.  After follow-up by petitioner and his counsel, on August 5, 1998 information regarding disposition of the investigation and potential claims against Mitchell was produced to the petitioner.  Hearing Exh. P-74.

### 2. Medical Records

Efforts on petitioner's behalf to secure records from the medical examiner's office included a request for the medical file on August 20, 1997, Hearing Exh. P-13, and ultimately led to the issuance on February

4, 1998 of a state court order directing the production of the medical examiner's records pertaining to the Hill murder.  Hearing Exh. P-31. Those records were subsequently provided to the petitioner on March 24, 1998; included within the materials disclosed was the autopsy report, which included a report of Dr. Collins' inspection of the victim's brain, and an initial report reflecting that it appeared initially that the victim had been dead for between two and three days when the body was discovered on Monday, March 30, 1987.  Hearing Exh. P-37.  Upon further inquiry, the medical examiner's office confirmed to petitioner's counsel that there were no consultative reports concerning the autopsy of Valerie Hill's body other than that of Dr. Collins already produced.  Hearing Exh. P-190.

Once available information as to the medical examiner's actions regarding the Hill murder was gathered by attorneys working on petitioner's behalf it was forwarded to Dr. Wecht on June 11, 1998, with a request that he provide an opinion concerning the medical examiner's opinions and work product.[10]  Hearing Exh. P-61.  After reviewing the

---

[10]     Dr. Wecht was initially approached by the petitioner on May 30, 1996 with a request for his assistance.  Hearing Exh. P-7.  Dr. Wecht responded that he would need to be contacted and engaged by an attorney representing the petitioner. Hearing Exh. P-8.  There does not appear to have been any further communication between petitioner and his representatives on one hand, and Dr. Wecht on the other, until the June 11, 1998 letter from Attorney Schuman.  Hearing Exh. P-61.

materials, Dr. Wecht rendered a report on September 10, 1998, setting forth his findings.  Hearing Exh. P-77.  Those findings were ultimately incorporated, without further intervening exchange, into an affidavit given by Dr. Wecht on June 11, 1999.  Hearing Exh. P-93.  Significantly, no explanation has been offered during the course of this proceeding for the year long delay in preparing the Wecht Affidavit following the issuance of his report.

### 3.   *Brady* Materials

Petitioner's attempts to obtain copies of all of the investigative file materials generated by the Syracuse Police Department and other agencies, and to reconstruct any *Brady* and *Rosario*[11] materials provided to his counsel at the time of trial, were initiated in August of 1996 by the petitioner, and resulted in the production of 387 pages on September 21, 1998, *see* Hearing Exh. P-80, with an additional installment two months later, Hearing Exh. P-85, and the further disclosure of 407 pages in September of 1999.  In a letter dated March 23, 1998 from one of the attorneys working on Rivas' behalf, Sally Wasserman, Esq., to a representative of the Onondaga County District Attorney, it was noted that

---

[11]     *People v. Rosario*, 9 N.Y.2d 286, 213 N.Y.S. 2d 448 (1961).

in light of the inability to make contact with Rivas' trial attorney he was not necessarily seeking new records, but instead was asking "that the packet of *Rosario* materials turned over to Mr. Calle at trial be duplicated and provided [to counsel]." *See* Hearing Exh. P-35.  Senior Onondaga County District Attorney James P. Maxwell, Esq. wrote that all of the *Rosario* materials relevant to petitioner's prosecution were provided to his defense counsel prior to trial.  Hearing Exh. P-193.   In response Attorney Wasserman, acting on behalf of Rivas, wrote back to the office of the Onondaga County District Attorney requesting that "the entire *Rosario* package disclosed to trial counsel" be reproduced and provided to her pursuant to the FOIL.  Hearing Exh. P-194.

The four hundred seven pages produced by law enforcement officials to the petitioner in September of 1999, after the May 8, 1999 critical date, have been offered and received in evidence.  *See*  Hearing Exh P-104.  The three hundred eighty seven pages received by petitioner on September 21, 1998, however, have not been supplied.  *See* Hearing Exh. P-80.  And, while Rivas testified during the recent evidentiary hearing that the four hundred seven pages of documents received contained materials not provided to his counsel at the time of trial, he did not

elaborate by identifying which of those materials were new to him.

Hearing Tr. at 287.  The court is therefore unable to ascertain the extent

to which the later produced materials duplicate those received earlier, and

in particular whether the alleged *Brady* materials were among the three

hundred eighty seven pages provided in September of 1998, prior to the

critical date.  Petitioner contends that it was the receipt of the last

installment in September of 1999, coupled with the need to locate

petitioner's trial counsel in order to determine whether those documents

were provided to him at or prior to the time of trial, that prompted the delay

in bringing this proceeding and should result in his being excused from the

governing one-year statute of limitations.

At the hearing, petitioner's witnesses described the efforts made to

locate Rivas' trial counsel, Richard Calle.  By any measure, those efforts

were both extremely modest and ultimately successful.  Specifically,

Attorney Shuman testified at the evidentiary hearing that when he initially

attempted to contact Attorney Calle, Attorney Shuman had neither a

phone number nor a valid address for Attorney Calle, and that when

Attorney Shuman contacted New York's Office of Court Administration –

with which all attorneys admitted to the New York are required to

periodically register – that agency advised Attorney Shuman that Attorney

Calle had been suspended from the practice of law and was involved in a

criminal matter.[12],[13]  Evidentiary Tr. at 152-53.  Attorney Schuman testified

that either Anna Nieves or Marilyn Ortiz subsequently provided him with a

telephone number with which he was able to contact Attorney Calle.  *Id.* at

156.

That aspect of Attorney Schuman's testimony was buttressed by the

testimony of petitioner's sister, Anna Nieves, who testified that at some

point she received a telephone call from Attorney Schuman in which he

advised her that he wished to contact Attorney Calle.  *Id.* at 82, 84-85.

She then contacted Lisa Steinberg, who at the time was a neighbor and

friend of Attorney Calle as well as a friend of both Nieves and Rivas' wife.

*Id.* at 83.  Nieves succeeded in obtaining Calle's telephone number in

"about a month," *id.*, after which Schuman contacted Attorney Calle.[14]  *Id.*

_____

[12]    Attorney Wasserman additionally testified that her law firm had contacted a law firm for which Attorney Calle had previously worked, but that the firm "couldn't tell [the firm] anything about where [Attorney Calle] had gone."  Evidentiary Tr. at 216.

[13]    Attorney Wasserman testified that after Attorney Calle was contacted by her law firm, she and Attorney Schuman had "sporadic" contact with him.  Evidentiary Tr. at 211.

[14]    Attorney Calle is now disbarred, although the record now before the court does not disclose precisely when that occurred.  Publicly available reports, however, reveal that it was not until November of 2002 that he was stripped of his license to

at 83, 156.

Unfortunately, the witnesses who testified regarding this issue, including principally petitioner's sister, Nieves, were unable to provide critical information concerning the relevant chronology and significant dates.  The record does reflect that on March 23, 1998, Attorney Schuman wrote a letter to Assistant District Attorney Maxwell in which he noted that Attorney's Schuman's firm had, as of the date of that letter, been unable to contact Attorney Calle.  *See* Hearing Exh. P-35.  Attorney Calle was ultimately located by those working on behalf of the petitioner sometime after that date and prior to May 11, 1999, the date on which Attorney Schuman wrote to Attorney Calle at his West 37th Street address in New York City and inquired of Attorney Calle whether and when the District Attorney had disclosed certain documents to the defense.  *See* Hearing Exh. P-206.

As can be seen, the record does not definitively disclose precisely when Attorney Calle was located.  In any event, I am unable to conclude that the petitioner and those acting on his behalf acted with reasonable diligence in their attempts to locate former Attorney Calle to seek his input

---

practice law in New York.  *See Matter of Richard J. Calle*, 301 A.D.2d 218, 749 N.Y.S.2d 528 (1st Dep't 2002).

regarding the documents ultimately secured by Rivas through the measures described above.

II.    PROCEDURAL HISTORY

Represented by counsel, Rivas commenced this proceeding on December 12, 2001, Dkt. No. 1, and later filed an amended petition on June 19, 2002, at the court's direction.  Dkt. Nos. 12, 14.  Rivas' petition was opposed by respondent, who on September 3, 2002 filed an answer together with a memorandum in support of his opposition.  Dkt. Nos. 17, 18.  In contesting Rivas' amended petition, respondent argued that the proceeding was not timely filed, additionally asserting that in any event the claims set forth in the amended petition are without merit.  *See id.*

On January 28, 2005 District Judge Gary L. Sharpe issued a decision concluding that Rivas' petition was untimely, and ordering it dismissed without reaching the merits of his habeas claims.  Dkt. No. 21 ("January, 2005 Decision").  That determination was reversed on appeal to the United States Court of Appeals for the Second Circuit by summary order issued on October 2, 2008, however, and the matter was remanded to this court with instructions to conduct an evidentiary hearing limited to the issue of timeliness of the petition, with particular focus upon when the

24

"new evidence" serving of a factual predicate for petitioner's habeas claims was discovered, and whether it could have been discovered earlier through the exercise of due diligence.  *See* Second Circuit Mandate (Dkt. No. 39) ("Mandate") at 2-4.  The court was also instructed to consider whether, in the event of an adverse finding with regard to those issues, petitioner had nonetheless established a credible claim of actual innocence sufficient to avoid the otherwise fatal effect of the statute of limitations upon his habeas claims.  *Id.*

Upon its return to this court, the matter was referred to me by District Judge Sharpe for the purpose of conducting the required evidentiary hearing, which was held beginning on September 21, 2009. With the subsequent submission of petitioner's post-hearing brief on November 11, 2009, Dkt. No. 62, a brief on behalf of the respondent on December 9, 2009, Dkt. No. 63, and petitioner's reply memorandum of December 23, 2009, Dkt. No. 64, the matter is now ripe for determination and is before me for the issuance of a report and recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c).  *See also* Fed. R. Civ. P. 72(b).

III.   DISCUSSION

25

A.    <u>Statute of Limitations Generally</u>

Enactment by Congress in 1996 of the Antiterrorism and Effective Death Penalty Act ("AEDPA"), Pub. L. No. 104-132, 110 S. Stat. 1214 (1996), brought about significant changes to the prisoner litigation landscape.  One of those was institution of a one-year statute of limitations applicable to habeas petitions filed after April 24, 1996.  28 U.S.C. § 2244(d).  The law now provides, *inter alia,* that

> [a] one-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court.  The limitation period shall run from the latest of
>
>> (A)  the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review.

28 U.S.C. § 2244(d)(1)(A).

A judgment of conviction becomes "final", for AEDPA purposes, at the conclusion of the ninety day period during which the petitioner could have sought review by the United States Supreme Court, unless of course *certiorari* review is requested and undertaken by the Court.  *Williams v. Artuz*, 237 F.3d 147, 150-51 (2d Cir. 2000); *see also Hughes v. Irvin,* 967 F. Supp. 775, 778 (E.D.N.Y. 1997) (*citing* Rule 13 of the Rules of the

26

Supreme Court of the United States); *Allen v. Hardy*, 478 U.S. 255, 258, n.1, 106 S.Ct. 2878, 2880, n.1 (1986) (decision becomes final where "the availability of the appeal [is] exhausted, and the time for [filing a petition] for *certiorari* ha[s] elapsed."); *Soto v. Portuondo*, No. 02-CV-28, 2004 WL 2501773, at *3 n.4 (E.D.N.Y. Nov. 5, 2004) (citing *Ross v. Artuz*, 150 F.3d 97, 98 (2d Cir. 1998)) (further citations omitted).  In this instance the petitioner's conviction thus became final for AEDPA purposes on November 13, 1995, on expiration of the ninety day period following denial of his application for leave to appeal to the New York Court of Appeals. Since that date predates April 24, 1996, the effective date of the AEDPA, Rivas was eligible for a one-year grace period, or until April 27, 1997, to timely file his federal habeas corpus petition.  *See Ross*, 150 F.3d at 103; *Rhodes v. Senkowski*, 82 F.Supp.2d 160, 173-74 (S.D.N.Y. 2000) (*citing Ross*).  Applying this date, and excluding the time during which his application for a writ of error *coram nobis* was pending, *see Collins v. Breslin*, No. 07-CV-1918, 2009 WL 1151769, at *2 (E.D.N.Y. Apr. 27, 2009) (citing 28 U.S.C. § 2244(d)(2)), it is undisputed that if subject to the one-year limitation period Rivas' petition, which was filed on December

12, 2001, was untimely.[15]

The section governing timeliness of habeas petitions filed under section 2254 under circumstances such as now presented provides relief from the one-year limitation period in the event the petitioner's claims could not have been discovered through the exercise of due diligence in sufficient time to permit the timely filing of a petition, providing in such cases that the one-year limitation period begins to run on the later of April 24, 1997 or "the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence."  28 U.S.C. § 2244(d)(1)(D); *see Marte v. Brown*, No. 09 CIV. 1036, 2009 WL 4405803, at *2-3 (S.D.N.Y. Dec. 1, 2009) (quoting 28 U.S.C. § 2244(d)(1)).  The court must therefore analyze whether the factual predicate for any of Rivas' claims could have been discovered through the exercise of due diligence more than one year before the filing of his petition, factoring in the tolling which occurs while a properly filed application for state post conviction or other collateral review is pending.

---

[15]    From correspondence in the record it is clear that the petitioner was well aware of urgency of the matter, based upon the stringent time limit imposed under the AEDPA.  *See*, *e.g.*, Hearing Exh. P-24 at 2 ("I'm of the understanding that the new Federal Laws limit the time of filing a Federal Habeas petition, unless you can prove that you've had an ongoing investigation into newly discovered evidence.").

28 U.S.C. § 2244(d)(2); *see Dixon v. Conway,* 613 F.Supp.2d 330, 346 (W.D.N.Y. 2009) (quoting 28 U.S.C. § 2244(d)(2)). That exercise involves a case-specific inquiry, requiring the court to analyze the factual underpinnings of a petitioner's claims and then determine when the predicate facts were discovered, or could have been through the use of due diligence. *Jenkins v. Farrell*, No. 07 CIV. 6937, 2009 WL 1616008, at *7 (S.D.N.Y. June 9, 2009) (citing *Wims v. United States*, 225 F.3d 186, 190 (2d Cir. 2000)).

As the Second Circuit noted in its decision in this matter, since three hundred days of the one-year limitation period elapsed between final denial of petitioner's section 440.10 motion and the date on which the petition was filed, the new evidence upon which one or more of Rivas' claims are predicated must not have been discoverable through the exercise of due diligence prior to May 8, 1999, or sixty-five days prior to the filing of his 440.10 motion on July 12, 1999. *See* Mandate at 2-3.

B.    The Evidence In This Case

From his filings with the court as well as the evidence adduced during the recent evidentiary hearing, it is apparent that the primary focus of petitioner's claims regarding new evidence is on the allegedly false

testimony given at trial by the Onondaga County Medical Examiner, Dr.

Erik Mitchell, regarding the time of the victim's death, and the

prosecution's purported failure to provide Rivas' counsel with *Brady*

materials.  Rivas' petition also cites his unawareness of an investigation

into the medical examiner's office as a basis to find newly discovered

evidence sufficient to salvage his otherwise untimely action.

### 1.   Medical Examiner Investigation

Like the state court, I conclude that the investigation into practices

of Dr. Mitchell was neither newly discovered after May 8, 1999 nor

exculpatory.  As Judge Sharpe noted in his earlier decision, petitioner's

section 440.10 motion itself noted newspaper coverage of the

investigation predating the petitioner's trial.  *See* January, 2005 Decision

at 24, n.15 (citing CPL Motion (7/12/99) at Exh. 15); *see also People v.*

*Rivas*, No. 92-2794 (Onon. Cty. Ct. Sept. 8, 2000 at 12).  The publicity

regarding that investigation belies any claim that Rivas and his counsel

could not have learned of the investigation at or prior to the time of trial

through the exercise of due diligence.

Moreover, I find that the Mitchell investigation is also not of a

character which would have altered the jury's verdict.  While the

investigation apparently uncovered evidence of misconduct relative to the

disposal of bodies and body parts, there is no evidence nor any allegation

that Dr. Mitchell testified falsely in any trials.  Undeniably, knowledge

regarding the investigation could have provided the petitioner's trial

counsel with fertile material for use in cross-examining Dr. Mitchell.  To

the extent that such evidence could be viewed as *Brady* material, it is

sufficient to reiterate my finding that petitioner has failed to prove that

evidence regarding the investigation could not have been discovered

through the exercise of due diligence prior to May 8, 1999.

In any event it is clear that petitioner's attorneys were well aware in

1998 of the Mitchell investigation.  Efforts by Rivas' attorneys to obtain

records associated with that investigation culminated in the issuance of an

order on June 18, 1998 by Onondaga County Court Judge William Burke,

directing that the materials associated with that investigation be submitted

to him for *in camera* review.  *See* Hearing Exh. P-224.  Following that

review Judge Burke concluded that nothing contained within the record

submitted to his chambers was relevant to the issues raised in petitioner's

trial and post-trial challenges.  Hearing Exh. P-225.  Petitioner's counsel

therefore had the information necessary to advance this issue as a ground

for seeking habeas relief long before May 8, 1999.

2.    Dr. Wecht's Opinions

Petitioner contends that serving as another factual predicate for his habeas claims is an affidavit of Dr. Wecht, a forensic pathologist, given on June 11, 1999, opining that the medical examiner's testimony concerning the victim's time of death was not based upon generally accepted scientific principles and that instead, in all likelihood, the victim was not killed more than thirty-six hours before her body was discovered on Monday, March 30, 1987, or perhaps a few hours earlier.[16]

The June, 1999 affidavit of Dr. Wecht is neither new evidence, nor can it be considered to serve as a factual predicate for petitioner's apparent claim that his conviction was based upon fabricated testimony. That affidavit represents nothing more than a conflicting opinion to that of Dr. Mitchell regarding the time of the victim's death.  Dr. Wecht makes it clear in his affidavit that his contrary opinion derives from his review of Dr. Mitchell's trial testimony, as well as of the same materials relied upon by Dr. Mitchell in arriving at his conclusions at trial regarding the victim's time

_____

[16]    On cross examination, Dr. Wecht was unable to state conclusively that it was impossible for the victim to have been killed during the early morning hours of Saturday, March 28, 1987.  Hearing Tr. at 64-65.

of death.  Accordingly, Dr. Wecht's affidavit cannot properly be regarded as new evidence.  *Serrano v. Walsh*, No. 04CIV8615, 2005 WL 3340578, at *10 (S.D.N.Y. Dec. 9, 2005) ("Newly discovered evidence is, by definition, incapable of discovery through ... due diligence before or during trial.... Evidence in existence at an earlier date, though perhaps unknown to a petitioner, cannot later be described as newly discovered") (quoting *Hector v. Greiner*, No. 99 CV 7863, 2000 WL 1240010 at *1 (E.D.N.Y. Aug. 29, 2000)).

It is also readily apparent that even if his opinions are based in part on information developed after trial, Dr. Wecht had available to him, as did the petitioner, all of the materials leading to the formulation of his opinions well prior to May 8, 1999.  Indeed, the record firmly reveals that Dr. Wecht sent petitioner's counsel a written report, upon which the affidavit was later based, on September 10, 1998, well prior to the critical May 8, 1999 date.  *See* Hearing Exh. P-77.  Petitioner offers no explanation for the significant delay in preparing the June 11, 1999 affidavit or in commencing this proceeding once that report was in hand.  Moreover, petitioner has failed to cite any additional facts developed after September 10, 1998 to further support or bolster Dr. Wecht's opinion, or as a basis for arguing

that Dr. Mitchell's testimony at trial concerning the time of death was fraudulent.[17]

As constituting due diligence, petitioner cites his ongoing efforts to obtain the brain slides referred to in Dr. Mitchell's trial testimony, and the late discovery of the Dr. Collins report allegedly reflecting that it was he, rather than Dr. Mitchell, who examined the victim's brain. Neither of these, however, provides a basis to excuse the lateness of Rivas' petition.

Leaving aside the fact that the issues could have been easily clarified on cross-examination by petitioner's trial counsel, as Judge Brunetti concluded, the medical examiner's office response to a court order made clear to Rivas' counsel no later than March 24, 2008 that it was not in possession of brain slides of the victim. Specifically, the record establishes that in response to Judge Burke's February 5, 1998 order

---

[17]     Petitioner argues that Dr. Mitchell changed his opinion regarding the time of death, at the urging of the District Attorney, following a six year hiatus in the investigation into the Hill murder. There is no indication in the record, however, that Dr. Mitchell gave an initial opinion regarding the time of death that was in conflict with his trial testimony. While it is true that a search warrant application submitted by law enforcement officials during their initial investigation, and made available to the petitioner prior to trial, *see* Trial Tr. at 284-85, made reference to a preliminary determination of Dr. Mitchell concerning time of death, *see* Hearing Exh. P-12, he did not provide an affidavit to that affect. Moreover, in an initial medical report concerning the death, it is noted as a preliminary assessment that the victim appeared to have been dead for between two and three days. *See* Hearing Exh. P-37 at 21 (unnumbered).

directing that office to provide to petitioner's counsel, *inter alia*, "all slides prepared by the medical examiner's office of any organs or parts of organs of the deceased, Valerie Hill, or slides of any nature prepared in reference to Valerie Hill, including microscopic slides," *see* Hearing Exh. P-31 at 3, the medical examiner's office subsequently provided petitioner's counsel with several reports and rolls of film.  See Hearing Exh. P-37. Significantly, no brain slides of the victim were included in that response. *Id.*  That fact was explicitly recognized by Rivas himself in his April 23, 1998 letter to his attorney, Sidney Manes, Esq., wherein petitioner noted that he "truly wasn't surprised to learn that [the medical examiner's office] didn't have any brain slides."   *See* Hearing Exh. P-39 at 1.  Thus, petitioner was plainly aware that no such slides existed well prior to May of 1999.

The record also definitively establishes that petitioner received all of the available medical records regarding the victim's death, including the report of Dr. Collins, in March of 1998, and thus well prior to May of 1999.[18]  *See* Hearing Exh. P-37.

---

[18]        In any event, as the state court determined, the fact that Dr. Collins examined the victim's brain after "fixation" – meaning at least ten days after her death – does not cast doubt upon the medical examiner's claim that during the course of the autopsy, he too examined the brain.

In sum, neither Dr. Wecht's opinions nor the basis for those opinions represents a factual predicate for a habeas claim which could not have been discovered prior to May of 1999 through the exercise of due diligence.

### 3.   Attorney Calle's Affidavit

According to the petitioner, the factual underpinning of his *Brady* claim is an affidavit given by his former trial counsel, Richard Calle, Esq. also dated June 7, 1999, stating that he does not recall ever receiving certain specified materials from the prosecution at trial.  Since both of those affidavits post-date the critical May 8, 1999 date, Rivas argues, his petition was timely filed.[19]

As difficult as it is to determine the precise nature of the "new evidence" upon which the petitioner's fraudulent testimony argument is grounded, it is even more daunting to pinpoint the basis for his *Brady* claim and his contention that the factual predicate for that claim could not have been ascertained through due diligence prior to May 8, 1999.  To be sure, during the hearing the petitioner and other witnesses on his behalf

---

[19]     In that affidavit, Calle states that he has "no recollection whatsoever" of receiving numerous documents now portrayed by Rivas as constituting *Brady* materials.  *See* Affidavit of Richard Calle, Esq. (6/7/99) ("Calle Aff.") at ¶¶ 3-5.

testified to the great lengths to which they went to obtain pertinent materials from law enforcement agents, including the office of the medical examiner and various police agencies, following petitioner's conviction. Initiation of those efforts predated retention of Attorney Schuman in or about July of 1997, and extended well into 1999.  The new evidence analysis, as it relates to this claim, turns upon two questions, including whether 1) the materials upon which the claim is predicated truly are *Brady* materials, and 2) petitioner's trial counsel was provided with those materials at or prior to the time of trial.  As will be seen, while I find that all or some of the materials cited could be regarded as disclosable under *Brady*, the answer to the second of these inquires is seriously in doubt.

Turning first to whether the documents in question qualify as *Brady* materials, I note that not every piece of paper generated by law enforcement officers during the course of an investigation is exculpatory, thereby triggering a requirement of disclosure.  Under *Brady* and its progeny, prosecutors are only constitutionally mandated to provide to defense counsel evidence that is favorable to the accused, either as exculpatory or because it is impeaching.  *Boyette v. LeFevre*, 246 F.3d 76, 88, 90 (2d Cir. 2001) (*citing United States v. Bagley*, 473 U.S. 667,

674, 105 S.Ct. 3375, 3380 (1985)); *see also Strickler v. Greene*, 527 U.S. 263, 281, 119 S.Ct. 1936, 1948 (1999).  I assume, without deciding, that at least some of the materials cited fall within this category, particularly those related to other suspects and witnesses who heard screams on the Saturday evening of the weekend of the murder.  *See*, *e.g.*, Affidavit of H. Mitchell Shuman (7/6/99) at ¶¶ 12-13.

The more troublesome issue concerns whether any such documents, if they exist, were timely turned over to petitioner's trial counsel by the prosecuting authorities.[20]  On this issue I find, as did Judge Brunetti, that the evidence now before the court is at best equivocal, and insufficient to satisfy petitioner's burden of proof.  As Judge Brunetti concluded, the record does not definitively establish what materials were received by petitioner's trial attorney from the District Attorney as *Brady* as well as *Rosario* materials.[21]

Unfortunately, Attorney Calle did not testify during the course of the

---

[20]     During his hearing testimony Attorney Schuman candidly acknowledged that there is no accurate way to determine whether the materials obtained following petitioner's conviction were made available to his counsel at trial.  Hearing Tr. at 152.

[21]     In his affidavit, Attorney Calle acknowledges having received some *Rosario* and *Brady* materials from the District Attorney, but states he has no recollection of having received the documents which were provided to him by Attorney Schuman, Rivas' appellate lawyer, although he adds his belief that he "would certainly have remembered" receiving those materials in light of their nature.  Calle Aff. at ¶ 5.

38

hearing.  Accordingly, the only evidence offered by the petitioner

concerning the *Brady* materials came principally through the testimony of

Attorneys Schulman and Wasserman, as well as the petitioner.  Like

Judge Brunetti, I did not find Rivas to be particularly credible as a witness.

Moreover, petitioner's testimony was lacking in critical detail.  Rivas did

not, for example, testify that he was provided with access to the entirety of

his counsel's file, instead stating only that he went over with counsel *some*

of the materials received from the prosecution.  Hearing Tr. at 299.  The

fact that the critical documents may not have been in the files which were

ultimately forwarded to Attorney Schulman can be explained in a number

of ways, including the apparent fact that Attorney Calle did not operate out

of a formal business office, and that the records changed hands several

times between various attorneys representing Rivas at various stages.

Bearing in mind that it is petitioner's burden to establish the existence of

new evidence to support his claims which could not have been discovered

prior to May 8, 1999 through due diligence, *see Morris v. Duncan*, No.

03-CV-1428, 2007 WL 2815632, at *12 (N.D.N.Y. Sept. 25, 2007)

(McAvoy, S.J., adopting Report-Recommendation of Bianchini, M.J.)

39

(citations omitted), I find that this burden was not met.[22]

As one of the bases cited by petitioner for causing the delay in filing his petition, petitioner cites the difficulty on the part of himself and others working on his behalf to locate his trial attorney, Richard Calle.  Although by petitioner's account they extended over a lengthy period of time, as was noted earlier in this report, it is unclear precisely when those efforts were first undertaken, or the means that were resorted to in an attempt to locate Attorney Calle.  In this regard, the court notes that for years technology has made a wealth of digital information and other similar channels available to individuals who endeavor to locate individuals.  Nowhere in petitioner's written submissions to this court, or his oral presentation at the evidentiary hearing, has he described in any meaningful detail the avenues that were pursued, without success, to locate Attorney Calle.

In sum, I find that despite being afforded the opportunity of an

---

[22] The court's ability to ascertain what materials are at issue, and in turn when they became available to the petitioner, has been severely hampered.  The *Brady* materials in issue are alleged to have been attached to the Calle affidavit, which in turn was included as an exhibit to Rivas' amended petition; those materials, however, were not attached as advertised, and the court is therefore unable to ascertain whether they truly constitute *Brady* materials, and when they were ultimately obtained by Rivas or those working on his behalf.  *See* Amended Petition (Dkt. No. 14) Exh. F.

evidentiary hearing, petitioner has failed to establish by a preponderance of the evidence that one or more of the grounds in his habeas petition are predicated upon evidence which was neither available nor could reasonably have been discovered through the exercise of due diligence prior to May 8, 1999.

C.    Equitable Tolling for Actual Innocence

Before recommending dismissal of Rivas' petition as untimely, I must next determine whether there is any basis to invoke equitable tolling in order to salvage the otherwise untimely petition.  Equitable tolling applies "only in the 'rare and exceptional circumstance[ ].'"  *Smith v. McGinnis*, 208 F.3d 13, 17 (2d Cir. 2000) (quoting *Turner v. Johnson*, 177 F.3d 390, 391-92 (5th Cir.1999)) (alteration in original); *see also Doe v. Menefee*, 391 F.3d 147, 159 (2d Cir. 2004) (*cert. denied*, 546 U.S. 961, 126 S. Ct. 489 (2005) (citing *Smith*); *Corrigan v. Barbery*, 371 F.Supp.2d 325, 330 (W.D.N.Y. 2005) (citing *Smith*); *Austin v. Duncan*, No. 02-CV-0732, 2005 WL 2030742, at *3 (W.D.N.Y. Aug. 23, 2005). Specifically, it has been held that the equitable tolling of the AEDPA's statute of limitations is only available when "extraordinary circumstances" prevent a prisoner from filing a timely habeas petition.  *Pace v.*

41

*DiGuglielmo*, 544 U.S. 408, 418, 125 S.Ct. 1807, 1814 (2005) (citation

omitted); *see also Warren v. Garvin*, 219 F.3d 111, 113 (2d Cir. 2000)

(quoting *Smith*, 208 F.3d at 17); *Doe*, 391 F.3d at 154; *Spaulding v.

Cunningham*, No. 04-CV-2965, 2005 WL 1890398, at *3 (E.D.N.Y. Aug. 4,

2005); *Agramonte v. Walsh*, 00CV892, 2002 WL 1364086, at *1 (E.D.N.Y.

June 20, 2002).  "To merit application of equitable tolling, the petitioner

must demonstrate that he acted with reasonable diligence during the

period he wishes to have tolled, but that despite his efforts, extraordinary

circumstances beyond his control prevented successful filing during that

time."  *Smaldone v. Senkowski*, 273 F.3d 133 (2d Cir. 2001) (internal

quotation and citation omitted), *cert. denied*, 535 U.S. 1017, 122 S. Ct.

1606 (2002); *see also Warren*, 219 F.3d at 113 (citing *Smith*); *West v.

Hamill*, No. 04-CV-2393, 2005 WL 1861735, at *1 (E.D.N.Y. Aug. 1, 2005)

(citing *Smith*).

Among the circumstances in which a court may invoke its equitable

powers and excuse a late-filed petition is when a petitioner has

established a credible claim of actual innocence.  Borrowing from

principles "developed to mitigate the potential harshness of the judicial

limitations placed on petitioner's ability to file successive or otherwise

procedurally defaulted habeas petitions in federal courts, . . ."  and to

avoid miscarriages of justice, courts have allowed for equitable tolling of

the governing limitation period in cases where credible claims of actual

innocence are advanced, provided that the petitioner can also

demonstrate that he or she pursued the claim of actual innocence with

reasonable diligence.  *Menefee*, 391 F.3d at 160-61; *see also Whitley v.*

*Senkowski*, 317 F.3d 223, 225-26 (2d Cir. 2003).

As the Second Circuit explained in *Doe*, a petitioner claiming actual

innocence must support that claim through highly reliable evidence,

examples of which could include "exculpatory scientific evidence,

trustworthy eyewitness accounts, or critical physical evidence" not

presented during the course of trial.  *Doe*, 391 F.3d at 161 (quoting

*Schlup v. Delo*, 513 U.S. 298, 324, 115 S.Ct. 851, 865 (1995)).  When

analyzing the reliability of the new evidence, the Second Circuit explained

in *Doe,* "the habeas court must determine whether the new evidence is

trustworthy by considering it both on its own merits and, where

appropriate, in light of the pre-existing evidence in the record."  *Id.* (citing

*Schlup*, 513 U.S. at 327-28, 115 S.Ct. 851, 867).  In the event of a finding

of reliability, the court must then consider the claim of actual innocence in

43

light of the record as a whole "to determine whether new evidence truly throws the petitioner's conviction into doubt, or whether [the court] is so overwhelmed by the weight of evidence that it is insufficient to raise a question as to a petitioner's factual innocence." *Doe,* 391 F.3d at 162.  "In evaluating the record as a whole, the habeas court may make its own credibility determinations as to both the new evidence and the evidence already in the record that may be thrown into doubt by the new material." *Id.*, 391 F.3d at 163 (citing *Schlup*, 513 U.S. at 330, 115 S.Ct. at 868). When making this determination the issue is not whether in the court's judgment reasonable doubt exists, but instead whether, more likely than not, no reasonable jury could find the defendant guilty when all of the evidence, including the new evidence, is considered.  *Id.,* 391 F.3d at 163.

The centerpiece of petitioner's actual innocence claim is the opinion testimony of Dr. Cyril Wecht.[23]  After reviewing the available evidence, including reports of the autopsy on the victim's body, Dr. Wecht testified that in his opinion the time of Valerie Hill's death was at or after 3:30 p.m. on Saturday, March 28, 1987.  Significantly, however, Dr. Wecht

---

[23]     Nothing among the reportedly exculpatory *Brady* materials submitted to the court, nor materials associated with the investigation of the medical examiner's office, could properly be characterized as the type of highly reliable evidence upon which a claim of actual innocence could be predicated.

conceded on cross-examination that Hill's death could have occurred as early as four to six hours prior to that time, Hearing Tr. at 63, and he was unable to state with absolute certainty that she could not have died late Friday night into the early morning hours of Saturday, March 27, 1987. *Id.* at 63-64.  Accordingly, even assuming with certainty that based upon the alibi evidence presented, petitioner could not have killed the victim on Saturday evening or Sunday, *see* Affidavit of H. Mitchell Schuman in Support of Rivas' CPL Motion (7/6/99) ("Schuman Aff.") at n.1 (counsel declaring that Rivas had an "air-tight" alibi from Saturday night through Sunday), the evidence presented does not absolutely exclude the possibility that the murder occurred on late Friday night, when petitioner's alibi was less "air-tight."

Dr. Wecht's opinions, moreover, must be considered against the backdrop of the evidence of petitioner's guilt presented at trial, and characterized by the Appellate Division as "overwhelming". *Rivas*, 214 A.D.2d at 996.  At trial, the prosecution established that Rivas was observed waiting in his van near Hill's home at approximately 3:45 pm and again around 11:00 p.m. on Friday, March 27, 1987.  Trial Tr. at 351, 433-34.  That evidence, which contradicted Rivas' statement to law

45

enforcement agents concerning the times at which he claims to have been at Hill's home on that date, *see* Trial Tr. at 240-42, established that Rivas had an opportunity to kill Hill that night.  The prosecution also demonstrated that Rivas was obsessed with Hill after the termination of their relationship, to the point where he had constructed a shrine in his home devoted to Hill, Trial Tr. 272-73, and continued to "stalk[] ... the victim following the break-up of their relationship."  *Rivas*, 214 A.D.2d at 997.  Also offered at trial as evidence of petitioner's guilt was the fact that shortly after the victim's death, Rivas was overheard clearly exclaiming, "Valerie, Valerie, I didn't mean to do it."  Trial Tr. at 816-17.

Given the strength of evidence against the petitioner, though admittedly circumstantial, I find that Dr. Wecht's testimony does not rise to a level sufficient to permit the conclusion that no reasonable juror could have found guilt beyond a reasonable doubt had the additional evidence been considered.  I therefore recommend against a finding of equitable tolling of the statute of limitations, based upon the petitioner's claim of actual innocence, in order to salvage Rivas' otherwise untimely petition.

C.     <u>Certificate of Appealability</u>

The final issue to be addressed is whether the court should issue a

certificate of appealability on the case, given its circumstances and

history.  I note that 28 U.S.C. § 2253(c) provides, in relevant part that

> [u]nless a circuit justice or judge issues a
> certificate of appealability, an appeal may not be
> taken to the court of appeals from –
>
> > (A) the final order in a habeas corpus
> > proceeding in which the detention
> > complained of arises out of process
> > issued by a State court ....[24]

28 U.S.C. § 2253(c)(1)(A).  A certificate of appealability may only be

issued "if the applicant has made a substantial showing of the denial of a

constitutional right."  *See* 28 U.S.C. § 2253(c)(2).

   In light of the procedural history of this matter as was more fully

discussed above, I recommend that, if this report and recommendation is

adopted by the district judge, such court grant a certificate of appealability

on the issue of when the "new evidence" that serves as the factual

predicate for petitioner's habeas claims was discovered by him, and

whether it could have been discovered earlier through the exercise of due

diligence.

IV.    SUMMARY AND RECOMMENDATION

---

   [24] Rule 22 of the Federal Rules of Appellate Procedure also provides that an
appeal may not proceed "unless a circuit justice or a circuit or district judge issues a
certificate of appealability under 28 U.S.C. § 2253(c)."  *See* Fed.R.App.P. 22(b).

Despite the opportunity to do so during the course of an evidentiary hearing, petitioner has failed to prove that the factual predicate for any of the grounds asserted in his amended petition could not have been discovered by him through the exercise of due diligence before May 8, 1999.  Having concluded that Rivas' petition was therefore untimely, and that he has failed to establish a credible claim of actual innocence, it is respectfully

RECOMMENDED that the petition in this matter be DENIED and DISMISSED in all respects; and it is further

RECOMMENDED that if this recommendation is adopted, the court GRANT a certificate of appealability limited to the issue of when petitioner discovered the new evidence that serves as the factual predicate for some of his claims, and whether it could have been discovered earlier through the exercise of due diligence.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court within FOURTEEN days.  FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P.  6(a), 6(d), 72; *Roldan v. Racette,*

984 F.2d 85 (2d Cir. 1993).

It is further hereby ORDERED that the clerk of the court serve a

copy of this Report and Recommendation upon the parties in accordance

with this court's local rules.

_____

David E. Peebles
U.S. Magistrate Judge

Dated:     January 8, 2010
           Syracuse, NY