**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

_____

**HECTOR RIVAS,**

                     **Petitioner,**         **9:01-cv-1891**
                                           **(GLS)**

       **v.**

**BRIAN FISCHER,**

                     **Respondent.**

_____

| **APPEARANCES:** | **OF COUNSEL:** |
|---|---|
| **FOR THE PETITIONER:** | |
| Zimmer Law Office PLLC | KIMBERLY M. ZIMMER, ESQ. |
| 333 East Onondaga Street | |
| Monroe Building | |
| Suite 301 | |
| Syracuse, NY 13202 | |
| | |
| Office of Sally Wasserman | SALLY WASSERMAN, ESQ. |
| 352 Seventh Avenue | |
| 11th Floor | |
| New York, NY 10001 | |
| | |
| **FOR THE RESPONDENT:** | |
| HON. ERIC T. SCHNEIDERMAN | PRISCILLA I. STEWART |
| New York State Attorney General | ALYSON J. GILL |
| 120 Broadway | Assistant Attorneys General |
| New York, NY 10271 | |

**Gary L. Sharpe**
**Chief Judge**

## MEMORANDUM-DECISION AND ORDER

## I. Introduction

Petitioner Hector Rivas seeks habeas corpus relief pursuant to 28 U.S.C. § 2254, alleging that the following five grounds, singularly and cumulatively, demonstrate his entitlement to a writ: (1) newly discovered evidence has been uncovered since his conviction that shows misdeeds by Dr. Erik Mitchell, the medical examiner who testified at his trial; (2) the prosecution failed to disclose a myriad of *Brady* material; (3) he was denied his right to a fair trial by the trial court's assumption of the role of prosecutor; (4) he was denied a fair trial by the trial judge's failure to recuse himself; and (5) his trial counsel was ineffective. (*See* Am. Pet., Dkt. No. 14, Attach. 3 at 1-7.) Following extensive supplemental briefing, in which Rivas focused his efforts on the *Brady* and ineffective assistance of counsel claims, and argument before the court on May 29, 2013, (*See* Dkt. Nos. 92, 93, 96, 97, 103), the court dismisses the Amended Petition and denies Rivas' application for a writ of habeas corpus.[1] As explained in

_____

[1] In light of the Second Circuit's command that jurisdiction be returned to it upon any party's letter request following this court's decision on the merits of the Amended Petition, *see Rivas v. Fischer*, 687 F.3d 514, 553 (2012), the court need not address whether a certificate of

detail below, habeas relief is unwarranted because the state court judgments at issue here did not result in decisions evincing an unreasonable application of clearly established federal law, or an unreasonable determination of the facts. *See* 28 U.S.C. § 2254(d).

## II. <u>Background</u>

### A. <u>Facts</u>

On Monday, March 30, 1987, Randall Hill (hereinafter "Hill") discovered the lifeless body of his daughter, Valerie Hill, in her apartment at 248 Hickok Avenue in the City of Syracuse. (T: 100, 103, 136.[2]) Valerie was strangled with the sash from her bathrobe, and then likely anally penetrated with an unknown object. (T: 868-69, 880-82, 891.) In the ensuing criminal investigation, Hill and Valerie's brother, David Hill, told police officers that Rivas was Valerie's former paramour, and that the two had recently broken up. (T: 235, 257.) Given this information, investigator John Brennan of the City of Syracuse Police Department and another investigator were assigned to locate Rivas and bring him to the station for

---

appealability should issue under 28 U.S.C. § 2253(c).

[2] Page references preceded by "T:" refer to the consecutively-paginated, seven-volume trial transcript. (*See* Dkt. No. 56, Attachs. 6-9.)

an interview.  (T: 227, 235.)  The investigators found Rivas at his home in

the Town of Cazenovia,[3] and asked him to accompany them back to

Syracuse for an interview pertaining to Valerie.  (T: 236-37.)  Rivas agreed

to go with the investigators, but, as Brennan explained at trial, he asked no

questions about Valerie when they arrived at his home, and said nothing at

all during the twenty-five-minute ride to the police station in Syracuse.  (T:

237-38.)  According to Brennan, when Rivas was eventually informed that

Valerie was dead, "he showed absolutely no reaction at all."  (T: 247.)

The interview lasted from shortly after 3:00 P.M. until approximately

1:30 A.M. the following morning.  (T: 239, 257.)  During that time, Rivas

explained to the investigators that he last saw Valerie on Thursday, March

26, around 7:00 P.M.  (T: 240.)  He proceeded to recount his whereabouts

on Friday, Saturday, and Sunday.[4]  (T: 240.)  Rivas claimed that, on Friday,

he stopped by Valerie's apartment around 2:00 P.M., but left when he

found that she was not home.  (T: 240-41.)  Rivas stopped at Valerie's

---

[3] It is noted that, according to a search warrant issued during the
investigation, Rivas resided in the Town of Nelson.  (*See* Dkt. No. 56,
Attach. 2 at 47.)  Given the proximity of Nelson to Cazenovia—less than
five miles apart—this apparent discrepancy is of no moment.

[4] Unless otherwise noted, references to "Friday," "Saturday," and
"Sunday" are to March 27, 28, and 29, 1987, respectively.

apartment once more around 6:00 P.M., and, again finding that she was not home, left a note under her door.  (T: 241.)  According to Rivas, he continued on to Coleman's Pub in Syracuse, where he met with friends and remained until 11:00 P.M.  (T: 242.)  Afterward, Rivas told police, he returned to Cazenovia and went to Albert's, a tavern, where he remained until 2:00 A.M., at which time he went with friends back to Syracuse for breakfast.  (T: 242).  Rivas explained that he returned home at approximately 4:00 A.M. and slept until 11:30 A.M. Saturday morning.  (T: 242.)

On Saturday, Rivas told police that, after he woke, he went to Albert's to do some plumbing work; once there, he decided to, instead, have lunch.  (T: 243.)  He claimed that he then went home, returned to Albert's around 3:30 P.M., and stayed there until 8:00 P.M.  (T: 243.)  Rivas said that he left Albert's to attend a party hosted by Robert Giordano, where he remained until 4:00 A.M. on Sunday.  (T: 243.)  Sunday, according to Rivas, consisted of his waking at 11:00 A.M., traveling into town, getting a newspaper, driving around, going home to wash his car, and returning to Albert's "later in the afternoon" until 11:00 P.M., at which time he went home.  (T: 243.)

During the interview, Rivas also provided the police with information regarding his relationship with Valerie.  (T: 244-46.)  He explained that he and Valerie met in May 1986 and dated up until about two months prior to her death.  (T: 244-45.)  He also told the investigators that he did not want the relationship to end and could not understand why Valerie felt differently.  (T: 246.)  Rivas also mentioned that he once had a key to Valerie's apartment, but had returned it to her after their breakup.  (T: 245.)  Rivas admitted to police that, since the breakup, he traveled to Valerie's apartment "nearly every day . . . in an attempt to see her.  He would drive by, sometimes wait for her in the hallway.  And if she was not home, [he would] leave notes for her under her door, or on her door."  (T: 245-46.)  Despite giving the history of his intensive efforts to see Valerie almost every day, Brennan testified that Rivas could not explain why he made no effort to see her on Saturday or Sunday.  (T: 247.)

Rivas was not arrested until November 24, 1992, more than five years after Valerie's death.  (*See* Dkt. No. 55, Attach. 2 at 55.)  A two-count indictment followed, but the second count was eventually dismissed on the prosecution's motion, leaving for trial a single count of murder in the second degree.  (*See* Dkt. No. 55, Attach. 2 at 21, 349); N.Y. Penal Law

§ 125.25(1).  Rivas retained attorney Richard Calle to represent him.  (*See*

Dkt. No. 56, Attach. 2 at 13-14; 440: 12.[5])  In advance of trial, Calle, among

other things, filed an omnibus motion and notice of alibi on behalf of Rivas.

(*See* Dkt. No. 55, Attach. 2 at 28-41, 42.)

In his opening statement at trial, the District Attorney, William

Fitzpatrick, explained to the jury that he would prove that Rivas killed

Valerie on Friday, and that the crime was not committed on Saturday or

Sunday.  (T: 43-55.)  Calle made clear in his opening statement that he

intended to both show that Rivas had a good alibi for the days in question

and discredit Dr. Mitchell for purportedly changing his opinion about

Valerie's time of death.  (T: 77-78, 81-82, 84.)  The ensuing trial lasted

seven days.  (T: 1, 1027.)

The first prosecution witness, Hill, explained that he and Valerie met

for dinner around 7:00 P.M. on Friday despite their plans to meet at 6:30

P.M.  (T: 96.)  Valerie left the restaurant after an "hour and fifteen minutes";

she had one cocktail and "sampled" some of Hill's entrée.  (T: 98.)  Hill also

told the jury that Valerie had plans to visit a friend in Schenectady, New

---

[5] Page references preceded by "440:" refer to the one-volume transcript of an evidentiary hearing regarding Rivas' N.Y. Crim. Proc. Law § 440.10 motion held on April 7, 2000.  (*See* Dkt. No. 56, Attach. 4.)

York, from Saturday to Sunday, and that he did not attempt to contact her until Sunday evening when he expected her to return from her trip.  (T: 99.) Valerie did not answer the telephone on Sunday, nor did she answer Monday morning when he called again.  (T: 99.)  After calling Valerie Monday morning, and receiving no response, Hill went to St. Joseph's Hospital—where Valerie worked as a nurse—to visit his ailing wife and check on Valerie.  (T: 89, 100.)  One of Valerie's co-workers informed Hill that Valerie was not at the hospital.  (T: 100.)  Hill, growing concerned, went to Valerie's apartment.  (T: 101.)

Hill parked his vehicle behind Valerie's car, which was in the driveway.  (T: 101.)  The exterior door used by both Valerie and her upstairs neighbors, the Stoneciphers, was unlocked, as was the interior door to Valerie's apartment.  (T: 102-03, 348-49, 390.)  Once inside, Hill saw Valerie's body on the living room floor.  (T: 103.)  Upon finding his deceased daughter, Hill "[b]ecame unglued" and called the police.  (T: 104.)  Hill smoked Carelton menthol cigarettes that day and used whatever ashtray was available in Valerie's apartment.  (T: 105.)  In addition to the foregoing, Hill provided background information about Valerie and her relationship with Rivas.  In particular, he gave testimony that, on March 17,

8

1987, while he and Valerie sat in his vehicle in her driveway and talked, Rivas emerged from the side door of her apartment.  (T: 108-10.)  Seeing Rivas prompted Valerie to say: "That bastard.  He's in my house again." (T: 117.)  According to Hill, prior to Valerie's relationship with Rivas, she dated Robert Lucas for approximately three years.  (T: 91.)  Hill also commented that Valerie was very neat and tidy in her home.  (T: 91.)

David Hill echoed his father's testimony that Valerie was "[v]ery, very neat" in her housekeeping habits, and he added that she was very quick to clean up after meals.  (T: 150.)  David explained that Valerie smoked Newport cigarettes occasionally, and, typically, when she drank alcohol socially.  (T: 150-51.)  According to David, Rivas smoked Barclay cigarettes and also drank alcohol.  (T: 151-52.)  The next prosecution witness, Elizabeth Michael, director at the Cazenovia Public Library, knew Valerie as a regular library patron.  (T: 172, 175.)  She explained that Valerie borrowed Stephen King's *The Dark Tower: The Gunslinger*, a book with a dark, black cover, in January 1987.  (T: 175, 178; Dkt. No. 55, Attach. 6 at 10.)  Because the book was not in the Cazenovia collection, it was on loan from the Mid York Library System in Utica, and had on its spine a gold label indicating that it so belonged.  (T: 175, 179.)  In fact,

nothing about the book's appearance indicated that it had been borrowed from the Cazenovia Library. (T: 183.) On March 24, 1987, one of Michael's employees called Valerie seeking the book's return. (T: 176.) During that conversation, Valerie claimed that she returned the book weeks earlier, which caused the library staff to search for the book to no avail. (T: 176-77.) Sometime between 3:30 P.M. on Saturday and 10:00 A.M. Sunday, the book appeared in the Cazenovia Library drop box. (T: 177-78.) Michael reported the book's return to authorities after reading in the newspaper that Valerie had been killed "and what was assumed the time of her death," which led her to think that the book was returned after the time that police suspected she was killed. (T: 179.)

The prosecution next called Anita Balducci, who was employed by Nye Ford in Oneida, New York at the time of Valerie's murder. (T: 185.) Balducci explained that, on Friday, Valerie came to the dealership just before 1:00 P.M. to have her vehicle serviced. (T: 186.) Valerie waited a little over two hours for the work to be completed. (T: 186-87.) The repair order indicated that, when Valerie's vehicle arrived, the odometer reading was 14,507 miles, although after the repairs were made, a technician likely tested the vehicle over the road for some very short distance. (T: 188-90.)

A police investigator later testified that the odometer reading of Valerie's car as it sat in her driveway on March 31, after her death, was 14,539 miles, indicating that the car had been driven approximately thirty two miles since the odometer was read at Nye Ford.  (T: 209-10.)  Another officer explained that a trip from Nye Ford to Valerie's apartment at 248 Hickok Avenue, then to Candy's Restaurant, and, finally back to Valerie's apartment consisted of thirty-three miles, and that the distance between Coleman's and Albert's was approximately 23.5 miles and took thirty minutes to cover by vehicle. (T:318-19.)  Balducci also recalled seeing two books lying on the back seat of Valerie's car, one appeared to be a novel on loan from a library with a dark black cover.  (T: 191.)

Travel agent Cynthia Reiser testified next.  (T: 196.)  She met with Valerie on Friday around 4:30 P.M. regarding a trip to the Bahamas that Valerie first contacted her about on March 15 or 16.  (T: 197-98, 205.)  According to Reiser, Valerie "wanted to go away by herself."  (T: 199.)  Valerie was supposed to travel on April 27, and return on May 3.  (T: 201-02.)  On Friday, Valerie made her final payment, and picked up two airline tickets and related trip documents.  (T: 204-06.)

Next to testify was Laura Adams, a friend of Valerie's that lived near

Saratoga Springs, New York.  (T: 213, 224.)  According to Adams, she and Valerie made plans for Valerie to visit her the weekend of March 27 through March 29; it was unclear whether Valerie would depart from Syracuse on Friday evening or Saturday morning.  (T: 216.)  Around 4:30 P.M. on Friday, and at least twenty other times up until midnight, Adams placed telephone calls to Valerie to solidify their plans, but all of them went unanswered.  (T: 217-18, 221.)  At one point when Adams called on Friday, Valerie's telephone line was busy.  (T: 221.)  Beginning the next morning around 8:00 A.M., and continuing until early Saturday afternoon, Adams continued unsuccessfully to call Valerie.  (T: 218-19.)  Adams tried to contact Valerie again on Sunday, without any response, and heard of her death on Monday, March 30.  (T: 219.)  Finally, Adams explained that Valerie visited her "many, many times and never once had she never, ever, not shown up or not called when she was coming to visit."  (T: 219-20.)

Police officer David Phinney told the jury that he was the first officer to arrive at Valerie's apartment on Monday, March 30.  (T: 268.)  He saw no indication of forced entry.  (T: 269.)  Later that day, Phinney and fellow officer Thomas Stassi executed a search warrant, which permitted them to search Rivas' home for a key to Valerie's apartment, gray sweater, gray

pants, and "any other blood stained, semen stained or contaminated clothing." (T: 270, 272, 309; Dkt. No. 56, Attach. 2 at 47.) While searching Rivas' kitchen garbage, Stassi found pieces of a torn letter; one of those pieces had the words "Hi, Bob" written on it, which was of interest to Stassi who knew that Bob Lucas was Valerie's former boyfriend. (T: 311-12.) In Rivas' basement, Phinney found a damp, gray Member's Only jacket hanging on a clothesline, and, in the garbage, he discovered discarded Barclay cigarette packages and butts. (T: 274-75.) Phinney also found, on a shelf in Rivas' bedroom closet, "a rather large statue of the Virgin Mary," along with two burning candles, a plate with some coins in it, and a photograph of Valerie leaning against the base of the statue. (T: 272-73; 315-16.) Although the officers brought cameras with them, one malfunctioned, and the other, a Polaroid, only had enough film for four or five photographs. (T: 274.) On cross-examination, Phinney admitted that the display in the closet was "odd," but that he had failed to take any photographs of it in light of the difficulties the officers had with their cameras. (T: 287-88.) Stassi conceded that the police clearly erred by failing to have functioning cameras with adequate film on hand when the warrant was executed. (T: 334-35.)

Valerie's upstairs neighbors, Donald and Karen Stonecipher were called as the next witnesses.  (T: 346-48, 395.)  Donald told the jury that he left work for his home at 3:30 P.M. on Friday.  (T: 350-51.)  When he arrived home, he saw Rivas' red Chevrolet van, with Rivas inside, parked in front of the house.  (T: 351.)  Later that evening, Donald and Karen went out to dinner.  (T: 355.)  During their dinner, Donald left Karen at the restaurant to give one of their sons a ride home from work.  (T: 355.)  The Stonecipher's son got off work between 9:20 and 9:30 P.M., at which time Donald picked him up and drove him home.  (T: 355.)  When he dropped his son off, Donald noticed that the lights in Valerie's apartment were on, which he considered unusual.  (T: 356.)  Later that evening, when Donald and Karen returned from dinner, at approximately 10:30 or 11:00 P.M., only the living room light remained on.  (T: 356, 403.)  Karen explained that she had witnessed Rivas enter Valerie's apartment with a key prior to January 1987.  (T: 398.)  On Tuesday, March 24, she overheard Rivas "banging at the back door" attempting to enter Valerie's apartment while Valerie was home.  (T: 398-400.)  The knocking stopped at some point, and Karen assumed that Valerie let Rivas into the apartment.  (T: 400, 416.)  Karen too saw Rivas' red van parked on her street on Friday afternoon, although

she noticed the vehicle around 2:00 or 3:00 P.M. (T: 400-01.) Lastly, Karen recalled seeing Valerie's cat in the common back hall of the building on Saturday morning, which was unusual because Valerie's "cats were never out." (T: 404.)

On Friday around 4:30 P.M., paperboy Christopher Reynolds came to collect payment from the Stonecipher and saw Rivas in a gray Member's Only jacket in front of 250 Hickok Avenue. (T: 428-30, 432.) Peter Cooney, an acquaintance of Rivas, passed by him twice on the road while driving on Friday. (T: 434-37.) At around 2:00 P.M. on Friday, Cooney saw Rivas driving his red van near Syracuse. (T: 436-37.) At around 5:00 or 5:30 P.M. that afternoon, Cooney was returning to Cazenovia on Route 92 when he saw Rivas heading the opposite direction, into Syracuse, driving his car. (T: 437-38.) Later that evening, Cooney testified, he went to Albert's at 10:30 P.M. (T: 439.) Cooney stayed at Albert's for about forty-five minutes and did not see Rivas there, although he did not check the back area of the bar. (T: 439, 449.) From Albert's, Cooney went to another nearby bar, but eventually returned to Albert's around 12:00 or 12:30 A.M. (T: 439-40.) Upon his return to Albert's, Cooney observed Rivas at the bar. (T: 440.)

Rivas' friend Mark Brosh also provided testimony about Rivas' whereabouts on Friday.  (T: 457-58.)  Brosh claims that Rivas, whom he said smoked Barclay cigarettes, called him earlier in the day to make plans that evening even though the two had not spent time together socially in about six months.  (T: 460-61, 463.)  Brosh told Rivas that he was going to Coleman's around 6:00 P.M., and encouraged Rivas to meet him there.  (T: 460-61.)  Rivas arrived at Coleman's between 6:00 and 6:45 P.M. and left between 9:00 and 9:30, according to Brosh.  (T: 461, 463, 469.)  Brosh's wife, Lori,[6] testified similarly about the timing of Rivas' departure from Coleman's.  (T: 486, 490.)  After testifying on cross-examination that Rivas "was a gentleman and polite" around women, Brosh admitted on re-direct examination that he was aware that Rivas had previously been arrested for "beat[ing] up" Sarah Hamlin, a former girlfriend, and that Hamlin had since moved away from Central New York "to get away from . . . Rivas."  (T: 465-66, 481-82.)

The next prosecution witness, John Cassano, was working at Liquor

_____

[6] As Lori Brosh had not yet married Mark Brosh at the time of Valerie's murder, police reports discussed below refer to her by her maiden surname, Fleming.  (*See, e.g.*, Dkt. No. 56, Attach. 2 at 132; Tr: 485.)

Square on Friday evening. (T: 493, 495-96.) He recalled Rivas, who drove a light gray or silver car, coming into the store between 9:30 and 10:00 P.M. and buying a bottle each of Almaden wine, rum, and an unknown third liquor. (T: 497-99, 501-02.) A sales receipt from 9:40 P.M. confirmed a sale of Bacardi rum and Almaden wine at that time. (T: 500.) Cassano explained that bottles sold by Liquor Square did not bear any identifying marks that would indicate that they were purchased from that store, and he could not verify whether a bottle of rum recovered from Valerie's apartment was purchased from Liquor Square. (T: 518-20.)

James Crimi was called as a prosecution witness after Cassano. (T: 525.) At the time in question, Crimi was dating Susan Stonecipher, the daughter of Donald and Karen. (T: 528, 926.) After Crimi picked Susan up from work around 8:00 P.M. on Friday, the pair "cruised around" for a while before Crimi dropped Susan off at her home on Hickok Avenue around 11:00 P.M. or 12:00 A.M. (T: 531-32.) Crimi saw Rivas, who was smoking a cigarette, sitting in his car on the street when they arrived at the building where Valerie and the Stoneciphers all lived. (T: 533.)

In connection with the investigation of Valerie's murder, James Kimak, another police officer witness, recorded video footage of Valerie's

apartment on March 30.  (T: 542-43.)  On cross-examination, Kimak

testified that he observed no packed suitcase and that only $22 was found

in the apartment.  (T: 560, 565-66.)  Officer Thomas Bland obtained

fingerprints from, among other things, a bottle of Blue Nun wine, a Bacardi

rum bottle, and an ashtray found in Valerie's apartment.  (T: 576, 579-80.)

Another officer, William Donohue, attempted to identify the fingerprints

secured by Bland.  (T: 583.)  The bottle of Blue Nun and ashtray had Rivas'

prints on them, and the Bacardi bottle had Valerie's prints on it.  (T: 589-

90, 592-93.)  Donohue admitted that he could not determine when the

prints were left behind on those items.  (T: 599.)  Fingerprints which

Donohue was unable to identify were also recovered from the telephone in

Valerie's apartment, and from the Stephen King book returned to the

Cazenovia Public Library.  (T: 588, 601.)  Officer Drew Buske recovered

from a drawer in Valerie's spare bedroom "a stack of greeting cards and

personal notes" she apparently received from Rivas and saved.  (T: 617;

*see* Dkt. No. 55, Attach. 6 at 35-96.)  Gary Pratt, another police officer,

explained that a host of other greeting cards and notes from Rivas were

found in the apartment.  (T: 648-50; *see* Dkt. No. 55, Attach. 6 at 99-104,

106-11.)  Officer Pratt also identified both Barclay and Carlton cigarette

18

butts in a photograph of the ashtray found in Valerie's home on March 30. (T: 632, 655-56; *see* Dkt. No. 55, Attach. 6 at 113.)

Lucas testified for the prosecution that he received a letter from Valerie in February 1987. (T: 670.) The first two lines of the letter he received were identical to those of the torn letter that police recovered from Rivas' kitchen garbage can. (T: 675; *compare* Dkt. No. 55, Attach. 5 at 196, 198, *with* Dkt. No. 55, Attach. 6 at 119-20.) Prosecution witness Margaret Burke Frio worked with Valerie and the two were friends. (T: 733-34.) Frio recounted that on February 18 or 19, 1987, she and Valerie bought a bottle of Blue Nun wine after their hospital shift ended, and went back to Valerie's apartment to have a glass of the wine. (T: 737-39.) While the women sat on the porch having a drink, Rivas arrived with flowers for Valerie, a situation about which Valerie was not pleased. (T: 739-40.) While Frio and Rivas were alone for a moment, he asked her to speak to Valerie on his behalf to help patch up their relationship. (T: 742.) On March 4, 1987, Frio and Valerie were at a bar with several friends from work when Rivas arrived and attempted to buy them drinks. (T: 743-44.) After rejecting Rivas' offer, Valerie and Rivas had a disagreement. (T: 744-45.) Frio and Valerie spoke briefly Friday morning, and, at that time,

Valerie mentioned her plans for the weekend.  (T: 746-47.)  Finally, Frio explained that Valerie was in the habit of cleaning out her ashtray often. (T: 751.)

Elizabeth Lewis was called as the next witness.  (T: 758.)  Lewis met Valerie through Lucas, and, with Lewis' husband, the four lived together from 1982 to late 1983.  (T: 760.)  According to Lewis, Valerie was very neat and tidy when they lived in the same home.  (T: 762.)  On March 20, Lewis called Valerie's apartment at a time that she later learned Valerie could not have been at home; the telephone was answered, however, by Rivas.  (T: 769-70.)  This prompted Lewis and her husband to suggest to Valerie that she change her locks, call the police, and stay with them.  (T: 771.)  On March 26 at around 1:30 A.M., Rivas called Lewis crying and saying Valerie's name in a mostly incoherent conversation where he spoke in both English and Spanish.  (T: 771-72.)  Lewis believed Rivas to be intoxicated when he called.  (T: 773.)  Lewis testified that Valerie had plans to travel on the weekend in question, and intended to leave Saturday morning.  (T: 774-75.)  Lewis also explained that she saw Rivas on Saturday night at Albert's.  (T: 777.)  According to her, she arrived at Albert's before 9:00 P.M. and saw Rivas when she walked in.  (T: 777-78.)

Lewis left Albert's for a party at Giordano's house where she did not see Rivas until around 12:00 A.M. (T: 779-80.) There, Rivas commented that it was "too bad" that Valerie did not feel well and did not come to the party, which Lewis found curious because Valerie was supposed to be out of town. (T: 780.) During the conversation, Rivas acknowledged that he went into Valerie's apartment when she was not home, took back a gift he had given her for her birthday, and was forced to follow her around because she would not speak to him on the telephone and he "had to see her." (T: 796.) Rivas also spoke about Valerie in the past tense during the exchange with Lewis. (T: 796.)

Next, Joseph Fields, an acquaintance of Rivas, testified that a week or two after Valerie was killed, he and Rivas spoke at Albert's. (T: 813-14.) While they were talking about Valerie, Rivas, who was "quite drunk," began to cry and said: "Valerie, Valerie, I didn't mean to do it." (T: 816-17.) Fields' girlfriend at the time, Kelly Williams Grey, did not overhear the conversation, but saw Fields react to something that Rivas said to him. (T: 826-27.) As drawn out during cross-examination, Grey did not come forward with the information she testified about until 1993 when contacted by "the authorities." (T: 828-29.)

Beverly Dorland lived near Rivas and was friendly with him in the weeks leading up to Valerie's death. (T: 846-48.) She went to Albert's on Friday at some time after 10:30 P.M., and testified that Rivas arrived there after midnight, "probably" between 12:30 A.M. and 1:30 A.M. on Saturday. (T: 848-49, 855.) To Dorland, Rivas appeared to be out of character when she first saw him, but, afterward, he "was totally normal." (T: 850.) A group of people including Dorland and Rivas decided to go out for breakfast together, but beforehand Rivas was asked by one of them to drive a woman home. (T: 851.) Rivas left Albert's around 1:50 or 2:00 A.M. to take the woman home; he met up with Dorland and the others for breakfast in Syracuse approximately one hour later. (T: 851.) Following breakfast, Rivas drove Dorland back to Cazenovia and dropped her off at Albert's, where her vehicle was parked. (T: 851-52.) Dorland also testified that a few weeks prior to Valerie's death, Rivas cared for Valerie's cats at his home. (T: 853-54.)

Dr. Mitchell was the final prosecution witness. (T: 865.) He examined Valerie's body the afternoon of March 30, and found it in rigor, meaning that the musculature had stiffened, and beginning the process of livor. (T: 868-69.) The examination revealed a bruise on Valerie's

forehead, inflicted within a twenty-four-hour period prior to her death. (T: 875, 908.) He opined that the cause of Valerie's death was strangulation, and elaborated that, given the nature of the injuries, she likely would not have been able to speak during the strangulation. (T: 879-80, 891.) According to Dr. Mitchell, Valerie's stomach contained about one cup of fluid and congealed grease, and her blood alcohol content (BAC) was .03 percent. (T: 884-86.) Assuming that Valerie died on any given day between 10:00 P.M. and midnight, her BAC was inconsistent with consuming two alcoholic drinks at 7:00 P.M., but was consistent with one or two drinks at 7:00 P.M. and another shortly before her death. (T: 886.) Saliently, Dr. Mitchell admitted that he could not "pinpoint with certainty the time of a person's death," but opined that, in this case, it was "more likely" that Valerie "died Friday night to possibly very early Saturday morning." (T: 886, 890.) On cross-examination, Dr. Mitchell acknowledged that Valerie could have died on Saturday or Sunday, and that, despite his testimony on direct examination, it would "[p]robably" be "fair to say" that Valerie dying on Friday was "on the outside edge of a possibility." (T: 895-98, 906-07.) Dr. Mitchell also explained that, despite the fact that rigor typically leaves the body within twenty-four to forty-eight hours, and on March 30 at 3:30

23

P.M. Valerie's body was in full rigor, his opinion that Valerie's death more likely occurred late on Friday or in the wee hours of Saturday was buttressed by decomposition of the brain and cool temperatures in the apartment, which retarded the onset and relaxation of rigor. (T: 903-05, 914-17.) During redirect examination, the District Attorney asked Dr. Mitchell whether, since testifying before the grand jury, he had reviewed "notes and slides in connection with this case," to which Dr. Mitchell responded in the affirmative. (T: 915.) In reviewing those materials, Dr. Mitchell noted decomposition in Valerie's brain, which "tend[ed] to push the limits further out." (T: 915.)

After unsuccessfully moving for dismissal of the indictment, Rivas called several witnesses in support of his defense. (T: 923.) First, Susan Stonecipher explained that she saw Valerie on Friday morning. (T: 931.) She admitted that she originally told police that she saw Valerie on Saturday, but claimed that she later realized that she was mistaken, and provided the police with an updated affidavit two days after Valerie's body was found. (T: 932, 934-35.) Albert's employee Susan Volz acknowledged that she told police that she saw Rivas at Albert's on Friday around 7:30 or 8:00 P.M., although she had no recollection of that fact at

the time of trial.  (T: 961, 966-67.)  John Marion also provided testimony relevant to Rivas' alibi defense.  (T: 973.)  In particular, Marion told the jury that he saw Rivas on Saturday night at Giordano's party.  (T: 973-74.)

Three police officers also testified at the behest of Rivas.  (T: 993, 1002, 1007.)  Officer Michael Ostuni revealed that Joseph Morgan, described on cross-examination as a con artist, career criminal, and drunk, told him that a man by the name of Patsy Baricella admitted to him that he killed a girl on Hickok Avenue because God told him to do it.  (T: 993-99.)  Ostuni testified during cross-examination that Baricella was known by him to be mildly mentally retarded.  (T: 1001.)  Officer Leonard Stephens gave further information about Baricella.  (T: 1003.)  While posted outside of Valerie's apartment on March 31 around 11:20 P.M., Stephens observed a vehicle pass by his location two or three times, prompting him to radio officer Bernice Barnette for the purpose of having her stop the vehicle.  (T: 1003-04.)  Barnette, who was on patrol nearby, saw the vehicle Stephens told her about and pulled it over after observing a traffic violation.  (T: 1007.)  The vehicle was registered to Baricella, and the occupant admitted to being Baricella, although he was without identification.  (T: 1008-09.)  Following Barnette's testimony, the defense rested.  (T: 1011.)  After

summations and little more than seven hours of deliberation, the jury returned a guilty verdict.  (T: 1030-1132, 1178, 1197.)

With new counsel, Rivas filed an unsuccessful motion to set aside the verdict pursuant to N.Y. Crim. Proc. Law § 330.30.  (DEPH: 239.[7])  He was ultimately sentenced to a term of imprisonment of twenty-five years to life by County Court (Mulroy, J.) (hereinafter the "trial court" or "trial judge").  (*See* Dkt. No. 55, Attach. 2 at 20.)  Rivas thereafter appealed his judgment of conviction.  (*See id.* at 18.)  His conviction was affirmed on appeal by the Supreme Court of the State of New York, Appellate Division, Fourth Judicial Department, *see People v. Rivas*, 214 A.D.2d 996 (4th Dep't 1995), his application for leave to appeal to the Court of Appeals of New York, (*see* Dkt. No. 55, Attach. 11), was subsequently denied, *see People v. Rivas*, 86 N.Y.2d 801 (1995), and his motion for a writ of error *coram nobis* was denied by the Fourth Department, *see People v. Rivas*, 231 A.D.2d 971 (4th Dep't 1996).  In July 1999, Rivas moved, pursuant to N.Y. Crim. Proc. Law § 440.10, to vacate the judgment of conviction.  (*See* Dkt.

---

[7] Page references preceded by "DEPH:" refer to the consecutively-paginated, two-volume transcript of an evidentiary hearing regarding Rivas' Amended Petition held on September 9, 2009.  (*See* Dkt. Nos. 60-61.)

No. 56, Attachs. 2, 3.)  Rivas asserted that his conviction should be

vacated based upon: newly discovered evidence—specifically, the opinion

of Dr. Cyril Wecht that Valerie died less than forty-eight hours, and more

likely less than thirty-six hours, prior to when her body was found; the late

disclosure or non-disclosure of exculpatory *Brady* and *Rosario* material;

and because his rights to due process and the assistance of counsel were

violated.  (*See* Dkt. No. 56, Attach. 3 at 1-2.)  Following an evidentiary

hearing before County Court (Brunetti, J.) wherein Rivas, Calle and the

District Attorney all testified, the motion was denied in its entirety.  (440:

10, 81-82, 105, 135-41; *see* Dkt. No. 56, Attach. 5.)  The Fourth

Department thereafter denied Rivas leave to appeal the denial of his

§ 440.10 motion.  (*See* Dkt. No. 14, Attach. 3 at 19.)

**B.**     **Procedural History**

Following the foregoing, Rivas filed a petition for a writ of habeas

corpus on December 12, 2001.  (*See* Pet., Dkt. No. 1.)  In the face of

respondent Brian Fischer's motion to dismiss the petition, (*see* Dkt. No. 7),

Rivas sought leave to amend, which was granted, (*see* Dkt. Nos. 10, 12).

Rivas thereafter filed the operative Amended Petition and appended the

affidavit of former counsel H. Mitchell Schuman, a memorandum of

law—both of which elaborated upon the claims asserted in the Amended Petition—and various exhibits. (*See* Am. Pet.; Dkt. No. 14, Attach. 3 at 8-48)  The court, finding that the Amended Petition was filed outside of the one-year statute of limitations, dismissed it and entered judgment in favor of Fischer. (*See* Dkt. No. 21.)  The Second Circuit vacated that judgment on appeal and remanded with specific instructions that this court make factual findings regarding whether a diligent person in Rivas' circumstances would have discovered, before May 8, 1999, the evidence he put forth, and whether the evidence provided a factual predicate for any of his habeas claims.  *See Rivas v. Fischer*, 294 F. App'x 677, 678-80 (2d Cir. 2008).  If Rivas failed to satisfy the diligence requirement of 28 U.S.C. § 2244(d)(1)(D), the Second Circuit further instructed, this court was to consider whether Rivas "established a credible claim of actual innocence." *Id.* at 679.

In light of the Second Circuit's decision, Magistrate Judge David E. Peebles held a two-day evidentiary hearing in September 2009. (*See* Dkt. Nos. 60-61.)  Following the hearing, Judge Peebles recommended dismissal of the Amended Petition, which recommendation was adopted by this court. (*See* Dkt. Nos. 65, 68.)  The Second Circuit again reversed,

finding that Rivas made a credible and compelling showing of actual innocence, which serves as an equitable exception to the limitations period set forth in § 2244(d).  *See Rivas v. Fischer*, 687 F.3d 514 (2012).  This court has been instructed to pass upon the merits of the constitutional claims alleged in the Amended Petition, *see id.* at 518, a task that it now undertakes.  Since the latest remand, the parties have filed supplemental briefing and appeared for argument.[8]  (*See* Dkt. Nos. 92-93, 96-97, 103.)

### III.  <u>Standard of Review</u>[9]

The Antiterorism and Effective Death Penalty Act of 1996 (AEDPA) provides that a petition for a writ of habeas corpus

> shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United

---

[8] Despite the court's efforts to expedite the disposition of this case, both parties have made requests for extensions of time.  (*See* Dkt. Nos. 74, 89, 95.)

[9] By letter brief, Fischer "invite[s]" the court to reassess the Circuit's finding that Rivas made a gateway showing of actual innocence in light of the Supreme Court's recent decision in *McQuiggin v. Perkins*, 133 S. Ct. 1924 (2013).  (*See* Dkt. No. 99.)  *McQuiggin* provides no basis for this court to reexamine the issue decided by the Second Circuit, and the court declines to do so.

States; or
(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).  With respect to whether the state court adjudicated the merits of a petitioner's claims, § 2254(d) "does not require a state court to give reasons before its decision can be deemed to have been adjudicated on the merits."  *Johnson v. Williams*, 133 S. Ct. 1088, 1094 (2013) (internal quotation marks omitted).  So long as a federal claim was presented to the state court and relief was denied, "it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary."  *Id.*

Turning specifically to § 2254(d)(1), the Supreme Court has explained time and again that, "a federal habeas court may overturn a state court's application of federal law only if it is so erroneous that 'there is no possibility fairminded jurists could disagree that the state court's decision conflicts with th[e Supreme] Court's precedents.'"  *Nevada v. Jackson*, 133 S. Ct. 1990, 1992 (2013) (quoting *Harrington v. Richter*, 131 S. Ct. 770, 786 (2011)); *see Metrish v. Lancaster*, 133 S. Ct. 1781 (2013) (explaining that success in a habeas case premised on § 2254(d)(1) requires the

petitioner to "show that the challenged state-court ruling rested on 'an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement'" (quoting *Richter*, 131 S. Ct. at 786-87)); *Johnson*, 133 S. Ct. at 1091 ("[T]he requirements of § 2254(d) are difficult to meet."). AEDPA foreclosed "'using federal habeas corpus review as a vehicle to second-guess the reasonable decisions of state courts.'" *Parker v. Matthews*, 132 S. Ct. 2148, 2149 (2012) (quoting *Renico v. Lett*, 559 U.S. 766, 130 S. Ct. 1855, 1866 (2010)).

With respect to § 2254(d)(2), the Supreme Court has instructed that, while the meaning of "unreasonable" is "'difficult to define,'" "a state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Wood v. Allen*, 558 U.S. 290, 301 (2010) (quoting *Williams v. Taylor*, 529 U.S. 362, 410 (2000)).[10] Even where reasonable jurists might

---

[10] Section 2254(e)(1) provides that "a determination of a factual issue made by a State court shall be presumed to be correct," and that "[t]he applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." The question of how that provision fits together with § 2254(d)(2) is unsettled. *See Wood*, 558 U.S. at 300. Notably, Rivas has failed to make any argument opposing Fischer's contention that § 2254(e)(1) affords a presumption of correctness to County Court's factual determinations. For reasons expressed in detail below, Rivas' arguments relevant to these factual

disagree about the propriety of a factual finding, "'on habeas review that does not suffice to supersede the trial court's . . . determination.'"  *Id.* at 301 (quoting *Rice v. Collins*, 546 U.S. 333, 342 (2006)).

## IV.  Discussion

**A.**    ***Brady***

The court addresses first Rivas' claim that his constitutional rights "were violated by the prosecution's failure to disclose a myriad of *Brady* material to the defense."  (Am. Pet. ¶ 12(B).)  As that claim is elaborated upon in the supplemental briefing, Rivas contends that County Court's denial of his § 440.10 motion was "unreasonably wrong."  (Dkt. No. 92, Attach. 1 at 38-42.)  Specifically, Rivas argues that the late disclosure of evidence related to Baricella's alleged admission to killing a girl on Hickok Avenue, as related to police by Morgan, (*see* Dkt. No. 56, Attach. 2 at 64), inhibited Calle's ability to investigate and effectively use that information. (Dkt. No. 92, Attach. 1 at 40.)  The following materials favorable to the defense were, according to Rivas, not disclosed at all: (1) the voluntary affidavits of Peter and Mary Lazarski, who lived at 227 Hickok Avenue,

---

determinations are without merit even when the standard more favorable to him is applied.

reflecting that Mary heard a scream at about 12:30 or 1:00 A.M. on Sunday, (*see* Dkt. No. 56, Attach. 2 at 52, 54-55); (2) police reports suggesting that Valerie was intimately involved with a man other than Rivas at the time of her death, (*see id.* at 102, 104); (3) police reports noting that the Stonecipher's son was "arrested in 1985 for a burglary at 248 Hickok Ave.," which was prior to the time Valerie lived there, (*id.* at 86-88, 90-91, 95; T: 347-49); (4) a police report detailing that a man employed by the hospital where Valerie worked made her uncomfortable, she made some sort of complaint about him, the man was transferred as a result, and he expressed that Valerie did not like him, (*see* Dkt. No. 56, Attach. 2 at 84); (5) a police report which recounted information about a neighborhood man who was "said to have taken youth(s) into a cellarway and performed unknown acts" on them, (*id.* at 100); and (6) information that Crimi was previously convicted of assault in the third degree, (*see id.* at 70). (*See* Dkt. 92, Attach. 1 at 40-41.) In particular, Rivas contends that County Court "failed to recognize the exculpatory nature of [these] materials and ignored the value of [them] in supporting [Rivas'] alibi and as a means to create a reasonable doubt." (*Id.* at 42.) Even more significant, Rivas argues, is that County Court failed to consider the evidence that suggested

33

that Valerie died on Saturday or Sunday in conjunction with Dr. Wecht's affidavit.  (*See id.*)

In the memorandum of law filed along with his Amended Petition, Rivas offers additional arguments regarding the claimed *Brady* violation. (*See* Dkt. No. 14, Attach. 3 at 30-40.)  There, Rivas places the supposed *Brady* material into three categories: reports that undercut (1) Dr. Mitchell's conclusion regarding Valerie's time of death; (2) the evidence suggesting that the only possible suspect was Rivas, "and that he alone was possessed of an alleged motive to harm [Valerie];" and (3) the appearance that all of the prosecution's witnesses were in agreement with each other. (*Id.* at 31.)  In addition to the allegedly undisclosed evidence identified above, Rivas contends that the prosecution failed to hand over: a report that Valerie's neighbor heard a barking dog and car speeding away around 11:00 P.M. on Saturday, (*see* Dkt. No. 56, Attach. 2 at 82), which goes to the first category; a report indicating that "a local man with a burglary record[—other than the Stonecipher's son—]left the area immediately after [Valerie's] death on a spur of the moment trip," (*see* Dkt. No. 56, Attach. 2 at 98), going to the second category; and, going to the third category, evidence that undermined the testimony of Crimi and Reynolds, (*see id.* at

109-12, 114, 116; T: 428-32), a report showing an unsuccessful attempt by police to match the lot number on a bottle of rum recovered from Valerie's apartment with lots sold by wholesalers to Liquor Square, (*see id.* at 118-19), and, finally, evidence that Rivas was a suspect from the inception of the investigation despite testimony to the contrary, (*see* Dkt. No. 56, Attach. 2 at 121; T: 239). (Dkt. No. 14, Attach. 3 at 32-38.) For the reasons discussed below, none of these assertions compel relief.

To set the backdrop for this argument, it is necessary to outline the holdings of the state courts, namely the Fourth Department and County Court, on these issues. On direct appeal of his conviction, Rivas argued, among other things, that the untimely disclosure of the Morgan affidavit and "two police reports which placed Baricella at the scene of the crime shortly after its discovery" deprived him of a fair trial.[11] (*See* Dkt. No. 102,

---

[11] Initially, it is noted that the appellate brief originally filed as part of the record in this case, (*see* Dkt. No. 55, Attach. 7), was not the brief considered by the Fourth Department on Rivas' direct appeal. Apparently, after the Fourth Department denied Rivas' request to exceed the page limit, *see People v. Rivas*, 209 A.D.2d 1057 (4th Dep't 1994), Rivas filed a corrected brief, which was largely identical, but contained a truncated factual summary. (*See* Dkt. No. 102, Attach. 1.) Additionally, in the corrected appellate brief, it appears that Rivas confused the pieces of evidence related to Morgan and Baricella. (*See* Dkt. No. 102 at 48.) Specifically, Rivas seems to equate the "two police reports which placed Baricella at the scene of the crime" with the Inter-Departmental-Memos

Attach. 1 at 47-52.)  In light of the trial court's offer to adjourn trial so that Rivas could "obtain witnesses concerning the exculpatory material or . . . introduc[e] . . . the material itself through the testimony of a police witness on [his] direct case," the Fourth Department found that Rivas, who selected the latter alternative, was provided a "'meaningful opportunity' to use" the untimely disclosed Morgan affidavit and Memos pertaining to Baricella's proximity to the crime scene on March 31.  *Rivas*, 214 A.D.2d at 997 (quoting *People v. Cortijo*, 70 N.Y.2d 868, 870 (1987)).

With respect to the host of evidence that Rivas contends was not disclosed, he argued in his § 440.10 motion that the prosecution failed to disclose a myriad of evidence that would have been favorable to his defense; that evidence has been set forth in detail above.  (*See* Dkt. No. 56, Attach. 3 at 13-24.)  At the conclusion of the evidentiary hearing on the motion, but prior to entry of its written decision, County Court made a factual determination that resulted in denial of that branch of Rivas' motion.

_____

dated May 27, 1987 and April 18, 1987.  (*Id.*)  The latter two Memos, however, pertain to Morgan, and make no mention of Baricella.  (*See* Dkt. No. 56, Attach. 2 at 59-60, 62.)  The former documents are likely two Inter-Departmental-Memos containing information regarding Baricella's close proximity to Valerie's home on March 31, 1987.  (*See* Dkt. No. 56, Attach. 2 at 66, 68.)

(440: 138; *see* Dkt. No. 56, Attach. 5 at 30-31.) In particular, the court found that, given Calle's shoddy memory of whether or not he received the purported *Brady* material in advance of trial, Rivas failed "to discharge his burden of persuasion . . . relative to [the] provision of documents," (440: 138). The only legal authority cited by the court on the issue was *People v. Ulrich*, 265 A.D.2d 884 (4th Dep't 1999), a case which, as relevant here, pertains to a § 440.10 movant's burden to establish by a preponderance every fact essential to support the motion. *See* N.Y. Crim. Proc. Law § 440.30(6).[12]

_____

[12] It is noted that in an argument related to, but distinct from whether a *Brady* violation occurred—which is considered below, *see infra* Part IV.B.6—Rivas asserts that Calle was ineffective for failing to make use of the identified *Brady* materials if he, in fact, received them. (*See* Dkt. No. 97 at 8.) On that point, County Court reached the issue of whether the jury would have reached a different verdict had Calle effectively used the materials, assuming he received them. (*See* Dkt. No. 56, Attach. 5 at 32-33.) The court did not, however, consider prejudice as it pertains to the instant issue of whether a *Brady* violation occurred at all; indeed, given its factual finding that Rivas failed to demonstrate suppression, the court had no occasion to consider the prejudice prong of a *Brady* claim. (*See id.* at 15-16; 440: 138.) Rivas' contention that, in deciding the instant claim, County Court "failed to recognize the exculpatory nature of such materials and ignored the value of these materials in supporting [Rivas'] alibi as a means to create a reasonable doubt," (Dkt. No. 92, Attach. 1 at 42), suggests that he may have conflated County Court's analysis of the *Brady* claim and the separate ineffective assistance of counsel claim based on a failure to utilize the *Brady* material.

Turning to the present inquiry—*i.e.*, whether the state courts' adjudication of Rivas' claims that he was denied a fair trial through a multitude of *Brady* violations, (*see* Am. Pet. ¶ 12(B)), involved an unreasonable application of clearly established federal law, or an unreasonable determination of the facts—the state courts were not unreasonable in their treatment of Rivas' *Brady* claim. "To establish a Brady violation, a petitioner must show that: (1) the undisclosed evidence was favorable to him; (2) the evidence was in the state's possession and was suppressed, even if inadvertently; and (3) the defendant was prejudiced as a result of the failure to disclose." *Mack v. Conway*, 476 F. App'x 873, 876 (2d Cir. 2012) (citing *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999)). While there is no bright-line rule regarding the timing of disclosure, "*Brady* material must be disclosed in time for its effective use at trial." *United States v. Coppa*, 267 F.3d 132, 135 (2d Cir. 2001); *see Leka v. Portuondo*, 257 F.3d 89, 100-01 (2d Cir. 2001). Thus, belated disclosure is not a *per se* violation. As is pertinent here, where the trial court makes an accommodation so that the defense can make effective use of the favorable information, such as grant an adjournment, no *Brady* violation occurs at all. *See United States v. Paredes-Cordova*, 504 F.

App'x 48, 53 (2d Cir. 2012). On the issue of suppression, it is the defendant's burden to show by a preponderance of the evidence that the prosecution failed to furnish the favorable documents. *See Walker v. Kelly*, 589 F.3d 127, 141-42 (4th Cir. 2009); *United States v. Pethick*, 361 F. App'x 910, 914 (10th Cir. 2010); *United States v. Gould*, 563 F. Supp. 2d 1224, 1243 n.3 (D. N.M. 2008); *Tipton v. Carlton*, No. 3:03-CV-434, 2006 WL 587595, at *10 (E.D. Tenn. Mar. 10, 2006); *Mathis v. Berghuis*, 202 F. Supp. 2d 715, 718 (E.D. Mich. 2002) ("Petitioner must establish each of the[ *Brady*] elements by a preponderance of the evidence."); *cf. Kyles v. Whitley*, 514 U.S. 419, 434 (1995) (indicating that all aspects of a *Brady* claim must be established by a preponderance with the exception of materiality, which "does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal"). New York courts apply the same standards as federal courts to questions involving the disclosure of defense-favorable *Brady* material. *See People v. Geaslen*, 54 N.Y.2d 510, 516 (1981).

Here, neither the Fourth Department nor County Court unreasonably applied federal law, nor did they unreasonably determine the facts. *See* 28 U.S.C. § 2254(d). As the Fourth Department explained, Rivas was given

options by the trial court for making effective use of the information contained in the Morgan affidavit and related documents, which, as relevant here, implicated Baricella as Valerie's killer. *See Rivas*, 214 A.D.2d at 997; (T: 947-59, 977-91.) The record reflects that Calle and Rivas conferred about which course to take, and, as a tactical matter, chose to introduce the information through police officers instead of accepting the court's offer to adjourn for the production of Morgan. (T: 985-87, 991.) Thus, found the Fourth Department, Rivas was "afforded a 'meaningful opportunity' to use the allegedly exculpatory material." *Rivas*, 214 A.D.2d at 997 (quoting *Cortijo*, 70 N.Y.2d at 870). That legal finding reflects a reasoned application of federal law as to Rivas' *Brady* claim on direct appeal. *See McKee v. Greiner*, 36 F. App'x 7, 7-8 (2d Cir. 2002). Indeed, "even though th[e] disclosure was belated, it was not 'suppressed' by the government within the meaning of *Brady* because the government's disclosure during trial was a 'sufficient disclosure in sufficient time to afford the defense an opportunity to use,'" particularly in light of the trial court's offer to adjourn the trial for the production of witnesses, or to permit Rivas to question several police officers with relaxed evidentiary rules. *Paredes-Cordova*, 504 F. App'x at 53 (quoting *Leka*, 257 F.3d at 103); (T: 987.)

Moving on to County Court's handling of the balance of evidence Rivas claims was favorable and discovered by him only after trial, it similarly cannot be said that the court adjudicated Rivas' claim as it relates to that evidence in an unreasonable way. At the evidentiary hearing on Rivas' § 440.10 motion, Rivas, Calle, and the District Attorney testified regarding the disclosure of the documents underpinning this claim. (440: 10, 81, 105.) Rivas alleged that he did not see many of the documents identified as supporting this branch of his *Brady* claim until they were obtained through a Freedom of Information Law (FOIL) request, or through other means, although he asserted that he reviewed documents that the District Attorney disclosed to Calle prior to trial. (440: 20, 22-27.)[13] Calle was unable to recall whether he had seen the evidence claimed to be

_____

[13] Rivas was not specifically asked if he had seen Exhibits 14, 15, 20, 27, 28, 29, 37, and 38 prior to trial. The omission is of no moment because Rivas incorporated all of the documents attached to his § 440.10 motion in his *Brady* claim, (*see* Dkt. No. 56, Attach. 3 at 13), which necessarily means that County Court ruled on the merits of the claim as it related to all alleged *Brady* material, *see Johnson*, 133 S. Ct. 1088, 1094. And, in any event, the court's ruling was globally applicable to the provision of all documents identified in the motion papers by the prosecution. (440: 138.) Finally, the court notes that Exhibit 5 and the second page of Exhibit 16 are identical, (*compare* Dkt. No. 56, Attach. 2 at 57, *with id.* at 82), there is no Exhibit 35, and Exhibits 31 and 36 are identical, (*compare id.* at 116, *with id.* at 127).

favorable to Rivas or not.  (440: 89-90; *see* Dkt. No. 56, Attach. 2 at 44-45.)  Finally, the District Attorney testified that he routinely disclosed police reports, and that, while he specifically recalled disclosing some of the evidence that was identified in the § 440.10 motion, he had no recollection as to the remaining evidence.  (440: 105-06, 112.)  Acknowledging the presumption of regularity that it could rely upon to find that the District Attorney had disclosed the evidence Rivas claimed he did not, the court decided the issue, instead, on the question of whether Rivas met his burden of proving that the defense did not receive the evidence.  (440: 136-38.)  As to that issue, County Court explained that it could not rely on the testimony of Rivas to meet his burden because he would have knowledge of the evidence only to the extent that Calle made him aware of it prior to trial, and the court also found Calle's testimony "too inaccurate or unpersuasive or undetailed" to carry the burden for Rivas.  (440: 137-38.)  Ultimately, the court found Rivas' proof "insufficient to discharge his burden of persuasion" and denied Rivas' "motion relative to provision of documents."  (440: 138.)

Although County Court was specifically referring to the statutory burden imposed on Rivas under New York law, *see* N.Y. Crim. Proc. Law

§ 440.30(6), the court's finding was consistent with, and satisfied, the federal rule requiring the same showing as to the government's suppression of favorable evidence, *see Walker*, 589 F.3d at 142. The factual determination, which was based, in part, on a credibility determination, that Rivas failed to satisfy the court that the prosecutor did not provide him with the evidence was also a reasonable determination in light of the evidence presented at the evidentiary hearing. *See* 28 U.S.C. § 2254(d)(2). A final note is necessary to address Rivas' claim that County Court acted unreasonably by failing to consider the supposed *Brady* material in conjunction with Dr. Wecht's affidavit, (*see* Dkt. No. 92, Attach. 1 at 42.) That argument goes to whether the allegedly uncovered evidence was material, and, thus, is irrelevant given the court's finding that there was no suppression by the prosecution. *See generally Mack*, 476 F. App'x at 876.

**B.    Ineffective Assistance of Counsel**

Rivas' next argument in favor of habeas corpus relief, and the one upon which he relies most ardently, is that the woefully inadequate performance of Calle deprived him of effective assistance of counsel, in violation of both the New York and federal constitutions. (*See* Dkt. No. 14,

43

Attach. 3 at 44-48.)  Specifically, Rivas contends in his Amended Petition that Calle's representation was rendered constitutionally deficient by his failure to: apprise Rivas of the fact that the decision to testify was his alone to make; insist that the trial court rule upon his *Sandoval*[14] motion; realize that a prosecution witness identified Rivas in a photograph on April 3, 1987 despite the fact that the photograph was not obtained by police until April 6, 1987; and raise the fact that the prosecution switched the evidence tag on a letter written by Valerie to reflect that it was recovered from Rivas' home, while the original tag indicated that it was recovered from Valerie's residence.  (*See* Am. Pet. ¶ 12(E).)  Additionally, Rivas' supplemental brief identifies the "most critical[]" shortcoming of Calle as his "failure to challenge, in any meaningful way, the unreliable and baseless testimony" of Dr. Mitchell.  (Dkt. No. 92, Attach. 1 at 2; *see* Dkt. No. 56, Attach. 3 at 34.)  Finally, while Rivas continues to pursue his underlying argument that the government withheld *Brady* material from the defense, he argues in the alternative that, if Calle in fact possessed the purported *Brady* documents at the time of trial, his failure to utilize them was further evidence of his

_____

[14] *People v. Sandoval,* 34 N.Y.2d 371 (1974).

ineffectiveness.[15]  (*See* Dkt. No. 92, Attach. 1 at 3, 18; Dkt. No. 14, Attach. 3 at 19.)

### 1. Ineffective Assistance of Counsel Standard

As discussed above, under the deferential standard set forth in AEDPA, in order for Rivas to prevail on his habeas petition on the issue of ineffective assistance of counsel, he must show that the state court's adjudication of that claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d); *see Cornell v. Kirkpatrick*, 665 F.3d 369, 374 (2d Cir. 2011).  The "'clearly established Federal law'" which defines "the right to effective assistance of counsel guaranteed by the Sixth Amendment," and which underlies Rivas' claim, is *Strickland v. Washington*, 466 U.S. 668 (1984).  *Cornell*, 665 F.3d at 374-

_____

[15] Rivas also raised several ineffective assistance arguments on direct appeal to the Fourth Department.  (*See* Dkt. No. 102 at 59-62.) With the exception of his claim relating to the testimony of Reynolds, (*see id*. at 61), Rivas does not reassert any of the ineffective assistance contentions argued on direct appeal, and the court therefore need not address them.

75; *see Taylor*, 529 U.S. at 390-91.

The Sixth Amendment right to counsel serves to "protect the fundamental right to a fair trial," which is guaranteed by the Constitution "through the Due Process Clauses." *Strickland* 466 U.S. at 684-85. "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Id*. at 686. To show that counsel was constitutionally ineffective, a convicted defendant must demonstrate both deficient performance by counsel, and resulting prejudice to the defense. *See id*. at 687. Failure to satisfy either of these two elements is fatal to a defendant's claim, and where one prong is found to be lacking, the court need not consider the remaining prong. *See id*. at 697; *Bennett v. United States*, 663 F.3d 71, 85 (2d Cir. 2011).

Because "the proper standard for attorney performance is that of reasonably effective assistance" considering all the circumstances, satisfaction of the first prong requires "the defendant [to] show that counsel's representation fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 687-88. The reviewing court

must be "highly deferential" in its scrutiny of counsel's performance, and "every effort [must] be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time" the challenged action was taken. *Id.* at 689. Furthermore, in light of "the difficulties inherent in making" such an evaluation, the "court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.* (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)).

In recognition of the fact that "[a]ttorney errors come in an infinite variety and are as likely to be utterly harmless in a particular case as they are to be prejudicial," defendants must also "affirmatively prove prejudice." *Id*. at 693. To do so, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*. at 694. Because the effect of attorney errors on factual findings made and

inferences drawn can range from trivial to pervasive, and because "a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support," the court must, in assessing prejudice, "consider the totality of the evidence before the judge or jury." *Id*. at 695-96.

### 2. State Court Adjudication

With the exception of that portion of Rivas' ineffective assistance claim that relates to the testimony of Reynolds, the state court adjudication at issue is County Court's determination of Rivas' § 440.10 motion.[16] (*See* Dkt. No. 56, Attach. 5 at 21-36.)  In denying Rivas' claim of ineffective assistance, County Court evaluated Calle's representation under New York's "meaningful representation" standard.  (*See id*. at 33-34 (citing *People v. Baldi*, 54 N.Y.2d 137 (1981))).  "To meet the New York standard, a defendant need not demonstrate that the outcome of the case would have been different but for counsel's errors; a defendant need only demonstrate that he was deprived of a fair trial overall."  *Rosario v. Ercole*,

---

[16] As discussed below, the court construes Rivas' ineffective assistance claim dealing with Reynolds' testimony as challenging the adjudication of the Fourth Department on direct appeal.  *See infra* Part IV.B.4.

601 F.3d 118, 124 (2d Cir. 2010) (citing *People v. Caban*, 5 N.Y.3d 143, 155-56 (2005)).  This threshold may be reached by "[a] single error by otherwise competent counsel . . . if that error compromised the integrity of the trial as a whole."  *Rosario*, 601 F.3d at 124.  While New York's "meaningful representation" standard differs from *Strickland*, the Second Circuit has determined that it is not contrary to the federal standard.  *See Cornell*, 665 F.3d at 382 n.11 (citing *Rosario*, 601 F.3d at 123-24).  Accordingly, Rivas cannot seek to show that County Court's adjudication of his ineffective assistance claim was "contrary to clearly established Federal law," but instead must show that it "involved an unreasonable application of" *Strickland*, or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d); *see Cornell*, 665 F.3d at 382 n.11.

When a state court determination on ineffective assistance is reviewed by a federal court under AEDPA, the question "is not whether [the] federal court believes the state court's determination under the *Strickland* standard was incorrect but whether that determination was unreasonable—a substantially higher threshold."  *Cornell*, 665 F.3d at 375 (quoting *Rosario*, 601 F.3d at 123).  Specifically, the question now before

the court is whether the state court decisions denying Rivas' claims of ineffective assistance "involved an unreasonable application of" *Strickland*, or were "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); *see Cornell*, 665 F.3d at 375. While the court considers Calle's purported failings in turn, it does so mindful that these errors must be viewed "in the aggregate." *Lindstadt v. Keane*, 239 F.3d 191, 199 (2d Cir. 2001). In light of the "doubly deferential" standard of review applicable to Rivas' claim, *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009), the court finds that the state court decisions in question neither reached unreasonable factual determinations nor applied *Strickland* in an unreasonable fashion.

     *3.    Right to Testify and* Sandoval *Motion*

     Rivas argues first that Calle failed to notify him that the decision to testify at trial was his alone to make, and that his ability to make such a decision was hindered by Calle's failure to insist that the trial court rule on his *Sandoval* application. (*See* Am. Pet. ¶ 12(E); Dkt. No. 14, Attach. 3 at 44-47.) Contrary to Rivas' contentions, however, County Court's adjudication of these issues was free of unreasonable factual determinations and did not involve an unreasonable application of

*Strickland*.

At the hearing before County Court, Rivas and Calle testified on the issue of whether Rivas was "adequately advised that whether to testify or not was his choice." (440: 135.) Rivas testified that Calle never informed him that the decision to testify was his to make, and that, although he informed Calle from the outset that he wanted to testify, Calle "kept brushing [him] off." (440: 17-18.) Rivas also recounted that, when he inquired of Calle at the close of the defense's case whether he would be permitted to testify, Calle told him that, because the prosecution would "use too much against [him]," he would not. (440: 18.) In stark contrast, Calle testified that he asked Rivas whether he would testify, and that Rivas responded "that he would not." (440: 83.)

On the issue of his failure to request a *Sandoval* ruling, Calle recalled that, while the trial judge raised the issue on the Friday prior to trial, he declined a hearing in light of uncertainty regarding Rivas' desire to testify, the fact that Rivas had "just [been] taken into custody at a hospital," and his belief that neither he nor Rivas was "capable of going forward" with a hearing at that juncture. (440: 83-84, 92.) Despite initially declining a *Sandoval* hearing, Calle believed that he requested that such a hearing

remain available in the event that Rivas decided to testify.  (440: 84.)

Specifically, Calle suggested to the trial court that a *Sandoval* hearing

could be held at the close of the government's case.  (440: 93-94.)  While

Calle likened this suggestion to his request to similarly delay the defense's

opening statement, he conceded that he did not consider the impact that a

pre-trial *Sandoval* ruling could have on voir dire.  (440: 84, 94.)  When

Calle subsequently became satisfied that Rivas was not going to testify, he

concluded that a *Sandoval* hearing would not be necessary.  (440: 85.)

At the close of the hearing, County Court found that, while Calle

"attempted to be truthful," there existed concerns "about the accuracy of

his recollection."  (440: 140-41.)  As to Rivas, the court harbored concerns

about both the "accuracy of his recollection and also his truthfulness."

(440: 141.)  In light of these findings, County Court determined that Rivas

had failed to meet his burden of "proving that he was not properly advised

relative to his right to testify."  (440: 141.)

Because County Court's decision as to Rivas' ineffective assistance

claim relating to his right to testify was based entirely on a factual finding,

the court construes Rivas' current challenge of that holding as alleging "an

unreasonable determination of the facts in light of the evidence presented

in the State court proceeding."[17]  28 U.S.C. § 2254(d)(2); (440: 129.)

Rivas' only argument in opposition to County Court's factual finding is a conclusory assertion that his "testimony established that he was never informed" that the decision of whether or not to testify was his to make.[18] (Dkt. No. 14, Attach. 3 at 45.)  Based on the "substantially contradictory"

---

[17] As discussed above, *see supra* note 9, the Supreme Court has yet to clarify "whether, in order to satisfy § 2254(d)(2), a petitioner must establish only that the state-court factual determination . . . was 'unreasonable,' or whether § 2254(e)(1) additionally requires a petitioner to rebut a presumption that the determination was correct with clear and convincing evidence," *Wood*, 558 U.S. at 299.  Where, as here, the petitioner's attack on the state court's factual determination fails under both § 2254(d)(2), and the "arguably more deferential standard set out in § 2254(e)(1)," *id*. at 301, however, the unresolved interplay between the two standards is immaterial.  *See Tatum v. Lempke*, 481 F. App'x 659, 661 n.2 (2d Cir. 2012).

[18] Although Rivas does not suggest that County Court's determination involved an unreasonable application of clearly established federal law, he cites *Brown v. Artuz*, 124 F.3d 73 (2d Cir. 1997), as articulating the standard under which Calle's actions should be judged. (*See* Dkt. No. 14, Attach. 3 at 45-48.)  In *Artuz*, the Second Circuit concluded, among other things, that "trial counsel's duty of effective assistance includes the responsibility to advise the defendant concerning the exercise of" his constitutional right to testify.  124 F.3d at 74.  It bears noting, however, that, at the time of Rivas' 1993 trial, which preceded the Second Circuit's decision in *Artuz* by four years, the question of "who should bear the responsibility for ensuring that the defendant is informed of the nature and existence of" his right to testify remained an undecided issue both within the Second Circuit, and amongst various other Circuit courts.  *Id*. at 78-79.

testimony of Calle and Rivas, however, the court's finding that Rivas failed to meet his burden of "proving that he was not properly advised relative to his right to testify," (440: 141), was not an unreasonable determination of the facts. *See Wood*, 558 U.S. at 301; *see also United States v. Caracappa*, 614 F.3d 30, 48-50 (2d Cir. 2010).

In the written order denying Rivas' § 440.10 motion, County Court found that Rivas "failed to carry his burden in proving that [Calle's failure to insist on a *Sandoval* ruling] constituted ineffectiveness." (Dkt. No. 56, Attach. 5 at 23.) This determination was based largely on the court's conclusion that Rivas failed to "show how he was specifically prejudiced by his alleged inaccessibility to the witness stand." (*Id*. at 23-25.) Specifically, County Court noted that, despite having "ten years in which to gather his thoughts," Rivas provided only "conclusory statements which [he] failed to support either in his supporting affidavit to the motion or in his testimony at the April hearing." (*Id*.) County Court found further that Calle's "advisement that [Rivas] not testify was not ineffective because it was part of an overall defense strategy," and that such strategy was "legitimate." (*Id*. at 25-26.)

County Court's factual determination that Calle's failure to insist on a

*Sandoval* ruling from the trial court was a component of his trial strategy was supported by Calle's testimony and was not unreasonable. *See Berryman v. Morton*, 100 F.3d 1089, 1095 (3d Cir. 1996) (holding that "[t]he question of whether a decision was a tactical one is a question of fact," while the question of "whether this tactic was reasonable is a question of law" (quoting *Horton v. Zant*, 941 F.2d 1449, 1462 (11th Cir. 1991))). Similarly, while Calle's decision to forego a *Sandoval* hearing prior to the commencement of trial may not have been the most deft tactic, County Court's determination as to the legitimacy and lack of prejudice caused by that decision, as well as by Calle's purportedly broader advisement that Rivas not testify, was not an unreasonable application of *Strickland*. *See, e.g.*, *Pringle v. Bradt*, No. 11-CV-06504, 2012 WL 3614184, at *10 (W.D.N.Y. Aug. 21, 2012) (finding that counsel's failure to request a *Sandoval* hearing was likely "a strategic decision not to place Petitioner in the witness chair," and was not "objectively unreasonable and prejudicial"); *Smith v. Lempke*, No. 08-CV-6065, 2010 WL 2629794, at *9 (W.D.N.Y. June 28, 2010) (finding that counsel's failure to request a *Sandoval* ruling was a "matter[] of trial strategy").

Accordingly, County Court's denial of Rivas' ineffective assistance

claim pertaining to his right to testify in his own defense was not based on an unreasonable determination of the facts, and did not involve an unreasonable application of *Strickland*. *See* 28 U.S.C. § 2254(d).

4. *Reynolds' Testimony and Evidence Tag*

Rivas argues next that Calle was ineffective in failing to recognize and raise two evidentiary inconsistencies in the prosecution's case. (*See* Am. Pet. ¶ 12(E); Dkt. No. 14, Attach. 3 at 47-48.) This claim is unavailing as to both evidentiary issues raised.

First, Rivas contends that Calle failed to highlight for the jury an inconsistency between the grand jury testimony of Reynolds—during which he purportedly stated that he identified Rivas with a photograph taken in Coleman's on Friday, and shown to him by police on April 3, 1987—and a police report obtained pursuant to FOIL requests which indicates that the police did not receive that photograph until April 6, 1987. (*See* Dkt. No. 14, Attach. 3 at 47.) This inconsistency, Rivas argues, would have required the jury "to conclude that either the prosecution's account of the identification was a fabrication or the police reports were a fabrication." (*Id*.)

Before considering Rivas' argument regarding Reynolds' testimony,

56

the court must first determine which state court adjudication is properly before it for review.  It appears as though the Reynolds argument now adduced by Rivas was raised in substantially the same form on both direct appeal and in support of his § 440.10 motion, (*compare* Dkt. No. 56, Attach. 3 at 38-39, *with* Dkt. No. 102, Attach. 1 at 60-61), and was adjudicated on the merits by the Fourth Department, *see Rivas*, 214 A.D.2d at 997.  Apparently anticipating the likelihood of such duplication, but not having been provided with Rivas' appellate briefs, County Court noted that, "[i]f defendant is complaining about something which occurred on the record . . . that issue should have been litigated on direct appeal, and defendant's unjustifiable failure to raise the issue . . . must result in the denial of the instant motion" pursuant to "[N.Y. Crim. Proc. Law] § 440.10(2)(c)."  (Dkt. No. 56, Attach. 5 at 27.)  County Court continued that, "[t]o the extent that the issue was raised and determined by the appellate court, this portion of [Rivas'] motion must be denied pursuant to [N.Y. Crim. Proc. Law] § 440.10(2)(a)," (*id.*), which requires denial of a § 440.10  motion when "[t]he ground or issue raised upon the motion was previously determined on the merits upon an appeal from the judgment." Noting uncertainty regarding the precise argument advanced by Rivas,

(*see id*. at 28 n.9), and whether such an argument was raised before the Fourth Department, County Court analyzed the Reynolds claim and found it to be without merit, concluding that Rivas "failed to show that there was any inconsistency in the testimony which trial counsel should have recognized." (*Id*. at 26-29.)

Because the court discerns no material difference in the Reynolds argument raised on direct appeal and that adduced in support of the § 440.10 motion, and in light of N.Y. Crim. Proc. Law § 440.10(2)(a), the court considers the Fourth Department's opinion to be the operative state court adjudication on this limited issue. *See Rivas*, 214 A.D.2d at 997*; see also Johnson*, 133 S. Ct. at 1094.[19] Where, as here, the "state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief." *Richter*, 131 S. Ct. at 784; *see Rivas*, 214 A.D.2d at 997.

––––––––––––––––––––

[19] The court notes, however, that, like the Fourth Department's opinion, and for substantially the same reasons articulated herein, County Court's denial of Rivas' ineffective assistance claim as it pertains to Reynolds' testimony is devoid of either unreasonable factual determinations or an unreasonable application of *Strickland.*

Turning to the merits of the claim,[20] Rivas argues that Reynolds testified before the grand jury that he identified Rivas based on "a photograph taken in a pub on the Friday night before [Valerie's] demise," and that, according to the police reports obtained through a FOIL request, that identification was made on April 3, 1987. (Dkt. No. 14, Attach. 3 at 47.) That testimony contradicts another police report, Rivas claims, which shows that the picture taken at Coleman's on Friday was not received by the police until April 6, 1987. (*See id*.) In fact, one of the undated police reports in question, which was completed by investigator Thomas Unger, indicates that Reynolds identified Rivas at two distinct points, based on two separate photographs. (*See* Dkt. No. 56, Attach. 2 at 129.) That report, which is authored in the first person, states that, at 10:15 P.M. on April 3, 1987, while "canvas[ing] the 200 [block] of Hickock [(sic)] Ave[nue]," Unger

---

[20] Rivas' argument pertaining to Reynolds appears to be premised on internally inconsistent assertions. The crux of his complaint is that Calle failed to cross-examine Reynolds on an inconsistency between his grand jury testimony and police reports which Rivas simultaneously argues Calle did not possess at the time of trial. (*See* Am. Pet. ¶¶ 12(B), (E); Dkt. No. 14, Attach. 3 at 47; Dkt. No. 56, Attach. 3 at 13.) Providing Rivas every benefit of the doubt, however, in light of County Court's finding that he failed to meet his burden in showing that the purported *Brady* material was withheld from Calle, the court considers Rivas' claim as though Calle possessed the police reports at the time of trial.

stopped and spoke with Reynolds, and showed him a picture of Rivas "that [he] had been showing to the other partys [(sic) he] had spoken to." (*Id*.) After reviewing the picture, Reynolds told Unger that, while collecting payment for his newspaper route at approximately 4:30 P.M. on Friday, he had seen Rivas in front of 248 Hickok Avenue. (*See id*.) Unger "then requested that [Reynolds] . . . respond with [him] to obtain a statement" regarding "what he saw." (*Id*.) The report states further that Unger "later showed [Reynolds] a picture that C.I.D.[ h]ad obtained from a gathering at Coleman's Rest[aurant]," which was taken on Friday, and that Reynolds indicated that the jacket worn by Rivas in that photograph was the same one that he was wearing when Reynolds saw him in front of 248 Hickok Avenue. (*Id*.) The second police report in question, authored by investigator Timothy Phinney, indicates that the photograph of Rivas at Coleman's on Friday was given to police by Lori Brosh on April 6, 1987. (*See id*. at 132; T: 485.)

Unger's undated report makes clear that Reynolds identified Rivas on two separate occasions, based on two separate photographs. (*See* Dkt. No. 56, Attach. 2 at 129.) While the first identification occurred on April 3, 1987, the fact that the police report is undated, and the ambiguous

language used by Unger, make it unclear whether Reynolds' second identification of Rivas, which was based on the photograph taken in Coleman's, and about which Rivas now complains, also occurred on April 3.  (*See id.*)  Even if the police reports in question are assumed to evince a discrepancy regarding Reynolds' identification of Rivas by way of the photograph from Coleman's, Reynolds clearly identified Rivas based on a different photograph on April 3, and, during his trial testimony, also identified Rivas in person and described the jacket that he was wearing on Friday.  (*See id.*; T: 430-32.)

As it is not clear that any discrepancy regarding Reynolds' testimony existed, and in light of the limited prejudicial impact that such a discrepancy, if highlighted, would likely carry given Reynolds' multiple identifications of Rivas, the Fourth Department's denial of Rivas' claim of ineffective assistance of counsel relating to Reynolds did not constitute an unreasonable application of *Strickland*.  *See Strickland*, 466 U.S. at 689, 693-94; *see also United States v. Nersesian*, 824 F.2d 1294, 1321 (2d Cir. 1987) ("Decisions whether to engage in cross-examination, and if so to what extent and in what manner, are . . . strategic in nature.").

Rivas argues next that Calle failed to alert the jury to the fact that the

original evidence tag on a letter written by Valerie, and "alleged to have been recovered from [Rivas'] home,"[21] indicated that the letter was in fact recovered from Valerie's home. (Am. Pet. ¶ 12(E); Dkt. No. 14, Attach. 3 at 47-48.) This contention is similarly without merit.

At trial, Stassi testified that, during a search of Rivas' home on the evening of March 30, 1987, he found a crumpled piece of newspaper in a kitchen garbage can. (T: 308, 311.) Upon opening the newspaper, he found a letter addressed to "Bob," that had been torn into sixteen pieces. (T: 311-12.) Stassi pieced together the sixteen torn portions of the letter, and a bag containing the reassembled correspondence was admitted at trial as People's Exhibit 22. (T: 311-14, 674.)

Rivas insists that, during a pre-trial hearing, he and Calle viewed the

-------------------

[21] In his memorandum of law in support of his Amended Petition, Rivas refers to the letter in question as "People's Exhibit 54." (Dkt. No. 14, Attach. 3 at 47.) It is clear from Rivas' description of the letter, however, that he is actually referring to People's Exhibit 22, which is comprised of a bag containing a torn letter that was allegedly recovered from a trash can in Rivas' home. (*Compare id*. at 47-48, *with* T: 313-15, 674; *see also* Dkt. No. 56, Attach. 3 at 39 n.3.) People's Exhibit 54, on the other hand, is a letter written by Valerie and received by Lucas, which the prosecution did not suggest was found in Rivas' home. (T: 670-71.) Accordingly, the court construes Rivas' argument as challenging Calle's failure to raise a purported change in the evidence tag on People's Exhibit 22.

evidence bag containing the letter, and that the evidence tag on the bag indicated that the letter was recovered from Valerie's home. (*See* Dkt. No. 14, Attach. 3 at 47-48.) This contention is in direct conflict with the stance taken by Rivas on direct appeal. (*See* Dkt. No. 102, Attach. 1 at 45-47.) In arguing before the Fourth Department that the trial court erred in permitting seizure of the torn letter, Rivas admitted that, "during the execution of the search warrant, Investigator Stassi seized a torn letter that was found inside a crumpled newspaper, which in turn was inside a garbage bag in [Rivas'] kitchen." (*Id*. at 46.) In fact, although it found the admission of the letter to be harmless error, the Fourth Department agreed with Rivas that the "seizure of the pieces of paper found during the search of his residence was not justified." *Rivas*, 214 A.D.2d at 996.

County Court denied Rivas' ineffective assistance claim relating to the evidence tag, concluding that he had "failed to support his allegations or to show that they had any impact whatsoever on his conviction." (Dkt. No. 56, Attach. 5 at 29-31.) In light of the lack of evidence suggesting that the evidence tag was changed, or that the torn letter was found anywhere other than in Rivas' home, the existence of considerable evidence to the contrary, and the absence of any indication of prejudice, neither County

Court's factual determinations nor its application of *Strickland* to Rivas'

evidence tag claim were unreasonable.  *See Strickland*, 466 U.S. at 689,

693-94.

### 5.      *Failure to Challenge Dr. Mitchell*

The aspect of Calle's representation which Rivas contends was

"most critically" deficient was his failure to appreciate that time of death

was a critical issue in the case, and his resulting failure to challenge the

findings and testimony of Dr. Mitchell.  (Dkt. No. 92, Attach. 1 at 2-3, 23-

38; *see* Dkt. No. 97 at 2-9.)  Specifically, Rivas argues that Calle erred in

failing to: consult or retain an independent forensic pathologist to examine

Dr. Mitchell's findings, or hire a local investigator to uncover impeachment

evidence relating to Dr. Mitchell himself; cross-examine Dr. Mitchell

regarding his apparent reliance on non-existent brain slides; and utilize a

search warrant application to cross-examine Dr. Mitchell in order to

highlight a discrepancy between his original time of death estimation, and

that articulated before the grand jury and at trial.  (*See* Dkt. No. 92, Attach.

1 at 2-3, 23-38.)[22]  Although hindsight suggests that Calle's handling of Dr.

_____

[22] Notably, while Calle's failure to retain an expert was raised in support of Rivas' § 440.10 motion, (*see* Dkt. No. 56, Attach. 3 at 34), it is not specifically argued in Rivas' Amended Petition, (*see* Am. Pet.).  In any

Mitchell was not without fault, County Court's denial of Rivas' ineffective assistance claim as it relates to that portion of his representation was comprised of both reasonable factual determinations and a reasonable application of *Strickland*.

      i. Cross-Examination of Dr. Mitchell

The court first considers Rivas' complaints regarding Calle's cross-examination of Dr. Mitchell. (*See* Dkt. 92, Attach. 1 at 30; Dkt. No. 97 at 5-6.) Rivas contends that Calle was ineffective for failing to question Dr. Mitchell on his purported review of non-existent brain slides, (*see* Dkt. No. 97 at 5-6), and for failing to impeach Dr. Mitchell with a copy of the search warrant application, (*see* Dkt. No. 92, Attach. 1 at 29-30). Neither of these claims warrants habeas relief.

During Dr. Mitchell's re-direct examination at trial, the District Attorney asked whether, in preparation for trial, he had "review[ed his] slides and . . . notes," to which Dr. Mitchell responded in the affirmative. (T: 915.) Dr. Mitchell testified further that, in reviewing his slides, he saw

---

event, the parties briefed this issue extensively, and, during the May 29, 2013 hearing, the court identified this absence, and *sua sponte* granted a motion by Rivas to amend his Amended Petition to include the argument in the pleading. (Dkt. No. 103 at 9-10, 17-19.)

some decomposition to the brain, and that such decomposition "tends to push the limits [of time of death] further out."  (T: 915.)  Calle did not conduct a re-cross-examination of Dr. Mitchell.  (T: 917.)  In his closing, the District Attorney stated that Dr. Mitchell "had a chance to review autopsy sectional slides of the brain."  (T: 1083.)  During the pendency of Rivas' § 440.10 motion, the government admitted that, while it possessed photographs of the brain, no brain slides existed.  (*See* Dkt. No. 92, Attach. 1 at 17.)

In assessing the question of whether the non-existence of brain slides constituted newly discovered evidence, County Court opined that "any competent defense counsel in a homicide case should be sufficiently familiar with the file contents of discovery from the medical examiner that such testimony would immediately raise questions to be answered at the time of cross-examination," and that Calle, specifically, "should have taken the opportunity at the time to challenge Dr. Mitchell's statement, or at least to inquire about the existence of slides."  (Dkt. No. 56, Attach. 5 at 5.) Although County Court concluded that "[a]ny argument relative to the failure of defense counsel to explore Dr. Mitchell's statement regarding the slide review should go to the effectiveness of trial counsel," (*id*. at 8-9), his

subsequent determination of Rivas' ineffectiveness claim was silent as to brain slides, (*see id*. at 21-36).

As an initial matter, it is unclear whether County Court included Rivas' brain slides claim in his opening comments on ineffective assistance when he remarked, after reviewing Rivas' ineffective assistance arguments, that "some [claims] appear on the record sufficiently to have allowed for appellate review and which are therefore precluded from review by this court, but which this court has considered as part of the overall picture of representation by this trial counsel." (*Id*. at 22.) Because it is not clear whether N.Y. Crim. Proc. Law § 440.10(2)(c) precluded consideration of this claim by County Court, the court assumes that the argument was encompassed in its decision, and was therefore adjudicated on the merits. *See Johnson*, 133 S. Ct. at 1094 (finding that, where a federal claim is presented to the state court and relief is denied, "it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary").

Though County Court was silent as to the brain slide issue in its ruling on ineffective assistance, its earlier discussion of the topic is instructive. The strong language used leaves little doubt that County Court

believed Calle's failure to cross-examine Dr. Mitchell on the issue of brain slides fell below an objective standard of reasonableness. (*See* Dkt. No. 56, Attach. 5 at 4-9.) County Court found, however, that because Dr. Mitchell may have been referring to the photographs of the brain, Rivas failed to show that his testimony about the slides was false. (*See id*. at 7.) Because of this ambiguity, and because "Dr. Mitchell never indicated that he was relying solely upon a review of those slides to support his time of death conclusions," County Court concluded that Rivas could not "show that the lack of existence of brain slides is of 'such character as to create a probability that had such evidence been received at the trial the verdict would have been more favorable to the defendant.'" (*Id*. at 7-8 (quoting N.Y. Crim. Proc. Law § 440.10(1)(g))). Although County Court's prejudice finding is related to Crim. Proc. Law § 440.10(1)(g), that standard is largely analogous to the *Strickland* prejudice prong. *See* 466 U.S. at 694.

In addition to County Court's reasoning, the likelihood that cross-examination by Calle as to the existence of brain slides would have impacted the verdict is minimized by the fact that, even absent such inquiry, Calle elicited an admission from Dr. Mitchell that it was "[p]robably" fair to say that a Friday time of death was on the "outside edge of a

possibility," and that Dr. Mitchell had "[p]robably" testified as such, before reviewing the slides, in front of the grand jury.  (T: 905-07.)  Accordingly, despite the lack of explanation offered, and discerning no error in County Court's factual conclusions, the court finds that County Court's denial of Rivas' ineffective assistance claim as to Calle's failure to cross-examine Dr. Mitchell on the issue of brain slides did not involve an unreasonable application of *Strickland*.

Next, Rivas complains that Calle was ineffective for failing to impeach Dr. Mitchell on his purported change in time of death using a search warrant application which was available to Calle at trial.  (*See* Dkt. No. 92, Attach. 1 at 29-30; Dkt. No. 56, Attach. 2 at 49-50.)  That application, authored by Timothy Phinney, stated that "Dr. Mitchell's preliminary estimate on the time of [d]eath of [Valerie] was sometime Saturday . . . afternoon, and Sunday morning."  (Dkt. No. 56, Attach. 2 at 50.)

During his cross-examination of Dr. Mitchell, Calle asked whether the examiner could explain a local newspaper story dated March 31, 1987, in which it was reported that Dr. Mitchell's "report" placed Valerie's time of death "sometime Saturday or early Sunday morning."  (T: 894-95.)  When Dr. Mitchell responded that he did "not speak to the newspapers," and that

Calle would have to take his inquiry up with the reporter himself, Calle broadened the scope of the question, asking whether Dr. Mitchell had ever estimated Valerie's time of death to be late Saturday or early Sunday morning. (T: 895.) Dr. Mitchell responded that he had "never tied [himself] to such a time," but admitted that it was "quite possibl[e]" that he had previously stated that late Saturday or early Sunday could have been the time of death, but that he did not recall if he had made such a statement. (T: 895-96.) Upon further questioning from Calle, Dr. Mitchell elaborated that, though he had "not given the opinion of a specific time of death," he would "have told people to consider those times as possible." (T: 897-98.)

As with the brain slide issue, County Court's ineffective assistance of counsel discussion does not specifically address Rivas' search warrant application claim. (*See* Dkt. No. 56, Attach. 5 at 21-36.) Although the fact that Calle possessed the search warrant application at trial suggests that this claim may have been included in the arguments summarily precluded by County Court pursuant to Crim. Proc. Law § 440.10(2)(c), (*see id*. at 21-22), the ambiguous nature of that preclusion leads the court to treat Rivas' search warrant claim as having been adjudicated on the merits. *See Johnson*, 133 S. Ct. at 1094. Rivas must therefore "show[] there was no

reasonable basis for the state court to deny relief."  *Richter*, 131 S. Ct. 770 at 784.

In light of the lack of deficiency or prejudice, Rivas clearly fails to meet his burden.  The crux of Rivas' argument is that Calle failed to use a search warrant application containing Dr. Mitchell's purported secondhand opinion, the admissibility of which is uncertain, *see, e.g.*, *United States v. Ramirez*, 894 F.2d 565, 570-71 (2d Cir. 1990), rather than a newspaper article containing the same purported secondhand opinion, (*see* Dkt. No. 92, Attach. 1 at 29-30).  The court discerns no deficiency in this election. *See Nersesian*, 824 F.2d at 1321 ("Decisions whether to engage in cross-examination, and if so to what extent and in what manner, are . . . strategic in nature.").  Furthermore, only Rivas' initial question to Dr. Mitchell on the topic related specifically to the newspaper article, after which he broadened the scope of his inquiry to Dr. Mitchell's statements as to time of death generally.  (T: 895-98.)  In the end, Calle elicited from Dr. Mitchell an admission that he would "have told people to consider [Saturday afternoon and Sunday morning] as possible."  (T: 897-98.)

As such, no prejudice resulted from Calle's choice of a newspaper article over a search warrant application as the tool through which he

sought to impeach Dr. Mitchell, and County Court's denial of Rivas'
ineffective claim as to that issue did not involve an unreasonable
application of *Strickland*.

### ii. Failure to Investigate

In support of his contention that Calle's representation was rendered
ineffective by his failure to challenge the findings and testimony of Dr.
Mitchell, Rivas points principally to Calle's failure to hire both an
independent forensic pathologist and a local private investigator.  (*See,
e.g.*, Dkt. No. 92, Attach. 1 at 2-3; 440: 82.)  A forensic pathologist, Rivas
argues, would have revealed that Dr. Mitchell's findings and testimony on
the issue of time of death were "unreliable and lacked [a] scientific basis,"
while a private investigator would have uncovered "a treasure trove of
cross-examination material that would have undermined Dr. Mitchell's
testimony," including "newspaper articles describing the New York State
Department of Health's investigation of Dr. Mitchell and the Medical
Examiner's Office at the time of trial for numerous improprieties and
possible criminal violations."  (Dkt. No. 92, Attach. 1 at 2-3, 11, 29.)

Applying New York's "meaningful representation" standard, County
Court concluded that Calle "formulated a trial strategy, it was an objectively

reasonable one, and it was executed in a reasonably competent manner."

(Dkt. No. 56, Attach. 5 at 33-34.)  Specifically, County Court found that

Calle's decision not to consult or hire a forensic pathologist to challenge

Dr. Mitchell's findings as to time of death was part of a trial strategy "based

upon a defense that [Rivas] was sufficiently alibied for the entire weekend,

(although arguably better alibied for Saturday night than Friday night)," and

that the prosecution would therefore "not be able to prove [Rivas'] guilt

beyond a reasonable doubt whether the jury found that the crime occurred

on Friday night or on Saturday night."  (*Id*. at 34-35.)  Although it expressed

concerns regarding the thoroughness of Calle's representation, County

Court found that the strategy which he employed was "reasonably

advanced," and that Rivas had failed to establish that it suffered from a

"complete lack of explanation or an absence of legitimacy."  (*Id*. at 35-36.)

Rivas' claim regarding Calle's failure to hire an investigator was similarly

denied by County Court, which concluded that Rivas' "specific complaints

about the alleged errors committed by [Calle] do not amount to ineffective

assistance of counsel."  (*Id*. at 32-36.)

Rivas challenges both County Court's factual finding that Calle's

failure to challenge the findings and testimony of Dr. Mitchell as to time of

death constituted a trial strategy, as well as its legal conclusion that such a strategy was reasonable.  (*See* Dkt. No. 92, Attach. 1 at 23-38; Dkt. No. 97 at 9); *see also Berryman*, 100 F.3d at 1095.  In light of Calle's testimony that he did not give significant consideration to retaining a pathologist to challenge Dr. Mitchell's time of death estimate because he believed that Rivas' alibi and his ability to impeach Dr. Mitchell's credibility on cross-examination precluded the government from proving their case beyond a reasonable doubt, (440: 85-86), County Court's predicate finding that such omission of action was part-and-parcel of a defense strategy was not an unreasonable determination of the facts,  (*see* Dkt. No. 56, Attach. 5 at 33-35); 28 U.S.C. § 2254(d)(2); *see also Wood*, 558 U.S. at 301.  The court turns, then, to the question of whether County Court's conclusion that Calle's strategy was reasonable was, itself, "an unreasonable application of" *Strickland*.  28 U.S.C. § 2254(d)(1); *see Cornell*, 665 F.3d at 375.

The reasonableness of electing to forego one avenue of defense in favor of another is gauged by the "adequacy of the investigation[] supporting [that] judgment[]."  *Wiggins v. Smith*, 539 U.S. 510, 521-23 (2003).  "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and

strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Strickland*, 466 U.S. at 690-91. Stated another way, "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Id*. at 691. Where counsel has "reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable." *Id*. "[A] court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further." *Wiggins*, 539 U.S. at 527.

While "[n]o particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant," *Strickland*, 466 U.S. at 688-89, "[n]orms of practice, reflected in national standards like the American Bar Association (ABA) Standards for Criminal Justice, are useful guides for evaluating reasonableness," *Greiner v. Wells*, 417 F.3d 305, 321 (2d Cir.

2005). The ABA standards in effect in 1993 instructed that "counsel should conduct a prompt investigation of the circumstances of the case and explore all avenues leading to facts relevant to the merits." ABA Standards of Criminal Justice: Prosecution and Defense Function § 4-4.1(a) (3d ed. 1993).

As an initial matter, the court is unpersuaded by Rivas' claim relating to Calle's failure to hire a local private investigator, and need not undertake a lengthy discussion of counsel's duty to investigate the personal and professional lives of opposing witnesses. Rivas complains primarily that, in failing to hire a local investigator or review local newspapers, Calle missed an opportunity to uncover a "treasure trove" of information detailing an investigation of Dr. Mitchell and the medical examiner's office by the New York State Department of Health. (*See* Dkt. No. 92, Attach. 1 at 29.) Rivas testified before County Court, however, that, prior to trial, he hired a personal investigator. (440: 48, 74-75, 77-78.) Although Rivas stated that Calle never "use[d] an investigator in the case," it is clear from his testimony that, while Calle did not hire a separate private investigator, he worked with, and provided file documents to, the investigator hired by Rivas. (440: 48, 74-75, 77-78.)

In addition to the obvious use of a local investigator by the defense, the extent to which Dr. Mitchell's investigation was public knowledge prior to the trial, and thus could have been discovered by Calle or the investigator hired by Rivas, is unclear. Although Rivas does not cite to it directly, the purported *Brady* documents provided by him include a March 5, 1993 article by the Syracuse Herald-Journal detailing a press conference held on the same date, at which Dr. Mitchell refuted "a series of allegations leveled against him by employees," and which was attended by a number of supporters, including the District Attorney. (Dkt. No. 56 Attach. 2 at 78-79.) Although Rivas specifically points to newspaper articles cited by the Second Circuit in *Rivas*, 687 F.3d at 521 n.7, as examples of documents which should have been uncovered by Calle, (*see* Dkt. No. 92, Attach. 1 at 29), those articles dealt with Dr. Mitchell's subsequent resignation, and were dated November 20, 1993 and November 16, 1995, or eight months, and two years and eight months, respectively, after Rivas' March 1993 trial.

Furthermore, while Rivas argues here that Dr. Mitchell's professional improprieties would have been discovered by resort to a private investigator or review of local newspapers, (*see* Dkt. No. 92, Attach. 1 at

29), this contention is in direct contravention of the position taken by him in support of his § 440.10 motion, (*see* Dkt. No. 56, Attach. 3 at 7, 9-10). There, in an effort to show that the evidence in question was newly discovered, Rivas argued that "even the best of attorneys could not have fully uncovered" the improprieties of Dr. Mitchell, and that "[c]ounsel could not have known to look for the prior bad acts of [Dr. Mitchell] and, had he looked, would never have found anything, as the investigations of Dr. Mitchell were not public at the time of trial and did not surface until after this prosecution was concluded." (*Id*. at 7, 10.)

County Court addressed Rivas' private investigator claim in two contexts. In considering whether evidence of Dr. Mitchell's investigation constituted newly discovered evidence, County Court noted that "although knowledge of the investigation . . . may have provided trial counsel with a wealth of cross-examination material," Dr. Mitchell was not accused of performing autopsies incorrectly or testifying falsely in any proceedings,[23] leading to the conclusion that Rivas had "failed to show how this

_____

[23] Although the court acknowledges that, in a separate filing, Rivas points to affidavits of Dr. Mitchell's former colleagues which suggest that he would be willing to testify untruthfully, (*see* Dkt. No. 66 at 4 n.3), those statements were prepared years after County Court's ruling, and are of no moment to the instant analysis.

information could have altered the jury verdict." (Dkt. No. 56, Attach. 5 at 12-14.)  As part of its ineffective assistance of counsel analysis, County Court also addressed, and denied, Rivas' private investigator claim.  (*See id*. at 32-33.)

In light of Rivas' testimony that an investigator was employed by him and that Calle worked with that investigator, and a resulting lack of prejudice in any event, County Court's determination regarding Rivas' ineffective assistance claim as it relates to Calle's failure to hire a local investigator did not involve an unreasonable application of *Strickland*.

The issue of Calle's failure to hire a forensic pathologist, however, requires a more searching inquiry.  To assess the reasonableness of Calle's strategy, the court must consider the investigation underlying that strategy, measured against prevailing professional norms.  *See Wiggins*, 539 U.S. at 523.  Although "[c]riminal cases will arise where the only reasonable and available defense strategy requires consultation with experts or introduction of expert evidence, whether pretrial, at trial or both," it is the "[r]are . . . situation[] in which the 'wide latitude counsel must have in making tactical decisions' will be limited to any one technique or approach." *Richter*, 131 S. Ct. at 789 (quoting *Strickland*, 466 U.S. at

689); *see Dugas v. Coplan*, 428 F.3d 317, 328-29 (1st Cir. 2005); *Miller v. Anderson*, 255 F.3d 455, 459 (7th Cir. 2001)*, vacated on other grounds*, 268 F.3d 485 (7th Cir. 2001).  "[T]here is no *per se* rule that requires trial attorneys to seek out an expert,"  *Gersten v. Senkowski*, 426 F.3d 588, 609 (2d Cir. 2005) (internal quotation marks and citation omitted), and while "[i]t can be assumed that in some cases counsel would be deemed ineffective for failing to consult or rely on experts, . . . even that formulation is sufficiently general that state courts . . . have wide latitude in applying it," *Richter*, 131 S. Ct. at 789; *see Toland v. Walsh*, No. 2-cv-399, 2008 WL 820184, at *8 (N.D.N.Y. Mar. 26, 2008) ("'[T]he decision whether or not to call an expert witness generally falls within the wide sphere of strategic choices for which counsel will not be second-guessed on habeas review.'" (quoting *Stapleton v. Grenier*, No. 98 CV-1971, 2000 WL 1207259, at *16 (E.D.N.Y. July 10, 2000))).

While the fact-specific nature of the reasonableness inquiry leaves the court with a dearth of factually analogous case law explicating counsel's duty to consult with an expert, a brief survey of several cases which have explored the issue—many of which Rivas cites in support of his petition, (*see generally* Dkt. No. 92, Attach. 1)—is instructive.  In *Showers*

*v. Beard*, 635 F.3d 625, 626 (3d Cir. 2011), the petitioner was convicted of murdering her husband by administering to him a lethal dose of liquid morphine.  In arguing that Showers "surreptitiously administered the lethal dose," the prosecution relied on circumstantial evidence and testimony from an expert that the liquid morphine could be masked, while the defense insisted that the deceased committed suicide.  *Id*. at 627. Showers' trial counsel did not present expert testimony to rebut the government's expert on the ability of liquid morphine to be masked, electing instead to rely on the testimony of a lay witness and cross-examination of the prosecution's expert.  *See id*. at 627, 631.  Like Rivas, Showers retained Dr. Wecht post-conviction, and he testified "that the lethal dose could not have been administered surreptitiously or forcefully and that [petitioner]'s husband likely committed suicide."  *Id*. at 627.  The Third Circuit found the investigation of petitioner's trial counsel to be insufficient, concluding that "testimony by an independent, credible expert witness was necessary to present to the jury the sharp, crucial contrast between voluntary and involuntary ingestion of a bitter toxic substance, the single most critical element in this case."  *Id*. at 633 (internal quotation marks and citation omitted).

In *Dugas*, 428 F.3d at 319, the petitioner was convicted of arson. Because Dugas' primary defense was centered on "creating reasonable doubt that the fire was not arson," and because the state had a weak case beyond its arson evidence, the First Circuit found that "challenging the state's arson case was critical." *Id*. at 329. Dugas' trial counsel failed, however, to "consult an expert in arson investigation or learn how to effectively use the terminology and techniques of arson investigation from his own research." *Id*. at 328. Although the First Circuit acknowledged that "reasonably diligent counsel are not always required to consult an expert as part of pretrial investigation in a case involving the use of expert witnesses by the state," it found that, taken together, "the importance of challenging the state's arson case to Dugas'[] defense, the unfulfilled promise to the jury to do so, the crucial role of the arson evidence to the state's case, [counsel's] lack of knowledge and experience in arson investigation and arson cases, and [counsel's] initial awareness of" weaknesses in the state's case, "demonstrate[d] the inescapable need for expert consultation in this case." *Id*. at 328-29, 331. The failure of Dugas' counsel to "thoroughly investigate the 'not arson' defense and seek expert assistance" was therefore deemed violative of *Strickland's* performance

prong.  *Id*. at 332.

In *Richter*, 131 S. Ct. at 781-82, the petitioner was convicted of murder, attempted murder, burglary, and robbery.  While the prosecution's case was built on victim testimony and circumstantial evidence, the defense's opening statement led the prosecution to shift its focus to blood evidence.  *See id*.  With no advance notice, and over the objection of Richter's trial counsel, the prosecution offered the testimony of a detective as an expert in blood pattern evidence, as well as the testimony of a serologist.  *See id*. at 782.  Richter's counsel cross-examined both expert witnesses and called seven defense witnesses, including Richter himself.  *See id*.  Following conviction, Richter petitioned for a writ of habeas corpus, arguing, among other things, that his trial counsel was ineffective "for failing to present expert testimony on serology, pathology, and blood spatter patterns," and supplemented this argument with affidavits from two serologists and a pathologist.  *Id*. at 783.  The Supreme Court disagreed with the Ninth Circuit's view as to what was the "critical issue" in the case, and reasoned that, "[e]ven if it had been apparent that expert blood testimony could support Richter's defense, it would be reasonable to conclude that a competent attorney might elect not to use it."  *Id*. at 789

(internal quotation marks and citation omitted).  In support of this conclusion, the Court noted that electing to test blood samples or make blood evidence a central issue of the case presented risks such as unfavorable test results or a shift in attention to "esoteric matters of forensic science, distract[ion of] the jury from whether [the victim] was telling the truth, or transform[ation of] the case into a battle of the experts." *Id*. at 789-90.  Noting that "it sometimes is better to try to cast pervasive suspicion of doubt than to strive to prove a certainty that exonerates," and that Richter's counsel simply "pursued a course that conformed to the first option," the Court found that "there was no basis to rule that the state court's determination [denying petitioner's ineffective assistance claim] was unreasonable."  *Id*. at 790.

It is also useful to consider a class of cases—child sexual abuse prosecutions—in which the Second Circuit has, despite acknowledging the lack of a *per se* rule requiring consultation with an expert, largely circumscribed defense counsel's latitude to forego such expert consultation.  *See Gersten*, 426 F.3d at 608-11; *Eze v. Senkowski*, 321 F.3d 110, 128 (2d Cir. 2003); *Pavel v. Hollins*, 261 F.3d 210, 223 (2d Cir. 2001); *Lindstadt*, 239 F.3d at 201.  Because such cases often turn on the

testimony of the alleged victim, and corroboration of that testimony by the interpretation of physical evidence by a medical expert, the Second Circuit has reasoned that the likelihood of undermining the entire prosecution by challenging the findings of the government's medical expert generally requires that defense counsel consult with a medical expert.  *See Gersten*, 426 F.3d at 608; *Eze*, 321 F.3d at 128.  In *Gersten*, however, the court noted that, while consultation with a medical expert is "particularly critical" where refutation of the prosecution's expert could serve to undermine "the only direct evidence that any crime occurred or that, if it did," it was perpetrated by the petitioner, "[t]he situation may be different in a case where objective evidence exists implicating petitioner in a crime."  426 F.3d at 609.

Turning to the details of the investigation at issue, Calle testified at the April 7, 2000 hearing that, although he "deal[t] with the issue of . . . time of death," he did not give "significant attention" to hiring an expert on the issue because he believed that Rivas did not commit the crime and that he "had an alibi for the entire weekend."  (440: 85-86.)  In addition to his reliance on Rivas' alibi, Calle also believed that, between 1987 and Rivas' indictment, Dr. Mitchell had changed his estimation as to the time of

Valerie's death from "either Saturday or Sunday," to Friday, and that he "would be able to impeach [Dr. Mitchell's] credibility" based on that inconsistency.[24]  (440: 86.)  Both of these strategies were on display in Calle's opening statement to the jury, during which he argued that Rivas could not have committed the crime on Friday as the prosecution alleged, that Valerie was alive on Saturday, and that Dr. Mitchell was unsure of the time of death, as evidenced by his inconsistent estimates on the issue.  (T: 77-85.)

As support for the alibi defense, Calle submitted to the trial court a notice of alibi covering Friday through Sunday.  (*See* Dkt. No. 55, Attach. 2 at 42.)  Rivas confirmed in his testimony before County Court that he and Calle discussed his alibi, and that some names included in the notice of alibi were provided to Calle by him, while others came from police reports.  (440: 49-51.)  In explaining his partial reliance on Rivas' alibi, Calle testified that, as to Friday, "there were a number of affidavits of people at bars in Cazenovia . . . which placed [Rivas] at that location some many miles away" from Valerie's apartment, and that he and Rivas had traveled to

_____

[24] As explained below, *see infra* Part IV.C.1, the record evidence calls into question whether Dr. Mitchell changed his opinion at all.

Cazenovia together to "conduct[] an investigation." (440: 85-86.) That investigation may well have been the source of Calle's knowledge that Albert's bar was comprised of two rooms, a fact on which he relied to elicit, on cross-examination, an admission from Cooney that he could not rule out the possibility that Rivas was at that bar during a particular portion of Friday night. (T: 438-39, 447-49.)

While Rivas did not testify at trial, his purported whereabouts during the weekend in question were presented to the jury through the testimony of Brennan, who described a March 30, 1987 interview during which Rivas detailed his movements between Friday and Monday. (T: 242-43.) Additional testimony regarding Rivas' whereabouts throughout the weekend was offered by multiple prosecution witnesses, some of whom were listed in the defense's notice of alibi. (*See, e.g.*, Dkt. No. 55, Attach. 2 at 42.) Although Calle was not asked specifically at the hearing what he understood Rivas' alibi to be for each portion of the weekend in question, it can safely be assumed that, in light of his pretrial discussions with Rivas, his review of witness affidavits, and his compiling of the notice of alibi, the factual basis which he developed through his investigation was substantially the same as that which was borne out by the trial testimony.

87

Brennan testified that, when asked about his whereabouts Friday night, Rivas claimed to have been at Coleman's in Syracuse from approximately 6:00 P.M. until 11:00 P.M., at which time he drove to Albert's in Cazenovia. (T: 242.)  After leaving Albert's at approximately 2:00 A.M., Rivas claimed to have driven back to Syracuse to eat breakfast with friends, following which he returned home at 4:00 A.M.  (T: 242.)  The testimony of Mark Brosh, who was named in the notice of alibi, confirmed Rivas' presence at Coleman's from 6:00 P.M. at the earliest, until 9:30 P.M. at the latest, and Lori Brosh provided photographs of Rivas at Coleman's during that period.  (T: 462, 469, 463, 487-88.)  As for Rivas' arrival at Albert's, Cooney, who first went to Albert's earlier Friday evening, testified that, when he returned to the bar between midnight and 12:30 A.M., Rivas was already there.  (T: 440.)  Dorland, who appears to be identified in the notice of alibi as well,[25] testified that she saw Rivas enter Albert's between 12:30 and 1:30 A.M.  (T: 849.)  Dorland corroborated Rivas' account of returning to Syracuse for breakfast, and added that, between leaving Albert's and arriving in Syracuse one hour later, Rivas

_____

[25] The notice of alibi references a woman identified as "Beth Dorlind."  (Dkt. No. 55, Attach. 2 at 42.)

provided a ride home to Karen Fitzsimmons. (T: 850-51, 861.) After breakfast, Dorland testified, Rivas drove her back to Cazenovia, where the two then parted ways. (T: 851-52.)

Brennan provided the jury with exclusive testimony regarding Rivas' alleged whereabouts during the daytime hours of Saturday and Sunday. (T: 242-43.) On Saturday, Rivas claimed to have been at Albert's long enough to eat lunch at approximately 11:30 A.M., and again from 3:30 P.M. until 8:00 P.M. (T: 242-43.) During the portions of the day that he was not at Albert's, Rivas claimed to have been at home. (T: 242-43) Rivas told Brennan that, after leaving Albert's at 8:00 P.M. Saturday, he went to Giordano's house party, where he remained until 4:00 A.M. (T: 243.) Lewis, a friend of Valerie's, testified that she went to Albert's on Saturday night, and that, when she arrived before 9:00 P.M., Rivas was there. (T: 777-78.) Lewis left Albert's about an hour and a half later, and arrived at Giordano's party before 11:00 P.M., at which time Rivas was not present. (T: 779-80.) Although she admitted that she did not see Rivas "come in the door" at Giordano's, the first time that she saw him there was around midnight. (T: 780.) Rivas' presence at Giordano's party was corroborated further by Marion, who appeared on the notice of alibi, though

he did not indicate at what time during the party he saw Rivas, or when Rivas arrived at, or left, Giordano's.  (T: 973-76.)

As for Sunday, Rivas told Brennan that he awoke at approximately 11:00 A.M. and went into town to buy a newspaper.  (T: 243.)  Rivas then drove around town for "a little while," went home to wash his car, and returned to Albert's "later in the afternoon," where he stayed until approximately 11:00 P.M. Sunday night.  (T: 243)

Accordingly, Calle's investigation of the facts likely made clear that, while large portions of Rivas' alibi for Friday were corroborated, a discrepancy existed as to the time of Rivas' departure from Coleman's and his arrival at Albert's, leaving his whereabouts unverified between approximately 9:30 P.M. and midnight.  This gap was not insignificant in light of Cassano's testimony that Rivas purchased liquor at Liquor Square between 9:30 P.M. and 10:00 P.M., and the testimony of Crimi and Susan Stonecipher that placed Rivas in his car in front of Valerie's apartment on Hickok Avenue at some time between 11:00 P.M. and 1:00 A.M.  (T: 497-502, 532-33, 936-37.)

On cross-examination, Calle acknowledged that, although he considered it to be "sufficient," Rivas' alibi for Friday was not complete, and

was "not as strong" as was his alibi for Saturday and Sunday. (440: 94-95.) Calle acknowledged further that limiting the time of death to Saturday and Sunday would have helped the defense's case. (440: 95.) While this acknowledgment likely reflects the degree to which Rivas' whereabouts were corroborated for Saturday night, Brennan's testimony highlighted the following periods of Saturday and Sunday during which Rivas professed to be alone, thereby rendering corroboration impossible: 4:00 A.M. until 11:30 A.M. Saturday morning; the period between completion of lunch and 3:30 P.M. Saturday afternoon; 4:00 A.M. until 11:00 A.M. Sunday morning; the period during which he drove around town after purchasing a newspaper Sunday morning; and the time between his car wash and arriving at Albert's later Sunday afternoon.

The alibi defense was not employed in isolation, but was combined instead with a strategy of impeaching Dr. Mitchell based on inconsistent testimony. (440: 86.) Specifically, Calle believed that he could impeach Dr. Mitchell's credibility on cross-examination by highlighting for the jury apparent inconsistencies between his original time of death estimate, and the estimate that he presented to the grand jury. (T: 86.) Impeaching Dr. Mitchell in such a manner, Calle reasoned, "would prevent the District

Attorney's office from proving the crime beyond a reasonable doubt." (T: 86.) Although he contends that Calle's cross-examination of Dr. Mitchell proved inadequate, Rivas concedes that Calle was "correct that impeaching [his] credibility, as the lead prosecution witness," would preclude the government from proving its case. (*See* Dkt. No. 92, Attach. 1 at 29.)

Calle's cross-examination of Dr. Mitchell largely achieved its desired effect. After Dr. Mitchell testified on direct examination that he considered it "more likely that [Valerie] died on Friday night, to possibly very early Saturday morning," Calle received from him a concession that it was "probably" fair to say that Valerie being killed on Friday was "on the outside edge of a possibility." (T: 890, 895-907.) Calle also elicited testimony from Dr. Mitchell that, during his 1992 grand jury testimony, he had "possibl[y]" characterized Friday as being on the outside edge of possibility. (T: 907.) Additionally, although Calle did not attack the scientific basis of Dr. Mitchell's findings, he cross-examined him on the topic of rigor mortis, and elicited testimony that, on average, and absent variables, rigor mortis disappears, or is disappearing, within twenty-four to forty-eight hours of death, and that, when he examined Valerie at approximately 3:30 P.M. on

Monday, she was in full rigor.  (T: 902-06.)

In an attempt to bolster his alibi and impeachment strategies, Calle also attempted to cast doubt on the prosecution's theory of the case by pointing to evidence that Valerie may have been alive on Saturday.  In his opening statement, he pointed to the return of Valerie's library book on Saturday or Sunday, as well as to the recanted statement to police by Susan Stonecipher that she last saw Valerie alive in the basement of their residence on Saturday morning.  (T: 85-86.)  Calle subsequently called Susan Stonecipher as a witness to highlight for the jury the change in her story.  (T: 921-32.)

As the cases discussed above make clear, analysis of the reasonableness of Calle's decision to limit his investigation to the facts and strategies detailed above, and forego further inquiry into the issue of time of death, requires consideration of the criticality of that issue.  *See, e.g.*, *Showers*, 635 F.3d at 633.  Rivas argues that, had Dr. Mitchell's findings as to time of death "been subjected to *any* meaningful challenge[,] the prosecution would not have been able to meet its burden to prove guilt." (Dkt. No. 92, Attach. 1 at 24.)  This assertion is based largely on Rivas' contention that "the time of death[, as estimated by Dr. Wecht,] occurred at

a time when [he] had a very strong alibi." (*Id*.)  Were this contention true, and a narrowed time of death as critical an issue as Rivas contends, Calle's actions may well have been objectively unreasonable.  Even if Rivas employed an expert who reached the same conclusions as Dr. Wecht, however, and those conclusions were credited fully, the time of death would simply be limited to sometime between 3:30 P.M. on Saturday and 11:30 A.M. on Monday, but "more likely" sometime in the early morning hours of Sunday.[26]  (*See* Dkt. No. 56, Attach. 2 at 20, 23.) Contrary to Rivas' contention, limiting the time of death to this later period would not foreclose his involvement in the murder, and may in fact have

---

[26] After reciting Dr. Wecht's opinion that "'the length of time between the death of Valerie . . . and the time she was found was less than [forty-eight] hours, *and more likely less than* [*thirty-six*] *hours*,'" the Second Circuit summarized that opinion as placing the most likely time of death "between 3:30 p.m. on Saturday, March 28, and 3:30 a.m. on Sunday, March 29," *Rivas*, 687 F.3d at 528.  It is clear from Dr. Wecht's affirmation, however, that, despite his references to the time that Valerie was "found," the time frame which he articulates is based upon Dr. Mitchell's examination of Valerie at approximately 3:30 P.M. on Monday, March 30.  (Dkt. No. 56, Attach. 2 at 20.)  Based on that starting point, Dr. Wecht concluded that "it is **highly unlikely** that [Valerie] was dead before the previous [thirty-six] hours, which would be in the early morning of Sunday." (Dkt. No. 56, Attach. 2 at 20, 23.)  Specifically, Dr. Wecht's opinion places the most likely time of Valerie's death at some point after 3:30 A.M. on Sunday.  (*See id*.)  In light of Rivas' largely corroborated alibi until approximately 4:00 A.M. on Sunday, and his uncorroborated whereabouts in the hours that followed, this is not a trivial distinction.

proved a risky strategy.

While Rivas' argument that he had a "very strong alibi" during the narrowed time frame offered by Dr. Wecht is true of Saturday night, Brennan's testimony established that Rivas was, by his own account, alone during a large portion of Sunday, beginning at 4:00 A.M. (T: 243). Thus, while Rivas' alibi for Friday evening is partially corroborated, his whereabouts in the hours after 4:00 A.M. Sunday morning—during which time Dr. Wecht opined that Valerie was most likely killed—are entirely without corroboration. (*See* Dkt. No. 56, Attach. 2 at 23.) Furthermore, while Calle argued generally in his opening statement to the jury that Valerie was alive on Saturday, and therefore could not have been killed on Friday, and bolstered this argument by impeaching Dr. Mitchell's credibility and highlighting his findings on rigor mortis, to offer Dr. Wecht's estimation would have presented the risk of fixing the jury's attention on a time frame during which, by his own account, Rivas' whereabouts could not be corroborated. *See Richter*, 131 S. Ct. at 790 ("Although courts may not indulge *post hoc* rationalization for counsel's decisionmaking that contradicts the available evidence . . . neither may they insist counsel confirm every aspect of the strategic basis for his or her actions." (internal

quotation marks and citation omitted)).

As discrediting Dr. Mitchell would not narrow the time of death to a period during which Rivas could not have committed the murder, so too would it fail to alleviate the considerable circumstantial evidence suggesting his involvement in Valerie's death.  To summarize, despite Rivas' claim to Brennan that his last visit to Valerie's apartment occurred at approximately 6:00 P.M. on Friday, and that he went directly from Coleman's in Syracuse to Albert's in Cazenovia that night, (T: 240-42), Cassano placed him at Liquor Square in Syracuse between 9:30 and 10:00 P.M., with a receipt indicating that a sale matching Cassano's description of Rivas' purchase occurred at 9:40 P.M., (T: 497-500).  Crimi and Susan Stonecipher testified that they saw Rivas parked in front of Valerie's apartment sometime between 11:00 P.M. and 1:00 A.M., and Crimi recalled specifically that Rivas was smoking a cigarette.  (T: 532-33, 535, 936.)

Both David Hill and Mark Brosh indicated that Rivas smoked Barclay cigarettes, and officer David Phinney found "numerous packs of Barclay cigarettes . . . as well as a large number of Barclay butts" in Rivas' garbage.  (T: 151, 275, 463.)  When police examined Valerie's apartment

after her death, they discovered an ashtray which bore Rivas' fingerprints, (T: 592-93), and which contained two Carlton-brand cigarettes—the same brand smoked by Randall Hill, who admitted to smoking in the apartment and disposing of at least one cigarette butt in an ashtray after finding his daughter's body, (T: 105-07, 127-28)—and five Barclay cigarettes, (T: 656). Although Rivas told Brennan that he was last in Valerie's apartment at approximately 7:00 P.M. on Thursday, March 26, David Hill, Frio, and Lewis testified that Valerie was very neat in her housekeeping, with David Hill adding that she cleaned her home on "almost a daily basis," and Frio noting that she typically cleaned her ashtray shortly after it was used. (T: 150, 750-51, 762.)

Furthermore, Rivas admitted to Brennan that, in the two months between the end of his relationship with Valerie and her murder, he had stopped at her residence nearly every single day in an attempt to see her, and that when she was not home he would sometimes wait for her or leave her notes. (T: 245-46.) Lewis confirmed Rivas' near-daily attempts to see Valerie. (T: 767.) This behavior continued up until Friday when Rivas admitted to stopping at Valerie's apartment twice within a four hour span. (T: 240-41.) Despite this pattern, Rivas told Brennan that he had made no

effort to contact Valerie on Saturday and Sunday, though he was unable to offer an explanation for this abrupt deviation from his normal pattern.  (T: 246-57.)

When police arrived at Rivas' door after the murder and asked to speak with him regarding Valerie—the woman with whom he was so enthralled that he called, wrote, or visited nearly every day—he appeared "very nervous," but did not ask what had happened to her, nor did he ask any such questions in the ensuing twenty-five-minute ride with police to Syracuse, nor in the hours-long interview that followed.  (T: 237-39.)  When Rivas was finally told, approximately two hours after his interview with police began, that Valerie was dead, he had "no reaction."  (T: 247-48.)  A subsequent search of Rivas' home on Monday evening revealed a torn letter wrapped in newspaper in his garbage can that bore the salutation, "Hi, Bob," and opened with the same two sentences as a letter which was sent by Valerie to Lucas, her former boyfriend.  (T: 311-12, 675.)  In Rivas' bedroom closet, police found a shrine of sorts, comprised of two burning candles, a plate with some change in it, and a photograph of Valerie resting against the base of a "rather large statue of the Virgin Mary."  (T: 272-73, 315-16.)  In the basement of Rivas' home, police found, hung over

a clothesline, a wrinkled, damp, gray Members Only jacket of the same style and make as that worn by Rivas on Friday night. (T: 275.)

Finally, Fields testified that, one or two weeks after Valerie's murder, he spoke with Rivas at Albert's. (T: 815-16.) Through tears, Rivas, who was "quite drunk," said "Valerie, Valerie, I didn't mean to do it." (T: 817.) After picking up his head and seeing Fields, Rivas "instantly stopped crying." (T: 817.)

In addition to circumstantial evidence relating to Valerie's murder, the jury also heard damning character evidence. Principally, Mark Brosh testified that Rivas was arrested for beating up Sarah Hamlin, a former girlfriend, and that Hamlin had since moved out of Central New York because, he guessed, she wanted to get away from Rivas. (T: 481-83.)

The scope of the ultimate question before the court bears repeating. The doubly deferential standard governing *Strickland* review under AEDPA requires that the court "determine what arguments or theories supported or . . . could have supported[] the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court." *Richter*, 131 S. Ct. at 786. Although, as Calle

admits, it would have likely benefitted the defense to consult or call a pathologist to refute the findings and testimony of Dr. Mitchell, to do so would not have been without risk. It is evident that Calle's decision not to consult or hire a pathologist was premised on a belief that the prosecution's case against Rivas could be sufficiently undermined through alibi evidence and the impeachment of Dr. Mitchell's credibility, and that, in electing that course, Calle first investigated the facts of the case. (440: 85-86, 94-95.) In doing so, he utilized conversations with Rivas, record evidence provided by the prosecution, grand jury testimony, and physical investigation, but stopped short of seeking facts or opinions regarding the scientific validity of Dr. Mitchell's findings. (440: 85-86, 94-95; Dkt. No. 55, Attach. 2 at 42; T: 77-85.)

The court need not specifically determine whether Rivas' decision to forego consultation with a forensic pathologist was objectively reasonable, but rather whether County Court's conclusion as to its sufficiency, itself, involved an unreasonable application of *Strickland*. *See Cornell*, 665 F.3d at 375. Because the court finds that it did not, Rivas' ineffective assistance of counsel claim relating to Calle's failure to consult with or hire a forensic pathologist is without merit.

### 6. *Failure to Use* Brady *Material*

Rivas' final allegation of ineffective assistance is raised in the alternative.  Although Rivas argues principally that a number of exculpatory documents were withheld from Calle by the prosecution, he contends that, if Calle possessed the documents, his failure to utilize them contributed to the ineffectiveness of his representation.  (*See* Dkt. No. 97 at 8.)  The predicate finding necessary to trigger consideration of this claim occurred above when the court determined that County Court's denial of Rivas' *Brady* claim was not unreasonable.  The factual finding underlying County Court's determination was not, however, that Calle was provided the *Brady* documents, but rather that Rivas' proof was insufficient to discharge his burden of showing by a preponderance of the evidence that the documents had not been provided to the defense.  (440: 135-38.)  As County Court noted in its decision, under the preponderance standard, "[i]f the evidence is equally balanced or if it leaves the trier of fact in such doubt as to be unable to decide the controversy either way[,] judgment must be given against the party upon whom the burden of proof rests."  (440: 138.)  Although County Court's reliance on the preponderance standard, as opposed to an affirmative finding that the documents were received by

Calle, leaves open the possibility that the evidence was equally balanced, the court nevertheless assumes for the sake of addressing Rivas' present argument that Calle possessed the *Brady* materials before and during trial.

Based on a supplemental request submitted by Rivas, County Court addressed this alternative claim in its written decision. (*See* Dkt. No. 56, Attach. 5 at 31-32.) After reviewing the *Brady* documents, County Court determined that "while many of the disputed documents contained information which might have been used to [Rivas'] advantage, and may have raised questions, none of them standing alone, or even all of them together, were of such a nature that the use of the evidence would have resulted in a different verdict." (*Id*. at 32.) Because County Court limited its discussion of this claim to a determination that Calle's purported failure to utilize the *Brady* documents did not result in prejudice, the court's analysis of that decision deals primarily with that prong of *Strickland*. It bears noting, however, that "counsel's decision as to whether to call specific witnesses—even ones that might offer exculpatory evidence—is ordinarily not viewed as a lapse in professional representation." *United States v. Best*, 219 F.3d 192, 201-02 (2d Cir. 2000) (internal quotation marks and citation omitted); *see Greiner*, 417 F.3d at 323.

Although the documents in question may have been advantageous to Rivas' defense, County Court's determination that Calle's failure to use them did not result in prejudice was not an unreasonable application of *Strickland*. *See* 466 U.S. at 696 (holding that, in analyzing the prejudice prong, a court must "consider the totality of the evidence before the judge or jury").  The first category of *Brady* material, which Rivas argues shows that Valerie died on Saturday night, includes a report from one of Valerie's neighbors that she heard a dog bark and a car pull away at a high rate of speed at 11:00 P.M. on Saturday, (*see* Dkt. No. 56, Attach. 2 at 82), and a voluntary affidavit from another woman who lived down the street from Valerie stating that she heard a woman's scream "at about 12:30 [A.M.] or 1:00 [A.M.]," (Dkt. No. 56, Attach. 2 at 54; *see* Dkt. No. 14, Attach. 3 at 31-32).  A jury may well have assigned diminished weight to one or both of these reports because, although Rivas argues that they are "consistent with the murder of [Valerie] occurring on Saturday night" (Dkt. No. 14, Attach. 3 at 32), they are in conflict temporally with one another.  They are also contradicted by considerable circumstantial evidence suggesting that Valerie died late Friday or early Saturday.  For example, Valerie was last seen alive on Friday evening, she was found in a nightshirt and bathrobe

with a heating blanket still turned on in her bedroom, and had a .03 percent BAC when she died.  (T: 868, 571-72, 616, 868, 885-86.)  Although these facts appear innocuous in isolation, they appear far less so coupled with Karen Stonecipher's testimony that one of Valerie's cats was in the apartment's back hallway on Saturday morning, which she found "[v]ery unusual," because Valerie's "cats were never out," (T: 404), and the fact that the mileage on Valerie's vehicle suggested that it was not driven after she returned home from dinner with her father Friday evening, (T: 190, 210, 319.)  Furthermore, despite having plans to visit Adams, her college roommate, in Saratoga Springs on Friday night or Saturday morning, Valerie uncharacteristically failed to contact Adams to notify her that she would not be arriving.  (T: 216-220, 774-75.)  With the exception of one busy signal on Friday, the numerous telephone calls placed by Adams to Valerie between Friday afternoon and Sunday went unanswered.  (T: 221-23.)

As for the second category of *Brady* material—reports which Rivas insists suggest that "there were others possessed of motives to harm [Valerie]," (Dkt. No. 14, Attach. 3 at 33)—any benefit that the defense may have received by the jury learning about the five men detailed in these

reports would likely be minimal in light of the lack of evidence tying any one of them to the crime, and the considerable circumstantial evidence pointing to Rivas.  As the Second Circuit noted in *Rivas*, 687 F.3d at 546, while these documents "might suggest that the police failed to pursue other leads in the investigation," they "do[] not compellingly point to Rivas'[] innocence."  One group of reports suggest that Valerie was romantically involved with someone other than Rivas in the days before her death. (*See* Dkt. No. 56, Attach. 2 at 102, 104.)  None of these reports, however, indicate that the purported relationship between this unnamed love interest and Valerie was tumultuous, and, given the prosecution's concerted effort to portray Rivas as a jealous ex-boyfriend, the introduction of such evidence could be equally as damning as beneficial.  Also identified in the reports cited by Rivas were a local cabdriver who was rumored to have performed "unknown acts" to neighborhood youths, (*id*. at 100), a male co-worker of Valerie's who was transferred after she reported his odd behavior towards women, (*see id*. at 84), and a man who was acquainted with Valerie who left town with a woman and another man on Monday, March 30, 1987 on an unplanned trip to "Color[a]do, Californ[ia], or possibly out of the country," (*id*. at 98).  Although Rivas argues that "the very existence of

all of these additional suspects would have damaged the prosecution's case," the tenuous connection which each of these individuals to Valerie, and the lack of evidence beyond their being mentioned to the police, would likely have a minimal impact on the jury's verdict in light of the considerable circumstantial evidence implicating Rivas.  (Dkt. No. 14, Attach. 3 at 35); *see Strickland*, 466 U.S. at 694.

The last individual identified in the reports which Rivas places in the second category of *Brady* material is the son of Donald and Karen Stonecipher.[27]  (*See* Dkt. No. 14, Attach. 3 at 33-34.)  Together, multiple reports indicate that, prior to Valerie living in the apartment on Hickok Avenue, the Stonecipher's son was convicted of petit larceny of that apartment.  (*See* Dkt. No. 56, Attach. 2 at 86-96.)  The tenant at the time of the petit larceny told police that the Stonecipher's son would occasionally walk across the home's front porch and past her apartment, and that she believed he did so "just to see if he could observe anything in her

---

[27] It should be noted that the Stoneciphers have two sons, Donald, Jr., and David.  (T: 347.)  Although the name of the son in question is redacted in the reports provided, it is clear that, at the time of Valerie's murder, he resided in Solvay, New York, a suburb of Syracuse.  (Dkt. No. 56, Attach. 2 at 87.)  As such, it does not appear that the son about whom Rivas argues is the same son that was dropped off at 250 Hickok Avenue by Donald Stonecipher on Friday night.  (T: 347, 356.)

apartment." (*Id*. at 95.)  Although she felt uneasy about this behavior, she ignored his actions and told police that they were infrequent enough that she did not consider them to be a major or threatening problem.  (*See id*.) The reports indicate further that police questioned both the Stonecipher's son and his girlfriend regarding his whereabouts during the weekend of Valerie's murder.  (*See id*. at 86-88.)  Although he admitted to passing his parents home in transit on Saturday, the Stonecipher's son told police that he did not call or visit his parents during the weekend in question.  (*See id*.) With the exception of the daytime hours of Saturday, during which she was working, the Stonecipher's son's girlfriend confirmed his whereabouts throughout the weekend.  (*See id*.)  A separate report indicates that a former schoolmate of the Stonecipher's son spoke with him in front of 248-250 Hickok Avenue on Monday after Valerie was discovered.  (*See id*. at 91.)  After interviewing both the Stonecipher's son and his girlfriend, the investigator who authored the report concluded that "it appear[ed he was] being truthful about his whereabouts during this time period."  (*Id*. at 88.)

Despite the conclusion of the interviewing investigator regarding the veracity of the Stonecipher's son, Rivas contends that "he provided the police with an inconsistent alibi," and that the fact that the police

interviewed him at all would have been a valuable impeachment tool against Donald, Karen and Susan Stonecipher as it provided them with a "strong motive to hone the case against [Rivas]." (Dkt. No. 14, Attach. 3 at 33.) Given the apparent brevity of the police's interest in the Stonecipher's son as a possible suspect, however, the likely value of that interest as a means of impeaching his parents and sister is minimal. Furthermore, the Stoneciphers' testimony was not especially prone to such impeachment. For instance, although the times at which Donald and Karen Stonecipher respectively placed Rivas on Hickok Avenue on Friday afternoon differ from Rivas' own recounting to Brennan, Rivas nevertheless admitted that he stopped at Valerie's apartment twice that afternoon. (T: 240-41, 351, 400-01.) Furthermore, Susan Stonecipher's testimony that Rivas was parked in front of Valerie's home at some time between 11:00 P.M. and 1:00 A.M. on Friday night was corroborated by Crimi. (T: 532-33, 535, 936.) Although Susan Stonecipher's changed recollection of seeing Valerie on Friday morning as opposed to Saturday morning would ordinarily be ripe for impeachment on bias grounds, she provided police with her corrected affidavit on Wednesday, April 1, 1987, four days before the police asked to interview her brother. (T: 926-35; Dkt. No. 56, Attach. 2

at 86.)

The third category of *Brady* material includes various reports which Rivas claims show "internal inconsistencies in the prosecution's proof." (Dkt. No. 14, Attach. 3 at 36.)  Rivas points first to two police reports which detail conversations with four individuals who patronized Albert's on Friday night.  (*See id*. at 37.)  The first interviewee recalled seeing Rivas at Albert's upon her arrival at approximately 11:30 P.M., while the second patron saw Rivas at Albert's on Friday, but was unsure whether it was between 6:15 P.M. and 10:00 P.M., or shortly after 11:00 P.M.  (*See* Dkt. No. 56, Attach. 2 at 109-10.)  The third patron interviewed was similarly unsure of the time at which she saw Rivas at Albert's, recalling only that he was there when she arrived at the bar between 11:00 P.M. and 12:30 A.M. (*See id*. at 111.)  The final interviewee told investigators that, when he arrived at Albert's between 11:30 P.M. and midnight, Rivas was already there.  (*See id*. at 112.)  Rivas argues that these reports refute Crimi's alleged sighting of him in front of Valerie's apartment between 11:00 P.M. and midnight.  (*See* Dkt. No. 14, Attach. 3 at 37.)

While Rivas is correct that the reports raise questions about Crimi's time line, the ambiguity in the interviewees' recollections would have

permitted the jury to conclude that the testimony of Crimi and Susan Stonecipher was neither "mistaken or patently false," as both stated that they could have seen Rivas in front of Valerie's apartment as early as 11:00 P.M. (*Id.*; T: 532-33, 535, 936.) Furthermore, placing Rivas at Albert's shortly after 11:00 P.M. on Friday would still leave at least an hour and a half gap between the latest time that Mark and Lori Brosh testified he could have left Coleman's, (T: 470-71, 486-87), and would do nothing to refute Cassano's testimony that Rivas purchased liquor at Liquor Square in Syracuse shortly before 10:00 P.M., (T: 497).

Next, Rivas points to two reports which he claims contradict the testimony of Reynolds. (*See* Dkt. No. 14, Attach. 3 at 37-38.) The first report details an interviewee's recollection that Rivas arrived at her home on Friday around 4:30 P.M., driving his red van, in order to retrieve plumbing tools. (*See* Dkt. No. 14, Attach. 3 at 37.) In addition to contradicting Reynolds' testimony, Rivas claims that this report would have suggested to the jury that, "contrary to [the prosecution's] theory of the case, [he] did not, in fact, stalk [Valerie] in the days before her death." (*Id.* at 37.) Even if Reynolds' testimony was contradicted, the jury would have had little doubt that Rivas visited Valerie's apartment on Friday, as he

admitted to Brennan to having done so twice.  (T: 240-41.)  Donald

Stonecipher also saw Rivas sitting in his red van in front of Valerie's

apartment for at least twenty minutes beginning around 3:45 P.M. on

Friday, while Karen Stonecipher saw his red van parked on Hickok Avenue

between 2:00 P.M. and 3:00 P.M. that same afternoon.  (T: 350-52, 401-

02.)  The limited effect of contradicting Reynolds' testimony similarly

diminishes the prejudicial impact of Calle's failure to cross-examine him on

a police report which indicated that he "could not remember seeing anyone

meetin[g] the description given by" the investigator.  (Dkt. No. 56, Attach. 2

at 127.)  Further limiting the effect the latter report would likely have had on

the jury is the fact that the questioning of Reynolds by the investigator

appears to be tailored specifically to his recollection of Sunday morning.

(*See id*.)

   The next report in the third category of *Brady* material details

investigators' attempts to match the lot numbers on the bottle of Bacardi

rum recovered from Valerie's apartment with the bottle purchased at Liquor

Square on Friday night.  (*See* Dkt. No. 14, Attach. 3 at 38; Dkt. No. 56,

Attach. 2 at 118-19.)  Although Rivas argues that the report indicates "that

the lot numbers did not match," that is not an entirely accurate

characterization.  (Dkt. No. 14, Attach. 3 at 38.)  Instead, the report indicates that there were two possible distributors that could have provided Liquor Square with the type of rum in question, and that one distributor was able to confirm that it had not shipped that type of rum to Liquor Square that year, while the other distributor was only able to rule out having shipped that type of rum to Liquor Square in the preceding two months–March or April of 1987.  (*See* Dkt. No. 56, Attach. 2 at 118-19.) While the report may have helped Rivas, particularly in light of Cassano's suggestion on cross-examination that the police had matched the bar code with Liquor Square's tape register receipt, (T: 518), Cassano admitted both on direct and cross-examination that he could not say that the bottle recovered by police was the same bottle purchased from Liquor Square, and that the bottle in evidence "could have been purchased anywhere," (T: 500-01, 517-18).  Furthermore, beyond his testimony regarding the type of rum purchased by Rivas, Cassano identified Rivas at trial as the man who arrived at Liquor Square between 9:30 P.M. and 10:00 P.M. on Friday, a time period during which Rivas told Brennan he was at Coleman's.  (T: 242, 501-02.)

As with the previous discussion of the objective reasonableness of

Calle's trial strategy, the court need not determine whether, but for Calle's failure to utilize the *Brady* material, "there is a reasonable probability that . . . the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. Instead, it must determine whether County Court's conclusion that Calle's failure to use that material did not result in such prejudice constituted an unreasonable application of *Strickland*. *See Cornell*, 665 F.3d at 375. For the reasons articulated above, and upon consideration of both the *Brady* documents specifically addressed by Rivas, and those left unaddressed, County Court's holding did not involve an unreasonable application of *Strickland*.[28]

As noted at the outset, while the court has discussed Rivas' individual allegations of ineffective assistance of counsel individually, it has considered these arguments "in the aggregate." *Lindstadt*, 239 F.3d at

_____

[28] It appears as though Rivas may also be arguing that, in addition to failing to utilize *Brady* material, Calle was ineffective for failing "to maintain any adequate document storage or retention." (Dkt. No. 92, Attach. 1 at 18, 26.) Rivas notes that County Court did not specifically address this claim in its September 8, 2000 decision. (*See id.*) As County Court's determination that Rivas did not suffer prejudice as a result of Calle's failure to use the *Brady* material did not involve an unreasonable application of *Strickland*, Rivas' ineffective assistance claim complaining of the way in which those documents were stored is similarly unavailing. *See Johnson*, 133 S. Ct. at 1094.

199.  Analyzing these allegations, as the court must, under the "doubly deferential" standard created by *Strickland* and AEDPA, *Knowles*, 556 U.S. at 123, the state court decisions challenged by Rivas were not "based on an unreasonable determination of the facts in light of the evidence," nor did they "involve[] an unreasonable application of[] clearly established Federal law," 28 U.S.C. § 2254(d).  Habeas relief is therefore denied as to Rivas' ineffective assistance of counsel claim.

## C.    Remaining Grounds for Relief

In his Amended Petition, Rivas raises three other grounds that warrant discussion.  (*See* Am. Pet. ¶ 12(A), (C), (D).)  Notably, Rivas makes absolutely no arguments in his post-Amended Petition supplemental briefs regarding these issues.[29]  Instead, he indicates summarily by footnote that the claims raised by him, but not addressed, remain pending before the court.  (Dkt. No. 92, Attach. 1 at 1 n.1; Dkt. No. 97 at 1 n.1.)  His claims are supported only by Schuman's affidavit and the

---

[29] Particularly glaring is Rivas' failure to make any arguments regarding his remaining claims tailored to the § 2254(d) standard.  During oral argument, counsel informed the court that, despite the lack of briefing, Rivas was continuing to pursue those grounds.  (Dkt. No. 103 at 16-17.)

memorandum of law that was attached to the Amended Petition.  (*See* Dkt. No. 14, Attach. 3 at 8-48.)  In any event, none of the remaining claims warrant habeas relief.

      1.    *Newly Discovered Evidence*

The first of the remaining grounds, related to newly discovered evidence, can be summarized as follows: evidence that did not come to light until after trial shows that Dr. Mitchell "provided false and misleading testimony," was under investigation "for the gross abuses of his position" as medical examiner, and his "conclusions as to time of death defied any verifiable and accepted scientific method" as shown by Dr. Wecht's opinion.  (Dkt. No. 14, Attach. 3 at 25-30.)  According to Rivas, all of these things show the knowing use of false testimony by the prosecution, which goes to "the heart of due process."  (*Id.* at 26, 30.)

On the first point, Rivas claims that Dr. Mitchell's testimony regarding "brain slides" and his examination of Valerie's brain was false and misleading because brain slides never existed, and Dr. Mitchell did not himself examine the brain.  (*See id.* at 26.)  Moreover, Dr. Wecht has opined that "Dr. Mitchell's report was unsound and that his conclusions were reached in contravention of accepted scientific methods in his field."

115

(*Id.* at 26-27.)  As to the second point—that Dr. Mitchell grossly abused his position—Rivas claims that a series of newspaper articles uncovered after trial demonstrate that Dr. Mitchell unlawfully disposed of body parts and organs.  (*See id.* at 27.)  Bluntly, Rivas asserts that Dr. Mitchell intentionally "fix[ed] the time of death at a time for which [Rivas] possessed a less readily demonstrable alibi defense" in order to ingratiate himself with the District Attorney and avoid prosecution for his own misdeeds.  (*Id.* at 30.)  Finally, Rivas concedes that "[t]he information concerning the absence of brain slides and [Dr. Mitchell]'s blatant disregard for accepted scientific method was arguably discoverable at trial," but urges the court to find that Calle's ineffectiveness prevented him from discovering these facts sooner.  (*Id.* at 27-28.)

As a threshold issue, the court notes that Rivas raised this newly discovered evidence issue in support of his § 440.10 motion by claiming, albeit generically, that he "was denied the fair trial and due process protections guaranteed to him by the . . . Federal Constitution."  (Dkt. No. 56, Attach. 3 at 1.)  County Court's denial of that motion, therefore, constitutes an adjudication of the constitutional claim on the merits.  *See Francolino v. Kuhlman*, 365 F.3d 137, 141 (2d Cir. 2004).  Accordingly, the

116

claim is reviewed under the standard set forth in AEDPA, and not *de novo*.
*See id.* As noted above, to apply AEDPA to County Court's presumed
merits adjudication, this court "must determine what arguments or theories
. . . could have supported[] the state court's decision; and then it must ask
whether it is possible fairminded jurists could disagree that those
arguments or theories are inconsistent with the holding in a prior decision
of th[e Supreme] Court." *Richter*, 131 S. Ct. at 786. Turning to the legal
framework applicable to this contention, it is important to stress that
"federal habeas corpus relief does not lie for errors of state law." *Estelle v.
McGuire*, 502 U.S. 62, 67 (1991) (quoting *Lewis v. Jeffers*, 497 U.S. 764,
780 (1990)). Specifically, decisions of New York courts that evidence is
not newly discovered in the meaning of N.Y. Crim. Proc. Law
§ 440.10(1)(g) on an independent state law basis do not give rise to
habeas review. *See Savinon v. Mazucca*, 318 F. App'x 41, 43 (2d Cir.
2009). "A claim 'based on newly discovered evidence ha[s] never been
held to state a ground for federal habeas relief absent an independent
constitutional violation occurring in the underlying state criminal
proceeding.'" *Ortega v. Duncan*, 333 F.3d 102, 108 (2d Cir. 2003) (quoting
*Herrera v. Collins*, 506 U.S. 390, 400 (1993)). Thus, the success of Rivas'

claim depends on whether he has made out a violation of due process based upon the District Attorney's alleged use of false and misleading testimony from the lips of Dr. Mitchell.

"'[A] conviction obtained by the knowing use of perjured testimony is fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury.'" *Drake v. Portuondo*, 553 F.3d 230, 241 (2d Cir. 2009) (quoting *United States v. Agurs*, 427 U.S. 97, 103 (1976)). On the other hand, "there is no clearly established Supreme Court holding [to] support[ a] claim that the alleged unknowing use of perjured testimony at trial by the prosecution constitutes a due process violation." *Richardson v. Lord*, 7 F. App'x 1, 2 (2d Cir. 2001).

It is clear from County Court's decision that the newly discovered evidence branch of Rivas' motion was expressly decided on independent state law grounds. Indeed, the court found that the supportive evidence was not newly discovered, and could have been located with due diligence, which, on its own, required denial of that portion of the motion under N.Y. Crim. Proc. Law § 440.10(1)(g). (*See* Dkt. No. 56, Attach. 5 at 2-14.) Viewing the issue in its constitutional dimension, as is required on habeas

review, County Court also made some determinations that bear on the issue now before this court. In particular, County Court determined that Dr. Mitchell's testimony regarding the existence of brain slides and his examination of Valerie's brain was not shown by Rivas to be false, (*see id*. at 7-12), nor did the evidence of misconduct go to Dr. Mitchell's propriety in conducting autopsies or testifying in trials, (*see id.* at 12-14). County Court did not specifically pass upon the now-pertinent question of whether the District Attorney knowingly relied upon false testimony to convict Rivas.

County Court's factual determinations, which establish that, at least in some ways, Dr. Mitchell's testimony was not fabricated, were not unreasonable in light of the record before it. More importantly, however, is that Rivas failed to establish that the District Attorney knew that Dr. Mitchell's testimony was false, or, as he puts it, "knowingly adduce[d] perjured testimony." (Dkt. No. 14, Attach. 3 at 30.) The evidence of record belies that conclusory allegation, and ultimately compels a finding adverse to Rivas on this claim. Before explaining how Rivas' claim is contrary to the record evidence, it is imperative to pare away the dead wood from his bogus contention.

To believe Rivas' arguments, one must first accept that Dr. Mitchell

"alter[ed] his initial conclusions as to time of death" years after the homicide occurred. (*Id.* at 26.) Rivas assumes that the March 30 search warrant application—which was not authored or signed by Dr. Mitchell, but nonetheless expresses that his "preliminary estimate on the time of Death of the Victim . . . was sometime [S]aturday the 28th of March afternoon, and [S]unday morning the 29th of March 1987"—fixes Dr. Mitchell's original opinion as stated in the application. (Dkt. No. 56, Attach. 2 at 49-50.) A note recorded in connection with the medical examination of Valerie's body on March 30 between 5:30 and 7:45 P.M., and bearing Dr. Mitchell's initials, contrarily states that Valerie's body "was there app[roximately] 2-3 days." (*Id.* at 72.) It is not clear when on March 30 Timothy Phinney drafted the search warrant application, but another officer testified that the search warrant itself was in the hands of the police around 9:30 or 10:00 P.M. that same day. (T: 270.)

The next fallacy in Rivas' argument involves his assertion that Dr. Mitchell must have been lying about his review of "brain slides" because none ever existed. (Dkt. No. 14, Attach. 3 at 26.) In fact, Dr. Mitchell never used the term "brain slides"; on redirect examination, the District Attorney, in an attempt to rehabilitate Dr. Mitchell regarding his opinion as

to the time of death, asked if prior to trial, but after testifying before the grand jury, he observed some decomposition in the brain while reviewing his "slides." (T: 915.) Dr. Mitchell responded: "Yes, sir." (T: 915.) It was not until the prosecution's summation that the District Attorney referred to the "slides" as "autopsy sectional slides of the brain." (T: 915, 1083.) That assumption by the District Attorney is wrongly attributed to Dr. Mitchell by Rivas. As opposed to attempting to intentionally dupe the jury, it is just as likely that Dr. Mitchell assumed that the District Attorney, a medical layman, was referring in his question on redirect to the photographs eventually produced by the prosecution. Nor is it outside the realm of possibility that Dr. Mitchell, understanding the District Attorney's question to imply tissue sectional slides, was simply mistaken about their existence and his review of them in this case.[30] Other equally probable explanations abound.

_____

[30] Notably, the testimony of Dr. Wecht that "[o]ne does not use the word slide synonymously with a photograph," is outside of the scope of the evidence that was presented to County Court. (DEPH: 27.) No such assertion was made in the affidavit of Dr. Wecht, which was before County Court. (*See* Dkt. No. 56, Attach. 2 at 17-23.) Moreover, for the same reasons already explained, Dr. Wecht's testimony would have any value only if it was clear that Dr. Mitchell ascribed the same meaning to the term "slides" that the District Attorney did during his summation.

Returning to whether the District Attorney's use of supposedly false testimony was knowing, the theories that could have supported County Court's decision are not inconsistent with Supreme Court precedent. *See Richter*, 131 S. Ct. at 786. As pertinent here, other than Rivas' bald assertion that the District Attorney nefariously encouraged or demanded that Dr. Mitchell opine that Valerie could have been killed on Friday to fit the prosecution's theory, (*see* Dkt. No. 14, Attach. 3 at 30), there is no actual evidence to suggest that the District Attorney, in fact, suborned perjury. Furthermore, Rivas' contention, as supported by Dr. Wecht's affidavit, that Dr. Mitchell's opinion as to time of death was scientifically infirm, (*see id.* at 28-29), cannot show that the District Attorney, untrained in medicine, knew that Dr. Mitchell was falsely testifying in that regard. Thus, because fairminded jurists could disagree about the correctness of County Court's determination as to whether Rivas established that the District Attorney knowingly used false testimony, habeas relief is inappropriate as to this ground. *See Richter*, 131 S. Ct. at 786.

2.    *Trial Court Assumed the Role of Prosecutor*

The second ground yet to be discussed pertains to Rivas' claim that he was denied a fair trial by the trial court's assumption of the role of

prosecutor.  (*See* Am. Pet. ¶ 12(C).)  The factual predicate for this claim is

that "the defense was sandbagged by the presiding judge in an off-the-

record conference between the [District Attorney] and the Court" wherein

the trial judge intentionally "delayed the timely production of . . .

exculpatory material [regarding Morgan] from the defense until the close of

the case."  (Dkt. No. 14, Attach. 3 at 40-43.)  Relying on his assertion that

an improper conversation occurred, Rivas also claims that the trial court

later made "a false record regarding the timing of the disclosure."  (*Id.* at

41.)  Rivas contends that the trial court's alleged misconduct shows actual

prejudice that required recusal to ensure a fair trial.  (*See id.* at 42.)[31]

Finally, in the event that the court finds ambiguity in the record regarding

judicial misconduct by the trial judge, Rivas asks the court "to order a

hearing so that a supplemental record may be produced on this key

question of constitutional deprivation."  (*Id.* at 42-43.)

Before analyzing the state court's holding under § 2254(d), it is

_____

[31] For reasons unknown to this court, Rivas cites *Liteky v. United States*, 510 U.S. 540 (1994), in support of his assertion that recusal was necessary in this case.  (*See* Dkt. No. 14, Attach. 3 at 42.)  In *Liteky*, the Court passed upon the requirements for recusal under 28 U.S.C. § 455(a), which pertains to federal judges, not the constitutional parameters of any "judge's qualifications to hear a case" as would apply in habeas litigation such as this.  *See Bracy v. Gramley*, 520 U.S. 899, 904 (1997).

important to outline the record evidence that bears on this issue.  After the prosecution's opening statement, but before defendant's opening, the following exchange occurred on the record:

> "[DISTRICT ATTORNEY]:    Judge, while the jury is coming in, I'm going to offer to Mr. Calle a two-page report dated April 18th, 1987, and a one-page report dated May 27th, '87, relating to a Joseph Morgan and the information we talked about earlier.
>
> THE COURT:                    Can I see you, Mr. D.A., before you do that?
>
> [DISTRICT ATTORNEY]:    Before I do --
>
> THE COURT:                    Well, bring these people in.  Would you bring in the jury?"

(T: 65.)  The reports referenced by the District Attorney were attached to Rivas' § 440.10 motion as Exhibits 6 and 7.  (*See* Dkt. No. 56, Attach. 2 at 58-62.)  After that exchange, the jury was brought into the courtroom and Calle gave an opening statement.  (T: 65-66.)  On the sixth day of trial, after the prosecution rested, the District Attorney disclosed the Morgan affidavit, identified in the § 440.10 motion papers as Exhibit 8, (*see* Dkt. No. 56, Attach. 2 at 63-64), which led the trial court to offer Rivas options about how he wanted to proceed in light of the clearly exculpatory evidence as described in the discussion of the *Brady* claim above.  (T: 944, 947-48.)

The only testimony regarding this issue at the evidentiary hearing before County Court was that of the District Attorney. He explained that the police reports, identified as Exhibits 6 and 7, were disclosed during trial at the time he announced his intention to disclose them. (440: 106-07, 116.) The District Attorney was not certain about whether he even spoke with the trial judge, but said that, if he did, Calle would have been present and he may have given Calle the reports at that time. (T: 117.)

Here, County Court determined that Rivas failed to show that an off-the-record conversation ever occurred, let alone its content. (*See* Dkt. No. 56, Attach. 5 at 16.) The court also explained that no purpose would be served by holding an evidentiary hearing on the issue inasmuch as Rivas had not identified anyone with knowledge of the alleged conversation. (*See id.* at 17.) Finally, the issue of prejudice arising from untimely disclosure was already decided by the Fourth Department on direct appeal, reasoned County Court, and the appellate tribunal found that the untimely disclosure of *Brady* material did not deprive Rivas of a fair trial. (*See id.* at 17-18.) That ruling, according to County Court, made irrelevant the alleged occurrence of a discussion wherein the trial judge dissuaded the District Attorney from making a timely disclosure. (*See id.* at 18-19.)

"[T]he floor established by the Due Process Clause clearly requires a 'fair trial in a fair tribunal,' before a judge with no actual bias against the defendant or interest in the outcome of his particular case." *Bracy v. Gramley*, 520 U.S. 899, 904-05 (1997) (quoting *Withrow v. Larkin*, 421 U.S. 35, 46 (1975)). "A trial judge's intervention in the conduct of a criminal trial would have to reach a significant extent and be adverse to the defendant to a substantial degree before the risk of either impaired functioning of the jury or lack of the appearance of a neutral judge conducting a fair trial exceeded constitutional limits." *Daye v. Attorney Gen. of N.Y.*, 712 F.2d 1566, 1572 (2d Cir. 1983). While *Daye* involved questioning by the trial judge that was detrimental to the defendant, it has been applied more broadly and generically to instances of claimed judicial partiality or bias. *See Francolino*, 365 F.3d at 142-44. As the Second Circuit explained in *Francolino*, whether presented in terms of partiality or excessive judicial intervention, the issue on habeas review "is better cast in terms of prejudice resulting from" the judge's "conduct at trial." *Id.* at 144. Accordingly, habeas relief is "not the vehicle for rectifying these constitutional concerns" unless actual prejudice is shown. *Id.* at 143.

Bearing in mind *Daye* and *Francolino*, as well as the evidence before

County Court, its adjudication of Rivas' claim that he was denied a fair trial because of the trial judge's misconduct in preventing timely disclosure of *Brady* material was not unreasonable. Indeed, other than pure speculation, Rivas cannot point to any evidence that would support the occurrence of any conversation between the trial judge and District Attorney. Accordingly, there is no basis upon which a court could find that the trial court improperly inserted itself in the trial. *Cf. Francolino*, 365 F.3d at 142; *Daye*, 712 F.2d at 1572. Moreover, the Fourth Department's well-reasoned ruling regarding the untimely disclosure of *Brady* material, including those that underpin this argument, demonstrates the absence of actual prejudice to Rivas. For all of these reasons, County Court's handling of this claim was not unreasonable.

3. *Trial Court Failed to Recuse*

Lastly, Rivas claims—in a two-page argument devoid of any legal authority cited in support—that he was denied a fair trial by the trial judge's failure to recuse. (*See* Am. Pet. ¶ 12(D).) As argued by Rivas, the trial judge had a close, "quasi-familial" relationship with the District Attorney—which he failed to disclose to Calle, who was not familiar with the upstate New York legal community—that required his recusal, or, in the

alternative, disclosure to the defense.  (*See* Dkt. No. 14, Attach. 3 at 43-44.)  Specifically, Rivas alleges that the trial judge was godparent to the District Attorney's child, and that, while his recusal would be voluntary, the judge's assumption of the role of prosecutor, as discussed above, shows actual bias to Rivas.  (*See id.*)  Further, Rivas argues that, in the absence of actual bias, recusal was required because he "should not have to live with the nagging suspicion that his conviction was preordained by the joining of a judge and prosecutor who were close friends, if not allies."  (*Id.* at 44.)

"The Supreme Court has recognized only a few circumstances in which an appearance of bias necessitates recusal to ensure due process of law."  *Greenway v. Schriro*, 653 F.3d 790, 806 (9th Cir. 2011).  Generally speaking, recusal is required "when 'the probability of actual bias on the part of the judge or decisionmaker is too high to be constitutionally tolerable.'"  *Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868, 872 (2009) (quoting *Withrow*, 421 U.S. at 47).  As that rule is applied to the facts of this case, it cannot be said that County Court unreasonably denied Rivas' § 440.10 motion as it relates to recusal.

There are several holes in Rivas' spurious argument.  Particularly, he

has not provided any support for the "quasi-familial" relationship that he claims existed, nor has he shown bias by the trial judge. As discussed above, *see supra* Part IV.C.2, the supposed off-the-record discussion has no basis in fact. County Court's ruling was premised upon, among other things, the lacking evidence of favoritism or bias. (*See* Dkt. No. 56, Attach. 5 at 19-21.) Frankly, Rivas failed to show any probability of actual bias, let alone an amount that would be constitutionally intolerable. For these reasons, the state court's adjudication of this claim was also reasonable.

## V. Conclusion

WHEREFORE, for the foregoing reasons, it is hereby

**ORDERED** that Rivas' Amended Petition (Dkt. No. 14) is **DISMISSED** and his application for a writ of habeas corpus is **DENIED**; and it is further

**ORDERED** that the Clerk provide a copy of this Memorandum-Decision and Order to the parties.

**IT IS SO ORDERED.**

August 6, 2013
Albany, New York

Gary L. Sharpe
Chief Judge
U.S. District Court